1
2
3
4
5
6

Rosemary M. Rivas (State Bar No. 209147)
rrivas@finkelsteinthompson.com
Mark Punzalan (State Bar No. 247599)
mpunzalan@finkelsteinthompson.com
**FINKELSTEIN THOMPSON LLP**
100 Bush Street, Suite 1450
San Francisco, California 94104
Telephone: (415) 398-8700
Facsimile: (415) 398-8704

7
8

Attorneys for Individual and Representative
Plaintiff Lindsay Kamakahi

9

[Additional Counsel Listed on Signature Page]

10

## UNITED STATES DISTRICT COURT

11

## NORTHERN DISTRICT OF CALIFORNIA

12
13
14
15
16
17
18
19
20

| | |
|---|---|
| LINDSAY KAMAKAHI, an individual, on behalf of herself and all others similarly situated, <br><br> Plaintiff, <br><br> vs. <br><br> AMERICAN SOCIETY FOR REPRODUCTIVE MEDICINE; SOCIETY FOR ASSISTED REPRODUCTIVE TECHNOLOGY, <br><br> Defendants. | Case No. 3:11-CV-1781 SBA <br><br> **FIRST AMENDED CLASS ACTION COMPLAINT** <br><br> **DEMAND FOR JURY TRIAL** |

21
22

Plaintiff Lindsay Kamakahi ("Plaintiff"), based upon personal knowledge, information, belief, and the investigation of counsel, alleges as follows:

23

## NATURE OF THE ACTION

24
25
26
27
28

1. This action challenges, as *per se* illegal under Section 1 of the Sherman Act, a horizontal price fixing agreement among purchasers of human egg donor services ("Donor Services"). As described more fully herein, Donor Services consist of the time, inconvenience, labor, and discomfort incurred by women who agree to supply their own human eggs for assisted fertility and reproductive procedures ("AR Eggs").

2.      Specifically, in 2000, Defendant American Society for Reproductive Medicine ("ASRM") promulgated certain rules setting forth the maximum compensation its members should pay for Donor Services ("Maximum Price Rules"), and Defendant Society for Assisted Reproductive Technology ("SART") adopted the Maximum Price Rules.

3.      ASRM, SART, and SART-member fertility clinics ("SART Clinics") agreed amongst themselves to follow the Maximum Price Rules, as did agencies serving such clinics.  Their agreement constitutes a contract, combination, and conspiracy in restraint of trade that is a *per se* violation of the Sherman Act.

4.      This action is brought as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a plaintiff Class, defined more fully below, consisting of all women who sold Donor Services directly to a member of the Defendant Class (defined below) during the Class Period defined below. ("Plaintiff Class").

5.      This action is brought against defendants SART and ASRM, both in their individual capacities and as representatives of a Defendant Class, defined more fully below, consisting of ASRM, SART, and all SART Clinics and all AR Egg agencies (other than those who purchased Donor Services in Indiana) that were either signatories to an agreement to abide by the Maximum Price Rules or otherwise agreed to adhere to such rules, and that paid for Donor Services during the Class Period ("Defendant Class").

**JURISDICTION AND VENUE**

6.      The Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1337 (commerce and antitrust regulation), as this action arises under Section 1 of the Sherman Act, 15 U.S.C. § 1, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.  The Court also has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(d), in that this is a class action in which the matter or controversy exceeds the sum of $5,000,000, exclusive of interest and costs, and in which some members of the proposed class are citizens of a state different from the Defendants.

CLASS ACTION COMPLAINT

7.     Venue is proper because Defendants reside, are found, have agents, and transact business in this District as provided in 28 U.S.C. § 1391(b) and (c) and in Sections 4 and 12 of the Clayton Act, 15 U.S.C. §§ 15 and 22.

8.     The Court has personal jurisdiction over Defendants because, *inter alia*, they: (a) transacted business throughout the United States, including in this District; (b) had substantial contacts with the United States, including in this District; and (c) were engaged in an illegal anticompetitive scheme that was directed at and had the intended effect of causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.

## PARTIES

9.     Plaintiff Lindsay Kamakahi sold Donor Services directly to a SART-member clinic located and doing business in this District during the Class Period.

