Rosemary M. Rivas (State Bar No. 209147)
rrivas@finkelsteinthompson.com
Mark Punzalan (State Bar No. 247599)
mpunzalan@finkelsteinthompson.com
**FINKELSTEIN THOMPSON LLP**
100 Bush Street, Suite 1450
San Francisco, California 94104
Telephone: (415) 398-8700
Facsimile: (415) 398-8704

Attorneys for Individual and Representative
Plaintiff Lindsay Kamakahi

[Additional Counsel Listed on Signature Page]

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LINDSAY KAMAKAHI, an individual, on behalf of herself and all others similarly situated, | Case No. 3:11-CV-1781 SBA |
| Plaintiff, | **PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED CLASS ACTION COMPLAINT** |
| vs. | |
| AMERICAN SOCIETY FOR REPRODUCTIVE MEDICINE; SOCIETY FOR ASSISTED REPRODUCTIVE TECHNOLOGY, | Date:        **November 15, 2011**<br>Time:        **1:00 p.m.**<br>Courtroom: **1, 4th Floor** |
| Defendants. | **Judge:        Hon. Saundra B. Armstrong** |

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

# **TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION AND SUMMARY OF ARGUMENT ............................................. 1

II.     FACTS ........................................................................................................... 2

III.    STANDARDS OF LAW .................................................................................... 4

      a.      Standards of Law on a Motion to Dismiss ........................................... 4

      b.      Standards of Antitrust Analysis ........................................................... 4

IV.     DEFENDANTS' MOTION TO DISMISS ............................................................ 6

V.      PLAINTIFF ALLEGES A PER SE VIOLATION OF THE ANTITRUST LAWS ...................... 7

      a.      The Maximum Price Rules Are A Price Fixing Agreement ................................. 7

      b.      Courts Consistently Judge Price Fixing Agreements Between Professionals Under the Per Se Standard ........................................................................................ 7

      c.      Defendants' Attempt to Overcome the *Per Se* Rule Fails................................. 11

      d.      Defendants' Purported Procompetitive Justifications do not Justify Applicability of the Rule of Reason Standard ......................................................................... 12

VI.     DEFENDANTS' MOTION NECESSARILY FAILS UNDER THE QUICK LOOK DOCTRINE ........................................................................................................... 13

      a.      The Quick Look Doctrine does not Require Market Analysis ........................... 13

      b.      Defendants' Justifications for the Maximum Price Rules are Counter to Law and Economically Flawed ................................................................................ 14

VII.    IN THE ALTERNATIVE, PLAINTIFF ADEQUATELY ALLEGES A VIOLATION OF THE ANTITRUST LAWS UNDER THE RULE OF REASON...................................... 18

      a.      Plaintiff Properly Alleges Relevant Product and Geographic Markets............................ 18

         i.      Plaintiff's Product Market is Adequately Defined ................................ 18

         ii.     Plaintiff's Geographic Market is Adequately Defined............................... 21

i

b.   Plaintiff Properly Alleges Market Power ............................................ 22

VIII.   CONCLUSION ............................................................................................. 23

TABLE OF CONTENTS

# TABLE OF AUTHORITIES

**Cases**                                                              **Page(s)**

*Advanced Health-Care Services, Inc. v. Radford Cmty. Hosp.,*
910 F.2d 139 (4th Cir. 1990) .................................................................... 6, 14

*Allied Tube & Conduit Corp. v. Indian Head, Inc.,*
486 U.S. 492 (1988) ...................................................................................... 12

*Amarel v. Connell,*
102 F.3d 1494 (9th Cir. 1996) ..................................................................... 23

*Ancar v. Sara Plasma,*
964 F.2d 465 (5th Cir. 1992) ..................................................................... 5, 7

*Arizona v. Maricopa County Med. Soc'y.,*
457 U.S. 332 (1982) ............................................................................... passim

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544 (2007) ........................................................................................ 4

*Big Bear Lodging Ass'n v. Snow Summit, Inc.,*
182 F.3d 1096 (9th Cir. 1999) ..................................................................... 21

*Brennan v. Concord EFS, Inc.,*
369 F. Supp. 2d 1127 (N.D. Cal. 2005). ............................................ 6, 14, 15, 16

*Cal. Dental Ass'n v. F.T.C.,*
526 U.S. 756 (1999) ...................................................................................... 12

*California ex rel. Harris v. Safeway, Inc.,*
2011 WL 2684942 (9th Cir. July 12, 2011) ......................................... 2, 5, 13

*Carter v. Variflex, Inc.,*
101 F. Supp. 2d 1261 (C.D. Cal. 2000) ......................................................... 5

*Catalano, Inc. v. Target Sales,*
446 U.S. 643 (1980) ...................................................................................... 11

*Craftsmen Limousine, Inc. v. Ford Motor Co.,*
363 F.3d 761 (8th Cir. 2004) ....................................................................... 17

*Datel Holdings Ltd. v. Microsoft Corp.,*
712 F. Supp. 2d 974 (N.D. Cal. 2010) .......................................................... 20

i

*Deutscher Tennis Bund v. ATP Tour, Inc.,*
610 F.3d 820 (3d Cir. 2010) ............................................................................ 13

*Erickson v. Pardus,*
551 U.S. 89 (2007) ............................................................................................ 4

*F.T.C. v. Superior Court Trial Lawyers Ass'n,*
493 U.S. 411 (1990) ................................................................................... passim

*Freeman v. San Diego Ass'n of Realtors,*
322 F.3d 1133 (9th Cir. 2003) .................................................................... 10, 15

*FTC v. Ind. Fed'n of Dentists,*
476 U.S. 447 (1986) ....................................................................... 11, 12, 16, 22

*General Cinema Corp. v. Buena Vista Distribution Co., Inc.,*
532 F. Supp. 1244 (C.D. Cal. 1982) ................................................................ 11

*Golden Gate Pharm. Svcs., Inc. v. Pfizer, Inc.,*
2010 WL 1541257 (N.D. Cal. Apr. 16, 2010) ................................................. 21

*Goldfarb v. Va. State Bar,*
421 U.S. 773 (1975) .......................................................................... 1, 8, 10, 11

*Gompper v. VISX, Inc.,*
298 F.3d 893 (9th Cir. 2002) ............................................................................ 4

*Graphics Prods. Distribs v. Itek Corp.,*
717 F.2d 1560 (11th Cir. 1983) ....................................................................... 22

*In re Ebay Seller Antitrust Litig.,*
2010 WL 760433 (N.D. Cal. Mar. 4, 2010) ..................................................... 23

*Johnson v. Riverside Healthcare System, LP,*
534 F.3d 1116 (9th Cir.2008) ............................................................................ 4

*Knevelbaard Dairies v. Kraft Foods, Inc.,*
232 F.3d 979 (9th Cir. 2000) .................................................................. 5, 7, 23

*Kreuzer v. American Academy of Periodontology,*
735 F.2d 1479 (D.C. Cir. 1984) ...................................................................... 17

*Law v. Nat'l Collegiate Athletic Ass'n,*
134 F.3d 1010 (10th Cir. 1998) ....................................................................... 18

*Lazy Y Ranch Ltd. v. Behrens,*
546 F.3d 580 (9th Cir.2008) ......................................................................... 4, 5

ii

TABLE OF AUTHORITIES

*Moore v. Boating Industrial Associations,*
    819 F.2d 693 (7th Cir. 1987) ................................................................... 17

*Nat'l Soc'y of Prof'l Eng. v. United States,*
    435 U.S. 679 (1978)................................................................... passim

*NCAA v. Bd. of Regents of Univ. of Oklahoma,*
    468 U.S. 85 (1984)................................................................... 13, 14

*Newcal Indus., Inc. v. Ikon Office Solution,*
    513 F.3d 1038 (9th Cir. 2008) ................................................................... 2, 19

*Paladin Associates, Inc. v. Montana Power Co.,*
    328 F.3d 1145 (9th Cir. 2003) ................................................................... 5

*Pecover v. Electronics Arts,*
    633 F. Supp. 2d 976 (N.D. Cal. 2009) ................................................................... 2, 3, 6, 18

*Reyn's Pasta Bella, LLC v. Visa U.S.A.,*
    259 F. Supp. 2d 992 (N.D. Cal. 2003) ................................................................... 7

*Shred-It Am., Inc. v. MacNaughton,*
    2011 WL 1842997 (D. Haw. May 13, 2011)................................................................... 21

*Sparling v. Daou,*
    411 F.3d 1006 (9th Cir. 2005) ................................................................... 4

*Tanaka v. Univ. of S. Cal.,*
    252 F.3d 1059 (9th Cir. 2001) ................................................................... 18, 20