10.    Defendant American Society for Reproductive Medicine ("ASRM") is an organization "devoted to advancing knowledge and expertise in reproductive medicine." ASRM membership is multidisciplinary and consists of medical professionals and corporations located throughout the United States.  It has its headquarters at 1209 Montgomery Highway, Birmingham, Alabama 35216-2809 and has a public relations office in Washington, DC.  It is incorporated in California.  A central function of ASRM's Ethics Committee is the publication of "ethics reports" setting forth certain ethical standards for reproductive professionals, and a central function of ASRM's Practice Committee is to promulgate guidelines and standards to be followed by reproductive professionals.  It is being sued on its own behalf and as a class representative on behalf of the Defendant Class defined below.

11.    Defendant Society for Assisted Reproductive Technology ("SART") is an affiliated society to ASRM.  It bills itself as the "primary organization of professionals dedicated to the practice of assisted reproductive technologies in the United States."  According to its website, SART's members include over 392 practices (including many in this District), representing over 85% of the clinics engaged in the practice of assisted reproductive technologies in the United States.  Many SART-member clinics in this District have paid SART money in exchange for having their name and address listed on SART's web page.  SART's mission is "to set and to help maintain the standards for assisted

- 3 -

CLASS ACTION COMPLAINT

reproductive technologies" including guidelines regarding ethical considerations, laboratory practice and proper advertising."  It has its headquarters at 1209 Montgomery Highway, Birmingham, AL 35216-2809, which is the same address as the ASRM's headquarters.  It is being sued on its own behalf and as a class representative on behalf of the Defendant Class defined below.

## CLASS ACTION ALLEGATIONS

### Plaintiff Class

12.     Plaintiff brings this action under Federal Rules of Civil Procedure 23(b)(2) and (b)(3) on her own behalf and on behalf of the following Plaintiff Class:

> All women who, at any time during the time period from April 12, 2007 to the present
> (the "Class Period"), sold Donor Services for the purpose of supplying AR Eggs to be
> used for reproductive purposes, within the United States and its territories, to any
> Defendant Class member (defined *infra*).

13.     The Plaintiff Class is so numerous, and its members so geographically dispersed throughout the United States, that joinder of all Plaintiff Class members would be impracticable. While the exact number of Plaintiff Class members is unknown at this time, Plaintiff believes that there are, at least, thousands of members of the Plaintiff Class and that their identities are contained in Defendants' books and records.

14.     Plaintiffs' claims are typical of the claims of the other members of the Plaintiff Class. Plaintiff and other members of the Plaintiff Class sold Donor Services at artificially low, non-competitive levels as a result of the actions of the Defendant Class and the restraint of trade alleged herein. Plaintiff and the members of the Plaintiff Class have all sustained damage compensable under federal antitrust law.

15.     Plaintiff will fairly and adequately protect the interests of the members of the Plaintiff Class and has retained counsel competent and experienced in class action and antitrust litigation.

16.     Defendants and the Defendant Class have acted or refused to act on grounds generally applicable to the Plaintiff Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

- 4 -

CLASS ACTION COMPLAINT

17.     Common questions of law and fact exist as to all members of the Plaintiff Class and predominate over any questions solely affecting individual members of the Plaintiff Class. Among the questions of law and fact common to the Plaintiff Class are:

      a.   Whether Defendants engaged in a contract, combination or conspiracy among themselves to fix, maintain, or stabilize the price of Donor Services purchased in the United States;

      b.   Whether the conduct of Defendants caused the prices of Donor Services to be artificially depressed;

      c.   Whether Defendants' conduct caused injury to the members of the Class and, if so, the proper measure of damages; and

      d.   Whether an injunction voiding the Maximum Price Rules should issue.

18.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all Plaintiff Class members is impracticable. The prosecution of separate actions by individual members of the Plaintiff Class would impose heavy burdens upon the courts and Defendants, and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Plaintiff Class. A class action would achieve substantial economies of time, effort and expense, and would assure uniformity of decision as to persons similarly situated without sacrificing procedural fairness.