*Todd v. Exxon Corp.,*
    275 F.3d 191 (2d Cir. 2001) ................................................................... 20

*TYR Sport Inc. v. Warnaco Swimwear Inc.,*
    679 F. Supp. 2d 1120 (C.D. Cal. 2009) ................................................................... 20

*United States v. Alston,*
    974 F.2d 1206 (9th Cir. 1992) ................................................................... 7, 9, 12, 13

*United States v. Brown University,*
    5 F.3d 658 (3d Cir. 1993) ................................................................... 9

*United States v. Grinnell Corp.,*
    384 U.S. 563 (1966)................................................................... 22

TABLE OF AUTHORITIES

*United States v. Kahan & Lessin Co.,*
    695 F.2d 1122 (9th Cir. 1982) ................................................................................... 13

*United States v. McKesson & Robbins, Inc.,*
    351 U.S. 305 (1956)............................................................................................... 8, 9

*United States v. Socony-Vacuum Oil Co.,*
    310 U.S. 150 (1940)................................................................................................... 8

*Wilk v. American Medical Association,*
    719 F.2d 207 (7th Cir. 1983) .................................................................................. 17

TABLE OF AUTHORITIES

1    Plaintiff hereby responds to the Motion to Dismiss ("MTD") filed by Defendants American

2    Society for Reproductive Medicine ("ASRM") and Society for Assisted Reproductive Technology

3    ("SART") (collectively referred to as the "Defendant Associations").[1]

4    **I.    INTRODUCTION AND SUMMARY OF ARGUMENT**

5    Defendants' Motion to Dismiss concedes that Plaintiff has adequately alleged a horizontal

6    agreement among ASRM, SART and the members of the Defendant Class of assisted reproduction

7    clinics to set the maximum price for Donor Services (defined *infra*).  MTD at 6.  The sole argument

8    advanced by Defendants in support of dismissal is their claim that Plaintiff has failed to allege that

9    agreement is illegal because the Complaint "contains only conclusory allegations defining the relevant

10   product and geographic markets at issue."  MTD at 1.

11   Because a plaintiff alleging a *per se* violation of the antitrust laws need not plead relevant

12   product or geographic markets, Defendants' argument rests on the false premise that price fixing

13   agreements are not *per se* illegal when carried out by professional organizations that claim to act for

14   charitable reasons.  The opposite is true.  It is well-settled that horizontal price fixing agreements are *per*

15   *se* illegal, even when conducted through a professional organization.  *See, e.g., Arizona v. Maricopa*

16   *County Med. Soc'y.*, 457 U.S. 332, 348 (1982); *see also* § V(b), *infra*.  This remains true, even when a

17   defendant association offers an ethical justification for the restraint because "[t]he social justifications

18   proffered for [a] restraint of trade . . . do not make it any less unlawful."  *F.T.C. v. Superior Court Trial*

19   *Lawyers Ass'n*, 493 U.S. 411, 424 (1990).  As a result, Defendants do not, and cannot, rely on decisions

20   that involve price-fixing in support of their "professional organizations" argument.  *See Goldfarb v. Va.*

21   *State Bar*, 421 U.S. 773, 786-87 (1975) (noting "the classic basis traditionally advanced to distinguish

22   professions from trades, businesses and other occupations . . . loses some of its force when used to

23   support . . . fee control activities.").  Indeed, the *per se* standard forecloses inquiry into the claimed

24   procompetitive justifications Defendants offer for their price fixing agreement.  *See* § V(d), *infra*.  Even

25   if inquiry into those procompetitive justifications were appropriate, their validity cannot be decided on a

26   motion to dismiss where the Court is required to take Plaintiff's allegations of anticompetitive effect as

27

28   [1]  References to Plaintiff's First Amended Complaint are in the form "¶ __."

---

1

1   true. *See* § III(b).

2   Defendants' argument that the *per se* standard is inappropriate leads them to the conclusion that

3   the rule of reason governs Plaintiff's claims. This not only ignores the clear application of the *per se*

4   analysis, but also wholly ignores the alternative "quick look" mode of analysis, which is typically

5   utilized to evaluate horizontal restraints by professional associations when those restraints are not

6   subject to the *per se* rule. *See, e.g., Nat'l Soc'y of Prof'l Eng. v. United States*, 435 U.S. 679, 696

7   (1978). Under that standard – which does not require a "detailed market analysis," but rather involves a

8   quick look at the proffered justifications for a restraint – Plaintiff is not required to plead or prove a

9   relevant geographic or product market. *California ex rel. Harris v. Safeway, Inc.*, 08-55671, 2011 WL

10  2684942, at *11 (9th Cir. July 12, 2011); *Carter*, 101 F. Supp. 2d at 1266.

11  Finally, Defendants' rule of reason argument seeks to hold Plaintiff to an impermissibly high

12  standard. Even if that analysis applied here, Defendants have not met their burden of showing that

13  Plaintiff's market allegations are "facially unsustainable." *Newcal Indus., Inc. v. Ikon Office Solution*,

14  513 F.3d 1038, 1045 (9th Cir. 2008). This is particularly true at this early stage, where the Court is

15  required to accept Plaintiff's market definition allegations as true. *Pecover v. Electronics Arts*, 633 F.

16  Supp. 2d 976, 983 (N.D. Cal. 2009).

17  For all of these reasons, this Court should deny the Defendants' Motion to Dismiss.

18  **II.   FACTS**

19  This action challenges, as *per se* illegal, a horizontal agreement to fix the maximum price paid

20  for Donor Services, defined as the time spent, and the inconvenience, labor, discomfort and risk incurred

21  by women ("AR Egg Providers") providing human eggs (or "oocytes") for use in artificial reproduction

22  ("AR Eggs."). ¶ 1; *see also* ¶¶ 47-48.

23  Defendants ASRM and SART are the two largest professional organizations for reproductive

24  medicine professionals in the United States. ¶¶ 10, 11. Over 85% of the medical clinics engaged in the

25  practice of reproductive medicine belong to SART. ¶ 11. The SART-member clinics compete with one

26  another to procure AR Eggs from AR Egg Providers and to use those eggs to perform assisted

27  reproductive procedures sold to clients. Each SART-member clinic is a member of the Defendant Class,

28  as are independent agencies that purchase Donor Services from AR Egg Providers. ¶ 12. As a

precondition to membership, SART requires its members to agree to comply with rules promulgated by ASRM's Ethics Committee. ¶ 51. Among other things, the ASRM rules govern compensation in the Donor Services market, as neither Congress, nor the vast majority of the states have enacted legislation governing compensation relating to Donor Services. ¶ 50.

Defendant Class members pay for Donor Services for the express purpose of "increase[ing] the number of oocyte donors" and "advance[ing] the goal of ethical fairness to donors." MTD Ex. 1 at 307. Indeed, Defendants have explicitly noted the paternalistic danger of barring payments to AR Egg Providers and have expressly argued that the risks of egg donation "are not so severe as to justify intervention in the decision-making authority of adult women." *Id.*

Prior to 2000, the free operation of competition set the price paid for Donor Services. ¶ 57. In 2000, Defendants elected to reverse course and suppress the price paid for those services. ¶ 58. To accomplish this result, ASRM's Ethics Committee promulgated a report entitled "Financial Incentives in Recruitment of AR Egg Providers," which it reaffirmed in 2007. ¶¶ 59, 63. This report set forth rules ("Maximum Price Rules") governing compensation paid for Donor Services, and mandated that "at this time sums of $5000 or more require justification and sums above $10,000 go beyond what is appropriate." ¶¶ 60, 63. ASRM purportedly based the Maximum Price Rules on the rates prevailing for sperm donation in the year 2000. ¶¶ 61, 62. The process of donating AR Eggs, however, is significantly more intrusive, burdensome, painful, and risky than the process of donating sperm. ¶ 104. ASRM has never increased the Maximum Price Rules' compensation cap. ¶ 64.

ASRM has repeatedly issued rules requiring compliance with the Maximum Price Rules, ¶¶ 66, 67, and SART requires its member clinics to agree to abide by these rules as a precondition of membership. ¶ 69. Those clinics have done so. ¶¶ 70, 71. Additionally, because some reproductive clinics acquire AR Eggs from independent agencies, SART has required agencies serving SART-member clinics to sign an agreement to adhere to the Maximum Price Rules, ¶ 76, and has made clear that it would punish independent agencies that failed to do so. ¶ 78. Many independent agencies have signed that agreement. ¶¶ 78 – 80. Indeed, many affirmatively tout on their websites their agreement to the Maximum Price Rules. ¶¶ 82 – 96.