### **Defendant Class**

19.     This action is brought under Federal Rules of Civil Procedure 23(b)(2) and (b)(3) against a Defendant Class consisting of:

ASRM, SART, and all SART-member Fertility Clinics and all AR Egg Agencies that agreed to comply with SART/ASRM rules on donor egg compensation and who paid for Donor Services at any time during the time period from April 12, 2007 to the present.. Excluded from the Defendant Class are all SART-member Fertility Clinics and AR Egg Agencies located in the state of Indiana.

20.     Both Defendants are Defendant Class Representatives.

21.     The Defendant Class is so numerous, and its members so geographically dispersed, that joinder of all members is impracticable.  There are hundreds of members of the Defendant Class located throughout the United States.

22.     All Defendant Class members were engaged in an illegal anticompetitive scheme that was directed at and had the intended effect of causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.

23.     Each Defendant Class Member demonstrates its membership in the Defendant Class by virtue of its membership in SART or, in the case of AR Egg Agencies, by agreeing to the Maximum Price Rules.

24.     Each Defendant Class Member is jointly and severally liable for the total damages caused by the Defendant Class.

25.     Defendants are typical of the Defendant Class.  Defendants have injured Plaintiffs and the Plaintiff Class by participating in the antitrust conspiracy alleged herein, as have all other Defendant Class members.

26.     Defendants will fairly and adequately protect the interests of the members of the Defendant Class.

27.     Common questions of law and fact exist as to all members of the Defendant Class and predominate over any questions solely affecting individual members of the Defendant Class.  Among the questions of law and fact common to the Defendant Class are:

a.   Whether Defendant Class Members engaged in a contract, combination or conspiracy among themselves to fix, maintain, or stabilize the price of Donor Services in the United States;

b.   Whether the conduct of Defendant Class Members caused the price of Donor Services to be artificially depressed; and

c.   Whether Defendant Class Members conduct caused injury to the members of the Plaintiff Class and, if so, the proper measure of damages.

CLASS ACTION COMPLAINT

28.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all Defendant Class members is impracticable. The prosecution of separate actions against individual Defendant Class members would impose heavy burdens upon the courts and Plaintiffs, and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Defendant Class.  A class action would achieve substantial economies of time, effort and expense, and would assure uniformity of decision as to persons similarly situated without sacrificing procedural fairness.

## RELEVANT MARKET

29.     Defendants' Maximum Price Agreement is *per se* illegal and requires no allegations of market definition.

30.     Plaintiffs also allege, in the alternative, that the Maximum Price Agreement is anticompetitive and illegal under the Rule of Reason.

31.     For purposes of the Rule of Reason, the Relevant Product Market is the market for the purchase of Donor Services.  The Defendant Class controls over 85% of the relevant product market.

32.     The Relevant Geographic Market is the United States.

## INTERSTATE TRADE AND COMMERCE

33.     The business activities of Defendants that are subject of this action were within the flow of, and substantially affected, interstate trade and commerce.

34.     During the Class Period, Defendants transacted business in multiple states in a continuous and uninterrupted flow of interstate commerce throughout the United States.

## FACTS

### Assisted Reproductive Eggs in the United States

### Background

35.     AR Eggs (also known as "oocytes") are a necessary component of human reproduction. There is no available substitute.

CLASS ACTION COMPLAINT

36.     While most AR Eggs are naturally produced by women who become pregnant, some are provided by females who provide Donor Services ("AR Egg Providers") by undergoing an extensive screening process and an administered cycle of hormones to medically induce ovulation.

37.     AR Eggs acquired from AR Egg Providers are used to enable women whose ovaries do not produce enough healthy eggs to become pregnant.

38.     AR Egg Providers go through a thorough screening and testing process before becoming eligible to provide their eggs.

39.     The screening process requires potential AR Egg Providers to first compile and disclose a detailed medical and psychological history about themselves and their close blood relatives, including questions about their use of cigarettes, alcohol, and both prescription and illegal drugs.

40.     AR Egg Providers are also required to have a physical examination, including a pelvic exam.  As a part of this exam, AR Egg Providers are screened for infectious diseases, including gonorrhea, chlamydia, syphilis, hepatitis B and C, HTLV-1, and HIV.  AR Egg Providers are also screened for inherited diseases and undergo psychological screening.