The Defendants' Maximum Price Rules have successfully suppressed the prices paid for AR

1  Eggs.  A SART study performed in 2007 demonstrated that the average price paid for Donor Services

2  was $4,217 for SART clinics and $5,200 for independent agencies serving SART clinics.  ¶ 98.

3  **III.   STANDARDS OF LAW**

4  ### a.  Standards of Law on a Motion to Dismiss

5  In *In re Flash Memory Antitrust Litig* , this Court made clear  the standards governing a motion

6  to dismiss under Rule 12(b)(6):

7

8  > To survive a motion to dismiss for failure to state a claim, the plaintiff must allege
> "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v.*
9  > *Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). "Specific facts are
> not necessary; the statement need only give the defendant[s] fair notice of what ... the
10 > claim is and the grounds upon which it rests." *Erickson v. Pardus*, 551 U.S. 89, 127 S.Ct.
> 2197, 2200, 167 L.Ed.2d 1081 (2007) (internal quotation marks omitted); *Johnson v.*
11 > *Riverside Healthcare System, LP*, 534 F.3d 1116, 1122 (9th Cir.2008).  "In general, the
> inquiry is limited to the allegations in the complaint, which are accepted as true and
12 > construed in the light most favorable to the plaintiff." *Lazy Y Ranch Ltd. v. Behrens*, 546
> F.3d 580, 588 (9th Cir.2008).
13

14 643 F. Supp. 2d 1133, 1141 (N.D. Cal. 2009).  "If dismissal is warranted, it is generally without

15 prejudice, unless it is clear the complaint cannot be saved by any amendment."  *Id.* (citing *Sparling v.*

16 *Daou*, 411 F.3d 1006, 1013 (9th Cir. 2005); *Gompper v. VISX, Inc.*, 298 F.3d 893, 898 (9th Cir. 2002)).

17 ### b.  Standards of Antitrust Analysis

18 The "'Sherman Act, so far as price-fixing agreements are concerned, establishes one uniform

19 rule applicable to all industries alike.'"  *Maricopa County Med. Soc'y*, 457 U.S. at 349 (quoting *United*

20 *States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 222 (1940)).  That "uniform rule" is that such

21 agreements are *per se* illegal, and universally condemned under the antitrust laws.  *Id.*  Accordingly, a

22 plaintiff alleging a price fixing agreement among competitors is not required to allege the defendants'

23 market power, nor the anticompetitive effects of the agreement. *Id.*  Rather, the "*per se* rules . . . reflect a

24 longstanding judgment that the prohibited practices by their nature have 'a substantial potential for

25 impact on competition.'"  *Superior Court Trial Lawyers Ass'n*, 493 U.S. at 433 (price fixing and group

26 boycott agreement by trial lawyers' association *per se* illegal).  "[H]orizontal price fixing is a *per se*

27 violation regardless of whether the prices set are minimum or maximum."  *Knevelbaard Dairies v. Kraft*

28 *Foods, Inc.*, 232 F.3d 979, 982 (9th Cir. 2000) ("Foremost in the category of per se violations is

1    horizontal price-fixing among competitors."); *see also Ancar v. Sara Plasma*, 964 F.2d 465, 470 (5th

2    Cir. 1992) (horizontal agreement to fix maximum price paid for blood plasma *per se* illegal).

3    The *per se* standard applicable to price fixing is one of three modes of analysis used to assess

4    antitrust violations. The second – applicable to actions challenging restraints whose anticompetitive

5    effects are not immediately apparent – is the "rule of reason," where courts "weigh[] legitimate

6    justifications for a restraint against any anticompetitive effects," including an analysis of a defendants'

7    market power in a relevant market. *Paladin Associates, Inc. v. Montana Power Co.*, 328 F.3d 1145,

8    1156 (9th Cir. 2003). The third method (known as the "quick look" standard) is applicable where *per se*

9    treatment is inappropriate, but the challenged restraint is of a type where "the great likelihood of

10   anticompetitive effect can easily be ascertained." *Cal. Dental Ass'n*, 526 U.S. at 770. The "quick look"

11   standard recognizes that "[f]ull rule of reason treatment is unnecessary where the anticompetitive effects

12   are clear even in the absence of a detailed market analysis." *Cal. ex rel. Harris v. Safeway, Inc.*, 08-

13   55671, 2011 WL 2684942, at *11 (9th Cir. July 12, 2011). Accordingly, the "quick look" standard does

14   not require a plaintiff to plead a relevant market or defendant's market power. *Id.*; *see also Carter v.*

15   *Variflex, Inc.*, 101 F. Supp. 2d 1261, 1266 (C.D. Cal. 2000). Rather, the court merely takes a "quick

16   look" at the procompetitive justifications proffered for a restraint. *Harris*, 2011 WL 2684942, at *11.

17   Moreover, even if a court preliminarily determines that the "quick look" or "rule of reason"

18   analysis applies, it is still required to construe the factual allegations of the complaint in the light most

19   favorable to the plaintiff. *Lazy Y Ranch*, 546 F.3d at 588. Accordingly, so long as the plaintiff properly

20   alleges that a particular practice has anticompetitive effects, a Rule 12(b)(6) motion must be denied even

21   if the defendant offers justification for the restraint. "Whatever the merits of these [justifications], they

22   are intrinsically factual, contrary to plaintiffs' pleading and inappropriate for resolution at the motion to

23   dismiss stage." *Brennan v. Concord EFS, Inc.*, 369 F. Supp. 2d 1127, 1133 (N.D. Cal. 2005). Indeed,

24   the Ninth Circuit has noted that even at the summary judgment stage, "[t]he law clearly envisions that

25   the balancing test is normally reserved for the jury." *Am. Ad Mgmt., Inc. v. GTE Corp.*, 92 F.3d 781,

26   791 (9th Cir. 1996).

27   Accordingly, even under a rule of reason or quick look analysis, the question of whether a

28   particular justification for an anticompetitive restraint is a "valid justification which also outweighs any

restraint on trade is a question of fact that should properly be decided by the jury." *Id.* At the pleading stage, "the plaintiff's allegations of adverse effects on competition must be accepted as true, and the defendants' pro-competitive justifications considered unproven. Until some discovery is completed, there is no record upon which to assess the reasonableness of the restraints alleged by the plaintiff" and summary dismissal is inappropriate. *Advanced Health-Care Services, Inc. v. Radford Cmty. Hosp.*, 910 F.2d 139, 145 (4th Cir. 1990). This same precept holds true for market definition allegations in a full-blown rule of reason case. *Pecover*, 633 F. Supp. 2d at 983 ("The rule of reason analysis requires a factual analysis of the line of commerce, the market area and the affected share of the relevant market . . . Such a factual inquiry is improper at this stage in the proceedings.")

## IV.   DEFENDANTS' MOTION TO DISMISS

Defendants' Motion seeks dismissal on a single, narrow ground – that the Complaint purportedly "contains only conclusory allegations defining the relevant product and geographic markets at issue." MTD at 1. To reach this ground, Defendants request this Court make a number of legal determinations in their favor.

*First*, Defendants argue that the *per se* ban on price fixing applies differently to professional organizations and further argue that this Court should weigh purported justifications for the Maximum Price Rules before deciding if the *per se* standard applies. MTD at 6.

*Second*, Defendants present a number of justifications for the Maximum Price Rules and ask this Court to determine that these justifications outweigh the anticompetitive effects of the Maximum Price Rules. MTD at 10 – 17. Importantly, Defendants never argue that these purported justifications themselves warrant dismissal of the Complaint. Rather, they only argue that they warrant rejection of the long-standing *per se* bar against price fixing and thus that Plaintiff must plead and prove relevant product and geographic markets.

*Third*, Defendants request this Court determine that Plaintiff's product and geographic market definitions are facially unsustainable. This is the *only* ground upon which Defendants seek dismissal. Accordingly, if this Court determines that Plaintiff need not plead a relevant market, Defendants have failed to present any grounds for dismissing the Complaint.

As detailed below, each of Defendants' arguments fails.