41.     In the event the potential AR Egg Provider passes the screening process, the AR Egg Provider must then go through the egg donation process.

42.     This requires the AR Egg Provider to receive a three-week course of painful hormone injections, aimed at stimulating egg production.  During this period, the donor cannot have unprotected sex, smoke, or drink alcohol, and must receive permission to take any other drugs.

43.     While receiving hormone treatment, AR Egg Providers must also receive frequent blood tests and ultrasound examinations to track the developing eggs and to monitor reaction to the hormones, thereby requiring frequent doctor visits.

44.     Short-term side effects during treatment include mood swings, fluid retention, and enlarged ovaries.  Occasionally, AR Egg Providers suffer serious side effects.

45.     When the eggs are ready for retrieval, they are removed from the AR Egg Provider's ovaries in a surgical procedure called *transvaginal ovarian aspiration*.  Following the procedure, the AR Egg Provider may require several days of restricted activity to recover.

CLASS ACTION COMPLAINT

**The Donor Services Market**

46.     Persons seeking to acquire AR Eggs do so through one of four means:

    a.   Through an individual donating for the benefit of a close friend or family member;

    b.   Through a full-service fertility clinic's ("Fertility Clinic") paid-provider recruitment program;

    c.   Through an egg-donor agency ("AR Egg Agency") that recruits through a paid provider program; or

    d.   Through a paid egg donor recruited directly by the person seeking to acquire the AR Eggs, either independently or through a broker, agent, or other intermediary.

47.     Since it is difficult (and frequently impossible) for an individual seeking AR Eggs to find a desirable person willing to provide Donor Services for no compensation, the majority of AR Eggs are acquired from women who are compensated for their services.

48.     Such payment is necessary to provide incentive for AR Egg Providers to go through the arduous process of providing AR Eggs.  Most Fertility Clinics and AR Egg Agencies actively recruit AR Egg Providers with the promise of compensation for their Donor Services, including the time, effort, discomfort, and health risks resulting from the medical procedures involved.

49.     The Donor Services market involves sales of approximately $80 million annually.

**Fertility Clinics and AR Egg Agencies Agree to Follow SART and ASRM Rules**

50.     The Donor Services market is largely self-regulated.  There are no federal laws or regulations governing economic compensation for Donor Services.  Plaintiff is aware of only two states with laws governing compensation for Donor Services: Louisiana, which bars such payments, and Indiana, which provides for a statutory cap on such payments.

51.     Assisted reproductive technology professionals agree to abide by ethical and professional standards promulgated by ASRM's Ethics Committee and ASRM's Practice Committee.  Indeed, all SART-member clinics must agree to abide by these standards as a condition of membership.  One commentator has noted this agreement "is intended to discourage any possible governmental legislation that would encumber the free practice US doctors now enjoy."

- 9 -

CLASS ACTION COMPLAINT

52.     SART, ASRM, and their member clinics openly admit that they have agreed to comply with ASRM's rules.  For example, a September 25, 2009 press release issued by ASRM noted that clinics who wish to become members of SART are "required to" agree to "[a]dhere to all standards and recommendations of the ASRM Practice Committee" and to "[a]dhere to all standards and recommendations of the ASRM Ethics Committee."

53.     Similarly, a "frequently asked questions" page on SART's web site notes that "SART members must agree to . . . abide by all practice, laboratory, ethical, and advertising guidelines" as part of SART's "rigorous requirements for membership."  These practice and ethical "guidelines" include the Maximum Price Rules.

54.     Moreover, SART sent a letter to certain AR Egg Agencies in February 2006 noting that Fertility Clinics must "comply with . . . ASRM and SART guidelines as a requirement of SART membership."

55.     SART-member clinics comprise approximately 85% of the assisted reproductive clinics in the United States.   One observer has noted that "[a]lmost uniformly, the major, mainstream IVF clinics are SART members and therefore 'SART compliant.'"