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

**V.    PLAINTIFF ALLEGES A PER SE VIOLATION OF THE ANTITRUST LAWS**

### a.  The Maximum Price Rules Are A Price Fixing Agreement

While the product at issue here may be exceptional, the anticompetitive agreement is not. Defendants concede that the Complaint properly alleges that Defendant Class members (who compete with one another) have "agree[d] to conform to the ASRM ethical guidelines concerning compensation of egg donors." MTD at 6. This agreement between horizontal competitors to fix or stabilize the price they pay for a particular service is a prototypical horizontal price fixing agreement. *Reyn's Pasta Bella, LLC v. Visa U.S.A.*, 259 F. Supp. 2d 992, 998 (N.D. Cal. 2003) (defining price fixing). Indeed, the 5th Circuit has correctly noted a complaint alleging a horizontal agreement to fix the price paid for blood plasma alleged a *per se* violation of the Sherman Act. *Ancar*, 964 F.2d at 470. It makes no difference that Defendants characterize the agreement as an ethical guideline: "[n]eedless to say, adoption of suggested or 'maximum' fee schedules will run afoul of Section One's *per se* rule as thinly-veiled attempts at price fixing." *United States v. Alston,* 974 F.2d 1206, 1214 (9th Cir. 1992).

This, standing alone, renders the Maximum Price Rules *per se* illegal, without any inquiry into their anticompetitive effects. *Id.*; *Ancar*, 964 F.2d at 470. Even if this were not so, there is no serious dispute that the Maximum Price Rules inhibit competition. "The aim and result of every price-fixing agreement, if effective, is the elimination of one form of competition." *Knevelbaard*, 232 F.3d at 986. Indeed, the copy of the Maximum Price Rules submitted with the MTD demonstrates that the intended purpose of the Rules is to inhibit price competition by preventing clinics and agencies from offering higher prices for Donor Services. *See* MTD Ex. 1 at 306 (describing higher prices in Donor Services market). The real theory underlying Defendants' defense is that they disapprove of the effects of competition in the market. But "[t]he elimination of so-called competitive evils [in an industry] is no legal justification" for price-fixing agreements. *Maricopa County Med. Soc'y*, 457 U.S. at 349. Defendants' efforts to cure those perceived evils by price fixing are *per se* illegal. *Id.* at 352.

### b.  Courts Consistently Judge Price Fixing Agreements Between Professionals Under the Per Se Standard

Defendants rely on a footnote in *Goldfarb* to argue that the *per se* rule does not apply to the price fixing agreement here because the defendants are professional organizations. *See* MTD at 9 (citing 421

7

1    U.S. at 788 n.17.   But the United States Supreme Court has consistently and repeatedly affirmed that

2    price fixing conducted by professional organizations is *per se* illegal, beginning with *Goldfarb* itself.

3    421 U.S. at 783.  In so doing, it has condemned (as *per se* illegal):  A physician groups' agreement to set

4    the maximum fees they could accept for medical services, *Maricopa County Med. Soc'y*, 457 U.S. at

5    335; a trial lawyers organizations' agreement to set the hourly rates for indigent representation, *Superior*

6    *Court Trial Lawyers Ass'n*, 493 U.S. at 433; and a county bar associations' minimum fee schedule.

7    *Goldfarb*, 421 U.S. at 773.  It is accordingly well-settled that the "the cautionary footnote in *Goldfarb* . .

8    . cannot be read as fashioning a broad exemption under the Rule of Reason for learned professions," and

9    certainly does not permit the price fixing at issue in this case.  *Nat'l Soc'y of Prof'l Engineers v. U. S.*,

10   435 U.S. 679, 696 (1978).

11        Defendants make their argument against this controlling authority in a footnote.  MTD at 10 n.2.

12   They contend that the *per se* rule against price fixing is limited to cases in which the professional

13   "associations' actions were driven by a desire to restrict output and raise prices for their members," as

14   distinct from efforts "to establish ethical norms and other, non-economic professional standards." *Id*.

15   This motive-based distinction does not exist: "[P]rice fixing is contrary to the policy of competition

16   underlying the Sherman Act . . .  It makes no difference whether the motives of the participants are good

17   or evil." *United States v. McKesson & Robbins, Inc.*, 351 U.S. 305, 309-10 (1956).[2]  Thus, in the

18   professional association context, "[t]he social justifications proffered for [defendants'] restraint of trade .

19   . . do not make it any less unlawful. The statutory policy underlying the Sherman Act 'precludes inquiry

20   into the question whether competition is good or bad.'" *Superior Court Trial Lawyers Ass'n*, 493 U.S.

21   at 424 (citations omitted).  Indeed, in *Superior Court Trial Lawyers*, the Court considered it irrelevant

22   that the challenged restraint served the salutary purpose of producing "better legal representation for

23   indigent defendants." *Id.* at 422 ("[I]t is not our task to pass upon the social utility or political wisdom

24   of price-fixing agreements.").

25

---

26   [2] *See also United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 222 (1940) (rejecting argument that

27   "good intentions of the members of the combination" justified a price fixing agreement and noting
     "Congress has not left with us the determination of whether or not particular price-fixing schemes are

28   wise or unwise, healthy or destructive."

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

1   Defendants also rely on the non-binding opinion in *United States v. Brown University* as further

2   support of their "ethical norms" justification.  5 F.3d 658, 675 (3d Cir. 1993).  In *Brown University*, the

3   Court evaluated under the Rule of Reason an agreement among Ivy League colleges setting the levels of

4   financial aid presented to students, in part because the agreement served the "congressionally-

5   recognized and important social welfare goal[]" of ensuring access to higher education.  *Id.* at 668.  In

6   light of  *Superior Court Trial Lawyers Ass'ns'* flat ban on considering social welfare justifications for

7   price fixing, 493 U.S. at 424, *Brown University* appears to have been wrongly decided.  In any event, the

8   governing principles applied in that decision are inconsistent with Ninth Circuit law, which holds that it

9   "does not matter why" a price is fixed, and that "[i]t is not a defense to price fixing that the defendants

10  may have had good motives . . . or that the conspiracy may have had some good results."  *Alston*, 974

11  F.2d at 1210 (9th Cir. 1992) (stating jury instructions were "an accurate statement of the law.").

12  Even if *Brown University* were controlling law, however, it would nevertheless be irrelevant.

13  There, the court stated that the "social welfare" goal at issue was "congressionally-recognized," and this

14  fact would "influence whether this conduct violates the Sherman Act."  5 F.3d at 668; *see id.* at 675

15  ("Congress has sought to promote the same ideal of equality of educational access and opportunity for

16  more than twenty-five years.").  Here, by contrast, there is no evidence of a "congressionally-

17  recognized" social welfare goal, and there exists no history at all of congressional concern about the

18  effects of competition in the Donor Services market.   This militates further against applying *Brown*

19  *University* in this case.  *Cf. Maricopa County*., 457 U.S. at 355 ("Congress may consider the exception

20  that we are not free to read into the statute.").

21  Defendants also propose a number of other exceptions to the *per se* rule against price fixing,

22  none of which are cognizable.

23  For example, Defendants argue that this Court should not apply *per se* treatment to "factual

24  settings not previously encountered."  MTD at 8.  Leaving aside the preceding discussion demonstrating

25  that courts are familiar with price fixing by professional organizations, in *Maricopa County*, the

26  Supreme Court explicitly rejected the idea that courts should decline to apply the *per se* rule against

27  price fixing in that case because "the judiciary has little antitrust experience in the health care industry."

28  *Maricopa County*, 457 U.S. at 349.   Indeed, "the argument that the *per se* rule must be rejustified for

9

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

every industry that has not been subject to significant antitrust litigation ignores the rationale for *per se* rules, which in part is to avoid 'the necessity for an incredibly complicated and prolonged economic investigation into the entire history of the industry involved, as well as related industries, in an effort to determine at large whether a particular restraint has been unreasonable—an inquiry so often wholly fruitless when undertaken.'" *Id.* (citations omitted).  The Ninth Circuit has echoed this view, noting that questions of "novelty" are irrelevant to the question of whether a particular price was fixed.  *Freeman v. San Diego Ass'n of Realtors*, 322 F.3d 1133, 1151 (9th Cir. 2003) ("[A]ny elements of novelty and cooperation in the [challenged industry] are irrelevant to whether support fees are fixed or set competitively.").