### The Illegal Agreement

### Background

56.     ASRM has long been concerned about the prices paid AR Egg Providers for AR Eggs used for reproductive purposes, and have promulgated ethical guidelines concerning such payments since at least 1994.

57.     Prior to 2000, ASRM's standards of practice merely stated that compensation for AR Donor Services "should not be so excessive as to constitute undue inducement" but neither organization had quantified a maximum (or indeed any) specific price.

### ASRM Promulgates an Artificially Low Fixed Price for Donor Services

58.     In 2000, ASRM, SART, and its members determined it would formally suppress the price paid to AR Egg Providers for Donor Services.

CLASS ACTION COMPLAINT

59.     Thus, in 2000, ASRM's Ethics Committee promulgated a report entitled "Financial Incentives in Recruitment of AR Egg Providers." ("2000 Maximum Price Report").

60.     The 2000 Maximum Price Report specifically set forth the Maximum Price Rules, which reflect what ASRM believes Fertility Clinics and AR Egg Agencies should pay for Donor Services. That Report stated "at this time sums of $5000 or more require justification and sums above $10,000 go beyond what is appropriate."

61.     The rates set forth in the Maximum Price Rules were originally keyed to the market rates for sperm donation, i.e. by taking the average price a sperm donor receives for a donation, computing an hourly rate based on that price, and then multiplying that hourly rate by the number of hours it takes for an egg donor to donate eggs.  That number was then purportedly slightly adjusted upwards to account for the additional inconveniences of Donor Services.

62.     However, one commentator recently noted that Egg Donors receive an "average hourly compensation of between roughly $75 and $93 for time spent in a medical setting, ***about the same as hourly sperm donor rates***." (emphasis added).

63.     In 2007, ASRM reaffirmed the $5000 and $10,000 Maximum Price Rules in a report entitled "Financial Compensation of Oocyte Donors." ("2007 Maximum Price Report").

64.     The rates called for by the Maximum Price Rules have never increased in the ten years since they were initially promulgated.

65.     ASRM's Practice Committee has repeatedly issued rules requiring compliance with the Maximum Price Rules.

66.      For example, the ASRM Report entitled "2002 Guidelines for gamete and embryo donation" specifically noted that "[c]ompensation to the donor should be in compliance with the" maximum prices set forth in the 2000 Maximum Price Report.

67.     Similarly, ASRM's "2006 Guidelines for gamete and embryo donation" noted that "[c]ompensation to [AR Egg Providers] should be in compliance with the ASRM Ethics Committee report on the subject."

- 11 -

68.     ASRM's "2008 Guidelines for gamete and embryo donation" made an identical observation, i.e. that "[c]ompensation to [AR Egg Providers] should be in compliance with the ASRM Ethics Committee report on the subject."

## SART Member Fertility Clinics Agreed to the Fixed Price

69.     As previously mentioned, SART-member Fertility Clinics agree to "[a]dhere to all standards and recommendations" of ASRM's Practice and Ethics Committees as a requirement of their membership in SART.

70.     Consistent with this obligation, SART-member Fertility Clinics agreed to abide by the Maximum Price Rules.

71.     This agreement was memorialized in, *inter alia*, a 2006 letter from SART indicating that its members were required to agree to the Maximum Price Rules.

72.     A survey of approximately 375 websites of SART-member clinics found that of those that mentioned the price for donor services, all of them were at or under $10,000.

73.     Moreover, certain SART-member Fertility Clinics and AR Egg Agencies admit their agreement to the Maximum Price Rules on their websites.

74.     For example, Defendant Class Member Pacific Fertility Center's web site noted during the Class Period that "[b]ecause of [its] continued efforts to practice medicine within guidelines set forth by ASRM and SART, egg donors participating in our program will NOT be paid above $10,000 per cycle."

## AR Egg Agencies Serving SART Member Fertility Clinics Agreed to the Fixed Price

75.     As some SART-member Fertility Clinics procure AR Eggs from AR Egg Agencies, AR Egg Agencies serving SART-member Fertility Clinics have also agreed to comply with the Maximum Price Rules.