Defendants make the argument that "courts have been reluctant to apply the *per se* rule when the alleged restraint is designed to pursue legitimate objectives of professional associations and other non-profit entities."  MTD at 9.  Even if this were true of some restraints, it fatally collides with the fundamental precept that price fixing is ***never*** a legitimate objective.  *Maricopa County Med. Soc'y*, 457 U.S. at 351 ("The anticompetitive potential inherent in all price-fixing agreements justifies their facial invalidation even if procompetitive justifications are offered for some.").  Even if some iteration of the Maximum Price Rules were appropriate, enacting those price restraints would properly be the job of legislatures, not Defendants and the Defendant Class.  *Maricopa County Med. Soc*, 457 U.S. at 354-55 ("The respondents' arguments against application of the per se rule in this case therefore are better directed to the Legislature."); *Goldfarb*, 421 U.S. at 792 ("In holding that certain anticompetitive conduct by lawyers is within the reach of the Sherman Act we intend no diminution of the authority of the State to regulate its professions.").[3]

//

---

[3] In any event, the notion that Defendants and Defendant Class Members are not acting in their own self-interest is false: the Complaint clearly alleges that the Maximum Price Rules are "intended to discourage any possible governmental legislation that would encumber the free practice US doctors now enjoy." ¶ 51.  Even assuming that the Defendant Class' self-interest is a legitimate subject of inquiry, their efforts to avoid legislation are not adequate justifications for enacting anticompetitive rules.  *Superior Court Trial Lawyers Ass'n*, 493 U.S. at 424 ("Respondents' agreement is not outside the coverage of the Sherman Act simply because its objective was the enactment of favorable legislation.").

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

### c.   Defendants' Attempt to Overcome the *Per Se* Rule Fails

It is undoubtedly true that courts analyze certain actions taken by professional organizations under the Rule of Reason due to the differing "nature of . . . competition in [professional] services." *Nat'l Soc'y of Prof'l Eng.*, 435 U.S. at 696.  But the Supreme Court has explicitly noted that "the classic basis traditionally advanced to distinguish professions from trades, businesses and other occupations . . . loses some of its force when used to support . . . fee control activities." *Goldfarb*, 421 U.S. at 786-87. This is why the Court has consistently applied the *per se* rule to price fixing rules promulgated by professional organizations, even as it applied different standards of review to other potentially anticompetitive restraints.  *See id.*; *see also* § V(b), *infra*.

The cases upon which Defendants rely to argue that courts are "reluctant to apply the per se rule" to professional organizations involve restraints other than price fixing. MTD at 9.  *See FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 458 (1986) (agreement by dentists to refuse to submit x-rays to insurers); *Nat'l Soc'y of Prof'l Eng'rs*, 435 U.S. at 692-97 (agreement barring competitive bidding);[4] *Cal. Dental Ass'n v. F.T.C.*, 526 U.S. 756, 761 (1999) (agreement between dentists regulating advertising); *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 497 (1988) (safety standards relating to materials used in electronic wiring systems).  Moreover, in those cases, the Court carefully distinguished the challenged restraints from price fixing agreements.  For example, in *California Dental Association,* the Court distinguished the advertising rules at issue from "classic horizontal agreements to limit . . . price competition."  526 U.S. at 773.  Similarly, the *Professional Engineers* court explicitly noted that the challenged restraint was "not price fixing as such."  *Nat'l Soc'y*

---

[4] While the *Professional Engineers* court discussed a "quick look" analysis, it is well worth noting that there is some dispute over whether it actually applied a *per se* analysis.  *General Cinema Corp. v. Buena Vista Distribution Co., Inc.*, 532 F. Supp. 1244, 1256 n.7 (C.D. Cal. 1982) ("The Supreme Court in [*Professional Engineers*] did not expressly relate its holding to the per se prohibition of price-fixing, but this court believes that a number of factors compel the conclusion that the per se rule, and not rule of reason analysis, was applied in that case."); *see also Catalano, Inc. v. Target Sales*, 446 U.S. 643, 647 (1980) (holding "an agreement among competing firms of professional engineers to refuse to discuss prices with potential customers until after negotiations have resulted in the initial selection of an engineer was held unlawful without requiring further inquiry" in *Professional Engineers*).  It is accordingly of limited value to Defendants.

---

11

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

1   *of Prof'l Engineers*, 435 U.S. at 692.   In *Indiana Federation of Dentists*, the Court made the same

2   observation about the restraint at issue in that case.   *See* 476 U.S. at 459 (quoting *Professional Engineers*

3   and noting restraint was "not price fixing").[5]   There is, simply put, no "professional organization"

4   exception to the *per se* rule against price fixing.

5        Defendants' reliance on *NCAA v. Board of Regents* and *Broadcast Music, Inc. v. Columbia*

6   *Broadcasting Systems* is similarly unavailing.   The Ninth Circuit has held that both of these cases fall

7   into a "very narrow class of cases" where "'horizontal restraints on competition are essential if the

8   product is to be available at all.'"   *United States v. A. Lanoy Alston*, 974 F.2d 1206, 1209 (9th Cir. 1992)

9   (quoting *NCAA*, 468 U.S. 85, 98-104 (1984) and citing *Broadcast Music*, 441 U.S. 1, 16-24 (1979)).[6]

10   Defendants do not and cannot argue the Maximum Price Rules are necessary to make AR Eggs available

11   at all.   *See Maricopa County Med. Soc'y*, 457 U.S. at 356 (noting maximum fee schedule between

12   competitors was "fundamentally different" than restraint at issue in *Broadcast Music*).   Indeed, the fact

13   that they were widely available before the enactment of the Maximum Price Rules conclusively

14   demonstrates the contrary.

15        **d.  Defendants' Purported Procompetitive Justifications do not Justify Applicability of**

16        **the Rule of Reason Standard**

17        Defendants cite a number of purported procompetitive justifications for the Maximum Price

18   Rules.   *See* MTD at 11 – 15.   But it is black letter law that "[p]rice fixing is illegal regardless of pro-

19   competitive justifications offered therefor."   *Alston*, 974 F.2d 1206, 1208 (9th Cir. 1992) (*citing*

20   *Superior Court Trial Lawyers*, 493 U.S. at 421-22).   This is because "[t]he anticompetitive potential

21   inherent in all price-fixing agreements justifies their facial invalidation even if procompetitive

22   justifications are offered for some." *Maricopa County Med*, 457 U.S. at 351.   Accordingly, the claimed

23   procompetitive justifications Defendants offer are irrelevant to the question of whether this Court should

24

25   [5] *Allied Tube* did not discuss the *per se* or rule of reason standards.

26   [6] *NCAA* involved a league of college basketball players; the Court rested its rejection of the *per se*
27   standard on the fact that the "case involves an industry in which horizontal restraints on competition are
     essential if the product is to be available at all." *NCAA*, 468 U.S. at 101.   *Broadcast Music* involved
28   blanket licensing of copyrights to musical competition, which the Court noted was "quite different from
     anything any individual owner could issue." *Broadcast Music*, 441 U.S. at 23.

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

1  or should not apply the *per se* standard.  *United States v. Kahan & Lessin Co.*, 695 F.2d 1122, 1125 (9th

2  Cir. 1982) ("Appellants argue that the per se rule should not apply if the price fixing can be shown to

3  have procompetitive justifications.  The Supreme Court rejected this argument in *Maricopa County*.").

4  **VI.   DEFENDANTS' MOTION NECESSARILY FAILS UNDER THE QUICK LOOK**

5       **DOCTRINE**

6       **a.  The Quick Look Doctrine does not Require Market Analysis**

7       Even if this Court were to decline to apply the *per se* rule to Defendants' price fixing, Plaintiff

8  would still not be required to plead (or prove) a relevant market, nor that Defendants had market power

9  in any market.

10       When the actions of professional organizations do not amount to *per se* violations of the antitrust

11  laws but pose a significant risk of anticompetitive effects, courts analyze those actions under the "quick

12  look" standard.  Indeed, the Supreme Court applied just such an analysis to the restraints in *Professional*

13  *Engineers* and *Indiana Federation of Dentists.  See Deutscher Tennis Bund v. ATP Tour, Inc.*, 610 F.3d

14  820, 830-31 (3d Cir. 2010).  The Maximum Price Rules here directly concern the price charged for

15  Donor Services, and accordingly pose a significant risk of anticompetitive effects.  *NCAA v. Bd. of*

16  *Regents of Univ. of Oklahoma*, 468 U.S. 85, 104 (1984) (restraint on price and output "has a significant

17  potential for anticompetitive effects").  Indeed, this significant risk is why they are commonly

18  condemned as *per se* illegal.  As such, in the event this Court decides not to apply the *per se* standard, it

19  should apply the "quick look" doctrine rather than a full-blown rule of reason analysis.

20       Under a "quick look" analysis, courts are not required to perform a "detailed market analysis."

21  *Harris*, 2011 WL 2684942, at *11.  Plaintiff is accordingly not required to plead or prove Defendants or

22  the Defendant Class have market power in any market.  *Carter*, 101 F. Supp. 2d at 1266 ("If the court

23  finds that there is a naked restraint on trade or an actual adverse effect on competition, the court may

24  apply a "quick-look" rule of reason without requiring proof of the relevant market or market power.");

25  *cf. NCAA v. Bd. of Regents of Univ. of Oklahoma*, 468 U.S. 85, 110 (1984) (courts have "never required

26  proof of market power" in cases alleging naked restraints on price). Since Defendants' Motion relies

27  exclusively on market definition arguments, *see* § IV, *supra*, it necessarily fails if the Court applies a

28  "quick look" analysis.