76.     In May 2005, SART sent a letter to independent AR Egg Agencies informing them that all AR Egg Agencies serving SART-member clinics were expected to agree to comply with the Maximum Price Rules, and requesting those agencies sign an agreement to abide by those rules and inform the SART-member clinics with whom they worked of their agreement.  In exchange, AR Egg

CLASS ACTION COMPLAINT

Agencies signing the agreement would be listed on SART's web site, and their names would be provided to two national infertility organizations (RESOLVE and the American Fertility Organization) to provide information to patients seeking guidance in their efforts to locate AR Egg Agencies.

77.     Many AR Egg Agencies did so, including many in this District.

78.     In February 2006, SART sent a second letter to AR Egg Agencies.  This letter first noted that SART clinics agreed to comply with the Maximum Price Rules as a requirement of SART membership.  It then noted that the names of AR Egg Agencies who had signed the agreement to comply with the Maximum Price Rules had been posted on SART's website and again requested the AR Egg Agencies sign such an agreement.  The letter also noted that a failure to comply with the Maximum Price Rules would result in removal of their agencies from the list of SART-approved donor programs.

79.     In March 2011 ASRM's web site contained a document listing the names and addresses of all AR Egg Agencies that had signed an agreement to comply with the Maximum Price Rules.  It is attached hereto as Attachment A and contains the following text:

The egg donor agencies listed below have signed an agreement with the Society for Assisted Reproductive Technology (SART) that they do and will abide by the American Society for Reproductive Medicine (ASRM) Ethics and Practice committees' guidelines governing . . . *financial compensation of oocyte donors*.

(emphasis added)

80.     In March 2011, SART's web site contained a similar list, attached hereto as Attachment B and prefaced by text reading:

The egg donor agencies listed below have signed an agreement with the Society for Assisted Reproductive Technology (SART) that they do and will abide by the American Society for Reproductive Medicine (ASRM) Ethics and Practice committees' guidelines governing . . . *financial compensation of oocyte donors*.

(emphasis added).

81.     AR Egg Agencies acknowledge this agreement.

CLASS ACTION COMPLAINT

82.     For example, AR Egg Agency and Defendant Class Member ConceiveAbilities, Inc. noted on its web site that "ConceiveAbilities strictly adheres to the guidelines as established by the American Society for Reproductive Medicine (asrm.org) which state egg donor compensation more than $10,000 is unethical.  Simply stated, a reputable agency will adhere to the guidelines and those that don't should be viewed with extreme skepticism."

83.     AR Egg Agency and Defendant Class Member Tiny Treasures, LLC's web site noted that it "adheres to ASRM guidelines" and that "[c]ompensation requests may not exceed $10,000 per the guidelines set forth by the American Society for Reproductive Medicine."

84.     AR Egg Agency and Defendant Class Member Conceptual Options' web site noted that "[w]e abide by all ASRM and SART guidelines . . . A single donor will not be paid more than $5000 without written justification and payments of $10,000 or more are not appropriate."

85.     AR Egg Agency and Defendant Class Member The Donor Source noted on its web site that it "is compliant with all regulations and standards set forth by the American Society for Reproductive Medicine," which would necessarily include the Maximum Price Rules.

86.     AR Egg Agency and Defendant Class Member The Stork Society's web site noted "[t]he ASRM guideline states that, 'Total payments to donors in excess of $5,000 require justification and sums above $10,000 are not appropriate.' Donors will NOT be paid over $10,000 under any circumstance."

87.     AR Egg Agency and Defendant Class Member Beverly Hills Egg Donation's web site noted "in compliance with ASRM/SART Guidelines, donor fees start at $6500, but will never be more than $9500."

88.     AR Egg Agency and Defendant Class Member Peas in a Pod, Inc. noted on its web site that "[o]ur agency prides itself in adhering to the ASRM's guidelines."

89.     The web site of San Diego Fertility Center's AR Egg Agency and Defendant Class Member (Egg Donor for You) notes that "[e]gg donor[s] are paid compensation based on American Society of Reproductive Medicine guidelines."

CLASS ACTION COMPLAINT

90.     AR Egg Agency and Defendant Class Member A Perfect Match's web site notes that "[w]e abide by all ASRM and SART guidelines regarding financial compensation of oocyte donors."