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

1

### b. **Defendants' Justifications for the Maximum Price Rules are Counter to Law and Economically Flawed**

2

3     Because Defendants do not argue that their claimed justifications for the Maximum Price Rules

4     warrant dismissal, *see* § IV, *supra*, Plaintiff need not argue against Defendants' justifications. Those

5     justifications, however, are invalid, both as a matter of law and economics. This is particularly true at

6     this early stage, where the Court takes Plaintiff's allegations of anticompetitive effect as true and rejects

7     Defendants' unproven justifications. *See* § III(b), *supra*; see also *Brennan*, 369 F. Supp. 2d at 1133

8     ("Whatever the merits of these [justifications], they are intrinsically factual, contrary to plaintiffs'

9     pleading and inappropriate for resolution at the motion to dismiss stage."); *see also Am. Ad Mgmt.*, 92

10    F.3d at 791; *Advanced Health-Care Services, Inc.*, 910 F.2d at 145. Indeed, this is why the various

11    decisions Defendants rely on were issued *after* discovery.

12    The purpose of the quick look balancing test "is to form a judgment about the competitive

13    significance of the restraint; it is not to decide whether a policy favoring competition is in the public

14    interest, or in the interest of the members of an industry." *Nat'l Soc'y of Prof'l Engineers*, 435 U.S. at

15    692. Defendants offer three purported justifications for their restraint. Most have little to do with

16    competition.

17    ***First,*** Defendants assert that "the ethical guidelines are intended to protect the health and safety

18    of both egg donors and recipients undergoing assisted reproductive technology procedures." MTD at

19    11. But the Supreme Court has held that an attempt to justify an anticompetitive restraint "on the basis

20    of the potential threat that competition poses to the public safety and the ethics of its profession is

21    nothing less than a frontal assault on the basic policy of the Sherman Act." *Nat'l Soc'y of Prof'l*

22    *Engineers*, 435 U.S. at 695. Accordingly, the argument that a "restraint on price competition ultimately

23    inures to the public benefit by . . . insuring ethical behavior" necessarily fails, as such a justification has

24    nothing to do with competition. *Id.* at 695; *see also Freeman v. San Diego Ass'n of Realtors*, 322 F.3d

25    1133, 1152 (9th Cir. 2003) (same). Defendants' speculation that some donors may be tempted to

26    misrepresent their health does not change this. The "equation of competition with deception, like the

27    similar equation with safety hazards, is simply too broad." *Id.* at 696 ("[W]e may assume that

28    competition is not entirely conducive to ethical behavior, but that is not a reason, cognizable under the

14

1    Sherman Act, for doing away with competition.").

2        This "intrinsically factual" justification fails as a matter of logic as well. *Brennan*, 369 F. Supp.

3    2d at 1133.  While Defendants claim that the Maximum Price Rules were enacted to eliminate the "risk"

4    that competitive payments would "induce 'prospective donors to conceal medical information relevant

5    to their own health or that of their biologic offspring,'" the Committee Report cites no evidence that the

6    size of payments is in any way related to the risk or frequency of concealment.  MTD at 11 (quoting

7    *Ethics Committee Report* at 306).   Defendants also fail to show that the arbitrary price cap bears any

8    necessary relationship to the asserted goal of minimizing concealment or that payments in a competitive

9    environment would be so high as to induce significant fraud.  Indeed, this argument reveals why

10   Defendants' justifications are not dispositive at this early stage.  Discovery may well reveal facts

11   demonstrating that higher payments would induce better educated, wealthier AR Egg Providers with

12   greater access to routine medical care, who are less likely to have hidden health risks.  Discovery may

13   also demonstrate that artificially low payments have induced a greater proportion of donors to whom the

14   smaller payments represent a larger share of their own financial resources, thereby increasing the

15   likelihood of concealment of adverse medical information.  In any event, Defendants have not shown

16   that effective regulation of information concealment cannot be accomplished through more direct means

17   than the drastic and illegal method of a price restraint.  Indeed, this entire argument is a tacit admission

18   that payments have been set at a price lower than that which would prevail in a competitive market.

19       ***Second***, Defendants argue the Maximum Price Rules "have important and legitimate social

20   welfare justifications," purportedly because "compensated egg donation poses significant risks" of

21   exploitation, undue inducement, or selective breeding.  MTD at 13-14.  This justification again has

22   nothing to do with competition.  Indeed, the Supreme Court has flatly rejected the paternalistic argument

23   that an anticompetitive practice can be justified when competition will purportedly "lead [individuals] to

24   make unwise and even dangerous choices." *Ind. Fed'n of Dentists*, 476 U.S. at 463 (quoting *Nat'l Soc'y

25   of Prof'l Engineers*, 435 U.S. at 695.).  Defendants' "social welfare" justifications cannot be reconciled

26   with this principle.  Defendants' invocation of "positive eugenics" and the "devaluation of human

27   life," MTD at 13, have significant rhetorical flourish, but have nothing to do with competition, and are

28   therefore also irrelevant. Defendants' reliance on *Brown University* for their "social welfare" argument

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

1    fails for the reasons discussed in § V(b), *supra.*

2            Defendants' argument is also factually flawed.  Any compensated AR Egg Provider may have

3    been induced, altered her behavior or been exploited if the payment she received was particularly

4    significant to her.  It is the fact of compensation, at any level, that gives rise to the purported risks

5    Defendants identify.  Nothing indicates that competitively set levels of compensation would

6    significantly alter these risks, and this Court certainly cannot make a factual determination to the

7    contrary on a motion to dismiss.  *Brennan*, 369 F. Supp. 2d at 1133.  Indeed, lower payments may create

8    a greater risk of exploitation of the financially less fortunate.  But this case does not present the question

9    of whether payments to AR Egg Providers are ethically proper.  Rather, this case presents the issue of

10   whether the level of those payments can lawfully be set pursuant to a horizontal agreement among

11   competitors.  Under the law, they cannot.  *Maricopa County Med. Soc'y*, 457 U.S. at 352 ("Even if a fee

12   schedule is therefore desirable, it is not necessary that the doctors do the price fixing").

13           ***Third***, Defendants assert that the Maximum Price Rules enhance output because ASRM chose to

14   permit *some* compensation rather than bar payments entirely. MTD at 15.  But Defendants fail to cite a

15   single case supporting the proposition that a maximum price restraint is output-enhancing or

16   procompetitive.  Instead, they again cite to cases addressing restraints that ***do not involve price***.[7]  It is

17   undoubtedly true that the anticompetitive effect of restraints that do not involve price are more

18   speculative that those directly involving price, but that is irrelevant to the Court's consideration of the

19   price-based restraint presented here.  Simply because Defendants agreed to allow some minimal amount

20   of compensation does not mean they are engaging in procompetitive conduct.  *See Nat'l Soc'y of Prof'l*

---

22   [7] *Allied Tube, Professional Engineers*, and *California Dental Association* are described above, and
     involve non-price restraints. *Craftsmen Limousine, Inc. v. Ford Motor Co.*, involved enforcement of
23   non-price based safety standards.  363 F.3d 761, 774 (8th Cir. 2004).  *Moore v. Boating Industrial
     Associations* involved non-price related efforts to encourage compliance with federal safety standards.
24   819 F.2d 693, 699 (7th Cir. 1987); *Kreuzer v. American Academy of Periodontology*, involved a dental
     trade associations' rule requiring its members to "devote themselves exclusively to the practices of
25   periodontics." 735 F.2d 1479, 1494 (D.C. Cir. 1984).  And *Wilk v. American Medical Association*
26   explicitly noted that it was "not a case in which it is alleged or shown that the medical doctors,
     competitors of one another, have combined, for example, to fix the prices they will receive from
27   consumers, and that they have agreed to ostracize or boycott those among them who fail to go along."
28   719 F.2d 207, 218 (7th Cir. 1983).

---

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

1   *Engineers*, 435 U.S. at 695 (condemning efforts to impose "views of the costs and benefits of

2   competition on the entire marketplace."); *cf Superior Court Trial Lawyers Ass'n*, 493 U.S. at 424 ("[I]t

3   was settled shortly after the Sherman Act was passed that it 'is no excuse that the prices fixed are

4   themselves reasonable.'").