91.     AR Egg Agency and Defendant Class Member Circle Surrogacy notes that it "complies with ASRM guidelines for egg donation compensation."

92.     AR Egg Agency and Defendant Class Member Heartfelt Egg Donation's web site states it "has signed an agreement with the Society for Assisted Reproductive Technology (SART) that states that we will abide by the American Society for Reproductive Medicine (ASRM) Ethics Committee Guidelines governing the payment of egg donors. The guidelines pertaining to appropriate donor compensation specifically state: 'Total payments to donors in excess of $5,000 require justification and sums above $10,000 are not appropriate.' Donors will not be compensated over $10,000 under any circumstance"

93.     AR Egg Agency and Defendant Class Member Asian Egg Donation LLC's web site states its "suggested compensation for Donors is $6000-$8000. Compensation requests may not exceed $10,000 per the guidelines set forth by the American Society for Reproductive Medicine (ASRM)."

94.     AR Egg Agency and Defendant Class Member Fertility Resources of Houston LLC's web site states that it "has agreed to be responsible for providing services in accordance with," among other things, the Minimum Price Rules.

95.     AR Egg Agency and Defendant Class Member Prime Genetics, LLC's web site states that it "strictly complies with ASRM guidelines on Egg Donor compensation. Most Egg Donors are compensated $5000 for their time, inconvenience, discomfort and other related services. ASRM guidelines require justification for compensation paid in excess of $5000 and prohibits compensation over $10,000 under any circumstance."

96.     AR Egg Agency and Defendant Class Member Heartfelt Egg Donation's web site notes that it "has signed an agreement with the Society for Assisted Reproductive Technology (SART) that states that we will abide by the American Society for Reproductive Medicine (ASRM) Ethics Committee Guidelines governing the payment of egg donors."

CLASS ACTION COMPLAINT

**Fertility Clinics and AR Egg Agencies' Compliance with the Maximum Price Agreement Has Suppressed the Price of Donor Services**

97.     SART-member Fertility Clinics and AR Egg Agencies serving SART-member clinics have successfully suppressed the price of Donor Services to prices within the range set by the Maximum Price Rules.

98.     Indeed, a 2007 survey performed for SART reported that SART-member Fertility Clinics paid an average of $4,217 for AR Eggs per donor cycle, while AR Egg Agencies serving SART-member Fertility Clinics paid an average of $5,200 per donor cycle.

99.     An article recounting the results of that survey was published in the journal Fertility and Sterility.  That article noted "the vast majority of clinics" are following the Maximum Price Rules.

100.    Defendant Class Members' agreement to comply with the Maximum Price Rules violates the antitrust laws.  Indeed, one commentator has made the following observation:

> This naked price-fixing of egg donor compensation is so unusual in the modern U.S.
> regulatory environment of unrestrained competition that the most intriguing question it
> raises is not whether it violates the Sherman Act—under existing precedent it does.
> Rather, the relevant question is how, given the government's substantial enforcement
> resources and the presence of an active and entrepreneurial plaintiffs' bar, this buyers'
> cartel has managed to survive unchallenged since at least 2000.

**ANTITRUST INJURY**

101.    During the Class Period, Plaintiff and the members of the Plaintiff Class sold Donor Services to Defendant Class members in the United States.

102.    Plaintiff and members of the Class have suffered injury of the type that the antitrust laws are designed to punish and prevent.  The price-fixing agreement eliminated price competition among SART member clinics in the procurement of Donor Eggs, a necessary component in the provision of AR Services.

103.    By collectively agreeing to maintain artificially low supply prices for Donor Eggs, Defendant Clinics have been able to reap anti-competitive profits for themselves.  Plaintiff and the

CLASS ACTION COMPLAINT

members of the Egg Donor Class have been injured by the absence of a competitive market for the supply of Donor Eggs because they have been paid less for Donor Services than they would have been paid absent the Maximum Price Rules.  Plaintiffs and the members of the Class were injured and financially damaged in their businesses and property, in amounts that are not presently determined.  As the direct victims of Defendants' antitrust violations, Plaintiffs are efficient enforcers of the antitrust claims made herein.