5   Even if Defendants' output-enhancing justification was logically or legally appropriate, it cannot

6   warrant dismissal at the pleading stage.  Defendants' argument leaves open the factual question of

7   whether unrestricted pricing for Donor Services would enhance output by leading to a greater supply of

8   AR Eggs.   Plaintiff has pled (in an allegation that must be accepted as true) that an outright ban on

9   payment was not a realistic alternative outcome, since it would have dramatically reduced the supply of

10  AR Eggs and therefore ended profitable business for the reproductive clinics.  ¶ 47.  Under basic

11  economic principles, higher payment levels will increase the supply of available donors willing to

12  undergo the arduous, invasive and risky procedure.  Defendants must believe that competitive pricing

13  would produce higher donor payments or they would not have needed to adopt the Maximum Price

14  Rules in the first place.

15  Defendants also speculate that "increases in the cost of donations will both increase the cost of

16  assisted reproductive procedures and decrease the demand for (and availability of) donated oocytes for

17  many of those infertile people or couples."  MTD at 16.  Even if competitive payments would result in

18  higher costs to clinic customers, this cannot serve as a justification for the Maximum Price Rules.

19  "[T]he claim that the price restraint will make it easier for customers to pay does not distinguish the

20  medical profession from any other provider of goods or services."  *Maricopa County Med. Soc'y*, 457

21  U.S. at 349; *see also Law v. Nat'l Collegiate Athletic Ass'n,* 134 F.3d 1010, 1022 (10th Cir. 1998)

22  ("Lower prices cannot justify a cartel's control of prices charged by suppliers, because the cartel

23  ultimately robs the suppliers of the normal fruits of their enterprises.").  No method of antitrust analysis

24  "support[s] a defense based on the assumption that competition itself is unreasonable" and this Court

25  should decline Defendants' attempts to create one.  *Nat'l Soc'y of Prof'l Engineers*, 435 U.S. at 695

26  (Sherman Act "precludes inquiry into the question whether competition is good or bad.").  Its legal flaws

27  aside, this argument is economically flawed.  If prices for Donor Services rise too high and demand for

28  reproductive assistance declines (as Defendants predict) free market forces will quickly make the

---

17

necessary adjustments to bring the competitive price for donor services back down to where the supply of Donor Services is again in balance with the demand.

## VII.   IN THE ALTERNATIVE, PLAINTIFF ADEQUATELY ALLEGES A VIOLATION OF THE ANTITRUST LAWS UNDER THE RULE OF REASON

Even assuming Plaintiff has not alleged a *per se* violation (which she has), and even assuming the "quick look" method of analysis is inapplicable, Defendants' "rule of reason" challenge must fail at this early stage. That challenge rests on three arguments: (1) that Plaintiff has not properly alleged a product market, (2) that Plaintiff has not properly alleged a geographic market, and (3) that Plaintiff has not properly alleged the Defendant Class has market power within the relevant markets.

### a.   Plaintiff Properly Alleges Relevant Product and Geographic Markets.

Under the Rule of Reason, Plaintiff must allege that "the restraint produces significant anticompetitive effects within a relevant market." *Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059, 1063 (9th Cir. 2001). However, the question of whether a plaintiff has alleged a relevant market is typically a question of fact for the jury: "since the validity of the relevant market is typically a factual element rather than a legal element, alleged markets may survive scrutiny under Rule 12(b)(6) subject to factual testing by summary judgment or trial." *Id.*; *see also Pecover*, 633 F. Supp. 2d at 983. Accordingly, there is no requirement that the relevant market be pled with specificity to survive a motion to dismiss. *Newcal Indus., Inc., v. Ikon Office Solution*, 513 F.3d 1038, 1045 (9th Cir. 2008). Rather, a complaint can only be dismissed if its relevant market is "facially unsustainable." *Id.*

### i.   Plaintiff's Product Market is Adequately Defined

Defendants' assertion that Plaintiff describes the Donor Services market in "a single, conclusory sentence," MTD at 18-9, is wrong. Plaintiff extensively describes the Donor Services market. *See* ¶¶ 1, 31, 35-49. Donor Services consist of "the time, inconvenience, labor, and discomfort incurred by women who agree to supply their own human eggs for assisted fertility and reproductive procedures." ¶ 1. Plaintiff alleges that "AR Eggs are a necessary component of human reproduction" for which "[t]here is no available substitute." ¶ 35. Plaintiff describes in detail the many steps that AR Egg Providers must endure in order to donate their eggs, which includes an extensive screening process and an administered cycle of hormones to medically induce ovulation. ¶¶ 36-45. Finally, Plaintiff describes four means by

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

1  which AR Egg Providers (as well as Defendants, the Defendant Class, and others) participate in the

2  actual Donor Services market.  *See* ¶ 46(a)-(d).  While the first of these methods involves "an individual

3  donating for the benefit of a close friend or family member," the other three involve paid compensation

4  to AR Egg Providers, like Plaintiff.  *See* ¶¶ 9, 46(a)-(d).

5        Defendants argue that Plaintiff's relevant market is deficient because it does not encompass all

6  products that are reasonably interchangeable with Donor Services.  *See* MTD at 18.  Defendants first

7  assert that the Donor Services market should include Donor Services purchased by non-SART clinics,

8  individual egg recipients, and others, as well as Donor Services provided "free of charge."  *See* MTD

9  19-20.  But the Donor Services market defined in the Complaint includes all such purchases.  *See* ¶ 1.

10  Indeed, the Defendant Class itself specifically includes "AR Egg Agencies that agreed to comply with

11  the SART/ASRM rules."  *See* ¶ 19.

12        Defendants next argue that the relevant market of Donor Services should include other "income

13  generating opportunities," such as blood, platelet, or plasma donation or paid trials by hospitals,

14  universities, and other institutions. See MTD 19-20.  But there will always be income generating

15  alternatives available to sellers: Defendants' argument, if accepted, would eliminate the possibility for a

16  relevant seller's market in every case.  Defendants' argument is also inconsistent with the law.  "[I]n the

17  context of a buyer-side conspiracy," the "market is not the market of competing sellers, but the market

18  of competing buyers."  *Todd v. Exxon Corp.*, 275 F.3d 191, 202 (2d Cir. 2001).  The focus, therefore,

19  should be whether "the market is comprised of buyers who are seen by sellers as reasonably good

20  substitutes" for one another.

21        In *Todd*, another buyer-side conspiracy case, the court found plausible a proposed relevant

22  market comprised of the "services of salaried, non-union, managerial, professional and technical (MPT)

23  employees in the oil and petrochemical industry … "  *Id.*  The court found that the proposed market was

24  plausible, even though it was limited to a specific industry, because employees with experience in the oil

25  and petrochemical industry may suffer a pay cut if forced to switch industries, and thus may not find job

26  opportunities outside the industry to be reasonable substitutes. *Id.* at 203.  Similarly here, AR Egg

27  Providers receive unique benefits from selling Donor Services, including greater financial benefits than

28  those provided by Defendants' proposed "other income generating opportunities."  Those other

19

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

1    opportunities are accordingly not reasonable substitutes for the sale of Donor Services, rendering

2    Plaintiff's relevant market plausible. "Viewing the allegations in the light most favorable to Plaintiff, …

3    Plaintiff has not improperly ignored products that may be reasonably interchangeable ones, but instead

4    has included … products in the alleged market and alleged differences regarding others that plausibly

5    exclude them from the relevant market." *See Datel Holdings Ltd. v. Microsoft Corp.*, 712 F. Supp. 2d

6    974, 997 (N.D. Cal. 2010); *see also TYR Sport Inc. v. Warnaco Swimwear Inc.*, 679 F. Supp. 2d 1120,

7    1129-30 (C.D. Cal. 2009) (relevant market of "high-end competitive swimwear" excludes casual

8    swimsuits).