104.    As set forth above, the average hourly rate Egg Donors receive for Donor Services is approximately the same as the hourly rate received by sperm donors.  Since the process of donating eggs is far more painful and risky than is the process for donating sperm, a price paid for Donor Services that does not account for those difference must be artificially low.

## COUNT ONE

### SHERMAN ACT SECTION ONE (15 U.S.C. § 1)

### Maximum Price Fixing

105.    Plaintiffs reallege each allegation set forth above, as if fully set forth herein.

106.    Defendants have entered into a *per se* maximum price fixing agreement, in violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.

107.    In the alternative, if evaluated under the Rule of Reason, the Maximum Price Agreement is an unreasonable restraint of trade in violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.

108.    In formulating and effectuating the Maximum Price Agreement, Defendants engaged in anti-competitive activities, the purpose and effect of which were to artificially suppress the price paid to Class Members for Donor Services.  These activities include the following:

      a.    agreeing to pay certain prices for Donor Services and otherwise fix, raise, maintain, and/or stabilize the prices of Donor Services; and

      b.    paying certain prices for Donor Services, thereby fixing the price of Donor Services at the agreed-upon rates.

109.    The illegal combination and conspiracy alleged had the following effects, among others:

- 17 -

CLASS ACTION COMPLAINT

a. price competition in the pricing for the purchase of Donor Services for reproductive uses and, consequently, the price of such purchases has been restrained, suppressed, or eliminated;

b. prices paid by Defendants for Donor Services for reproductive purposes has been fixed, raised, maintained, and/or stabilized at artificially low, non-competitive levels by the fixing of prices of Donor Services;

c. payments received by Class Members for Donor Services for reproductive purposes has been fixed, raised, maintained, and/or stabilized at artificially low, non-competitive levels by the fixing of prices of Donor Services; and

d. Class Members have been deprived of the benefit of free and open competition.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that:

A. The Court certify the Plaintiff Class and appoint Plaintiff as Plaintiff Class Representative.

B. The Court certify the Defendant Class and appoint Defendants as Defendant Class Representatives.

C. Defendants be adjudged to violate Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.

D. The Court declare the Maximum Price Rules to be unlawful and null and void.

E. Judgment be entered for Plaintiff and members of the Plaintiff Class against Defendants and the Defendant Class for three times the amount of damages sustained by Plaintiff and the Plaintiff Class, together with the costs of the action, including reasonable attorneys' fees, and such other relief as is appropriate.

F. Defendants, their affiliates, successors, transferees, assignees, and the officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf, be permanently enjoined and restrained from, in any manner, continuing, maintaining, or renewing the contract, combination, or conspiracy alleged herein, or from engaging in any other contract, combination, or conspiracy having similar purpose or

CLASS ACTION COMPLAINT

effect, and from adopting or following and practice, plan, program, or device having a similar purpose or effect.

G.     Plaintiffs and the members of the Plaintiff Class have such other, further, and different relief as the case may require and the Court may deem just and proper under the circumstances.

DATED: Thursday, June 23, 2011            **FINKELSTEIN THOMPSON LLP**


By: /s/ Rosemary M. Rivas
         Rosemary M. Rivas

Mark Punzalan
100 Bush Street, Suite 1450
San Francisco, California 94104
Telephone: (415) 398-8700
Facsimile: (415) 398-8704

Douglas G. Thompson
dthompson@finkelsteinthompson.com
Michael G. McLellan
mmclellan@finkelsteinthompson.com
**FINKELSTEIN THOMPSON LLP**
1050 30th Street NW
Washington, DC 20007
Telephone: 202-337-8000
Facsimile: 202-337-8090

Bryan Clobes
bclobes@cafferyfaucher.com
Ellen Meriwether
emeriwether@caffertyfaucher.com
**CAFFERY FAUCHER LLP**
1717 Arch Street, Suite 3610
Philadelphia, PA 19103
Telephone: 215-864-2800
Facsimile: 215-864-2810

Counsel for Individual and Representative
Plaintiff Lindsay Kamakahi

CLASS ACTION COMPLAINT