9         Defendants' cases are inapposite. For example, in *Tanaka*, a former collegiate soccer player

10   challenged an intercollegiate athletic association rule that prevented student-athletes from transferring

11   schools. *See Tanaka*, 252 F.3d at 1061. Plaintiff alleged that the relevant market was the "UCLA

12   women's soccer program." *Id.* at 1063. The court found that plaintiff's statement that the market was

13   "unique" and "not interchangeable with any other program in Los Angeles" was insufficient without

14   supporting facts. *Id.* Unlike the plaintiff in *Tanaka*, Plaintiff here has set out a detailed explanation as

15   to why Donor Services is the relevant market. In *Shred-It*, the court similarly found that the plaintiff

16   devoted only seven words of its thirty-two page complaint to define the relevant market. *See Shred-It*

17   *Am., Inc. v. MacNaughton*, No. 10-00547, 2011 WL 1842997 at *5 (D. Haw. May 13, 2011). Again,

18   Plaintiff here has set out much more detail. In *Big Bear Lodging*, plaintiffs brought an antitrust suit in

19   connection with a price-fixing conspiracy that only allowed ski resorts that were members of the Resort

20   Association to offer discounted ski packages. *See Big Bear Lodging Ass'n v. Snow Summit, Inc.*, 182

21   F.3d 1096, 1100 (9th Cir. 1999). The court determined that plaintiffs did not "allege that Big Bear

22   Valley is the area of effective competition in which buyers of these products can find alternative sources

23   of supply, or that there are no other goods or services that are reasonably interchangeable with lodging

24   accommodations or ski packages within this geographic market." *Id.* at 1105. In contrast, Plaintiff here

25   has clearly alleged that there is no adequate substitute for Donor Services. Finally, the court in *Golden*

26   *Gate* found that Plaintiff's relevant product market was hopelessly broad because it lumped all

27   pharmaceutical products together. *See Golden Gate Pharm. Svcs., Inc. v. Pfizer, Inc.*, No. C-09-3854,

28   2010 WL 1541257, at *3 (N.D. Cal. Apr. 16, 2010).

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

### ii.   Plaintiff's Geographic Market is Adequately Defined

Plaintiff alleges facts sufficient to make out a facially sustainable claim that the relevant geographic market for Donor Services is national.  Most importantly, Plaintiff alleges that the ASRM's Ethics Committee set one maximum price for all SART-member Fertility Clinics and associated AR Egg Agencies, nationwide.  *See* ¶¶ 59-82.  Indeed, Plaintiff specifically cites to fifteen AR Egg Agencies interspersed throughout the United States, whose websites state their compliance with the maximum price rule.  *See* ¶¶ 82-96.  That aside, Plaintiff alleges that the ASRM's members are "medical professionals and corporations located throughout the United States." ¶ 10.  Plaintiff also alleges that SART is the "primary organization of professionals dedicated to the practice of assisted reproductive technologies in the United States," and that its members include "over 392 practices, representing over 85% of the clinics engaged in the practice of assisted reproductive technologies in the United States." ¶ 11.

In *United States v. Grinnell Corp.*, the Supreme Court rejected an argument similar to the one made by Defendants here.  The Court evaluated the market for fire- and burglary-protection services and determined that the relevant geographic market for antitrust purposes was national because it "reflect[ed] the reality of the way in which [the defendants] conduct their business." 384 U.S. 563, 576 (1966). The Court made this decision despite the fact that the business was comprised of a nationwide network of fire- and burglary-protection affiliates which each had a range of about 25 miles.  *Id.* at 575. As recognized by the Court, "[t]he activities of an individual station are in a sense local as it serves, ordinarily, only that area which is within a radius of 25 miles.  But the record amply supports the conclusion that the business of providing such a service is operated on a national level." *Id.*  In reaching this conclusion, the Court cited the facts that: 1) there was national planning; 2) its agreements covered activity in many states; 3) it had a national schedule of prices, rates, and terms (which varied to meet local conditions); 4) it dealt with multi-state businesses through nationwide contracts; and 5) manufacturing was done interstate. *Id.* at 575-576.  *See also Graphics Prods. Distribs v. Itek Corp.*, 717 F.2d 1560, 1569 (11th Cir. 1983) (finding a national geographic market based on the defendant's conduct, including dividing the nation into exclusive territories and implementing nationwide policies to enforce compliance with these restrictions.).

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

As in *Grinnell* and *Graphics Products*, Plaintiff's allegations about Defendants' nationwide business practices – most notably the uniform, national pricing applied to members geographically disbursed nationwide – sufficiently set forth a facially sustainable relevant geographic market. Defendants' attempt to paint the relevant geographic market as local flies in the face of their own practices, as Defendants' decision to engage in a nationwide price-fixing campaign is probative. *See Ind. Fed'n of Dentists*, 476 U.S. at 460 ("[T]he purpose of the inquiries into market definition and market power is to determine whether an arrangement has the potential for genuine adverse effects on competition."). Accordingly, Plaintiff has set forth a facially sustainable relevant market, and Defendants' motion to dismiss should be denied.

### b. Plaintiff Properly Alleges Market Power

Defendants' argument that the Defendant Class lacks adequate market power in the Donor Services market rests on the proposition that it is "facially unsustainable" that a Class consisting of over 85% of the reproductive clinics in the United States, as well as the independent agencies serving those clinics, would have market power in the Donor Services market.[8] Merely to state this argument is to refute it. Indeed, given that "almost uniformly, the major, mainstream IVF clinics are SART members and therefore SART compliant," ¶ 55, it is a near-certainty that they have the relevant market power. Indeed, this is why they were successfully able to suppress the price of Donor Services. *See* ¶¶ 97 – 100.

In any event, "unlike [monopolization] claims, [conspiracy] restraint of trade claims need not establish the threshold showing of monopoly control over a relevant market. To show a violation of Section 1, a plaintiff must establish a contract, conspiracy or combination intended to restrain competition and which actually has an anticompetitive effect." *Amarel v. Connell*, 102 F.3d 1494, 1522 (9th Cir. 1996).[9] Plaintiff has adequately pled that the price of Donor Services was suppressed by the

---

[8] While Defendants quibble with this by stating that it includes only *clinics*, this ignores Plaintiff's allegations about AR Agencies also participating in the conspiracy as well as Plaintiff's allegation that "the majority of AR Eggs are acquired from women who are compensated for their services." ¶ 47, 75-96.

[9] Market power and monopoly power are synonymous in the 9th Circuit. *See In re Ebay Seller Antitrust Litig.*, No. 07-01882, 2010 WL 760433, at *4 n.4 (N.D. Cal. Mar. 4, 2010).

1    Maximum Price Rules, ¶¶ 97 – 100.  At the pleading stage, this is more than sufficient to show the

2    Maximum Price Rules had an actual anticompetitive effect.  *Cf. Knevelbaard*, 232 F.3d at 988.

3    ("[w]hen horizontal price fixing causes . . . sellers to receive less[] than the prices that would prevail in a

4    market free of the unlawful trade restraint, antitrust injury occurs.")

5    **VIII.    CONCLUSION**

6            Plaintiff's Complaint alleges a violation that has long been judged a *per se* violation of the

7    antitrust laws, and Defendants' Motion to Dismiss should accordingly be denied.  This remains true

8    even if this Court decides to apply a "quick look" analysis, since Plaintiff is not required to prove market

9    power in such a case.  Finally, even if the Court applies a full-blown "rule of reason" approach,

10   Defendants' Motion would nevertheless fail, as it seeks to apply a wrongfully high standard to Plaintiff's

11   allegations at this early stage.

12

13   DATED: August 15, 2011                        **FINKELSTEIN THOMPSON LLP**

14

15                                                 By: /s/ Rosemary M. Rivas
                                                       Rosemary M. Rivas

16

17                                                 Mark Punzalan
                                                   100 Bush Street, Suite 1450
18                                                 San Francisco, California 94104
                                                   Telephone: (415) 398-8700
19                                                 Facsimile: (415) 398-8704

20                                                 Douglas G. Thompson
                                                   dthompson@finkelsteinthompson.com
21                                                 Michael G. McLellan
                                                   mmclellan@finkelsteinthompson.com
22                                                 **FINKELSTEIN THOMPSON LLP**
                                                   1050 30th Street NW
23                                                 Washington, DC 20007
                                                   Telephone: 202-337-8000
24                                                 Facsimile: 202-337-8090

25

26                                                 Bryan Clobes
                                                   bclobes@cafferyfaucher.com
27                                                 Ellen Meriwether
                                                   emeriwether@caffertyfaucher.com
28

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CAFFERTY FAUCHER LLP**
1717 Arch Street, Suite 3610
Philadelphia, PA 19103
Telephone: 215-864-2800
Facsimile: 215-864-2810

Counsel for Individual and Representative
Plaintiff Lindsay Kamakahi

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

## CERTIFICATE OF SERVICE

I, Julia Dito, declare as follows:

I am employed by Finkelstein Thompson, 100 Bush Street, Suite 1450, San Francisco, California 94104. I am over the age of eighteen years and am not a party to this action. On August 15, 2011, I served the following document(s):

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED CLASS ACTION COMPLAINT**

[X] **BY CM/ECF ELECTRONIC SERVICE:** Electronically filing the foregoing with the Clerk of the Court using the CM/ECF system sent notification of such filing to the e-mail addresses of registered participants.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct. Executed this 15th day of August, 2011, at San Francisco, California.

_Julia Dito_
Julia Dito

---

1
CERTIFICATE OF SERVICE