UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| LINDSAY KAMAKAHI and JUSTINE LEVY, individually, and on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>AMERICAN SOCIETY FOR REPRODUCTIVE MEDICINE and SOCIETY FOR ASSISTED REPRODUCTIVE TECHNOLOGY,<br><br>Defendants. | Case No: C 11-01781 SBA<br><br>**ORDER DENYING MOTION TO DISMISS**<br><br>Docket 57 |

This is a putative antitrust class action brought by Plaintiffs Lindsay Kamakahi ("Kamakahi") and Justine Levy ("Levy") (collectively, "Plaintiffs") against Defendants American Society for Reproductive Medicine ("ASRM") and Society for Assisted Reproductive Technology ("SART") (collectively, "Defendants") under § 1 of the Sherman Act, 15 U.S.C. § 1 ("Sherman Act" or "Act"). Plaintiffs challenge, as per se illegal under the Act, a horizontal price-fixing agreement among purchasers of human egg donor services. In the alternative, Plaintiffs claim that the agreement is an unreasonable restraint of trade in violation of the Act under the "rule of reason."

The parties are presently before the Court on Defendants' motion to dismiss the consolidated amended class action complaint ("CAC") under Rule 12(b)(6) of the Federal Rules of Civil Procedure. Dkt. 57. Having read and considered the papers filed in connection with this matter and being fully informed, the Court hereby DENIES

Defendants' motion to dismiss, for the reasons stated below. The Court, in its discretion, finds this matter suitable for resolution without oral argument. See Fed.R.Civ.P. 78(b); N.D. Cal. Civ. L.R. 7-1(b).

## I.   BACKGROUND

### A.   Parties and Nature of the Action

ASRM is an organization "devoted to advancing knowledge and expertise in reproductive medicine." CAC ¶ 10. ASRM membership consists of medical professionals and corporations located throughout the United States. Id. ASRM has an Ethics Committee and a Practice Committee that establish standards for its members; the central function of the Ethics Committee is the publication of "ethics reports" setting forth certain ethical standards for reproductive professionals, while the central function of the Practice Committee is to promulgate guidelines and standards to be followed by reproductive professionals. Id.

SART is an affiliated society to ASRM. CAC ¶ 11. It considers itself as the "primary organization of professionals dedicated to the practice of assisted reproductive technologies in the United States." Id. According to its website, SART's members include over 392 practices (including many in this District), representing over 85% of the clinics engaged in the practice of assisted reproductive technologies in the United States. Id. SART's mission is "to set and to help maintain the standards for assisted reproductive technologies, including guidelines regarding ethical considerations, laboratory practice and proper advertising." Id.

Plaintiffs are individuals that sold human egg donor services ("Donor Services") directly to SART-member fertility clinics. CAC ¶ 9. Plaintiffs define Donor Services as "the time, inconvenience, labor, and discomfort incurred by women who agree to supply their own human eggs for assisted fertility and reproductive procedures. ('AR Eggs)." Id. ¶ 1. Kamakahi sold Donor Services directly to a SART-member fertility clinic located in this District during the time period from April 12, 2007 to the present ("Class Period"), while

1 Levy (a citizen of California) sold Donor Services directly to a SART-member fertility clinic located in Seattle, Washington during the Class Period.  Id. ¶¶ 9, 12.

In 2000, ASRM promulgated certain rules setting forth the maximum compensation its members should pay for Donor Services ("Maximum Price Rules"), and SART adopted the Maximum Price Rules.  CAC ¶ 2.  According to Plaintiffs, ASRM, SART, and SART-member fertility clinics have agreed amongst themselves to follow the Maximum Price Rules.  Id. ¶ 3.  In addition, agencies providing SART-member fertility clinics with AR Eggs ("AR Egg Agencies") have also agreed to follow the Maximum Price Rules.  Id.  Plaintiffs allege that this agreement constitutes a contract, combination, and conspiracy in restraint of trade that is a per se violation of the Sherman Act.  Id.  Plaintiffs bring the instant putative class action to challenge the Maximum Price Rules on behalf of all women who sold Donor Services for the purpose of supplying AR Eggs directly to any member of the Defendant Class[1] that was either a signatory to an agreement to abide by the Maximum Price Rules or otherwise agreed to adhere to such rules on donor egg compensation during the Class Period.  Id. ¶¶ 4, 5, 12, 19.  Plaintiffs allege that putative class members "sold Donor Services at artificially low, non-competitive levels as a result of the actions of the Defendant Class and the restraint of trade alleged herein," i.e., the agreement to follow the Maximum Price Rules.  Id. ¶¶ 3, 14.

### B. Assisted Reproductive Eggs in the United States

AR Eggs or oocytes are a necessary component of human reproduction.  CAC ¶ 35.  There is no available substitute.  Id.  While most eggs are naturally produced by women who become pregnant, some are provided by women who provide Donor Services ("AR Egg Providers") by undergoing an extensive screening process and an administered cycle of hormones to medically induce ovulation.  Id. ¶ 36.  AR Eggs acquired from AR Egg

---

[1] The Defendant Class is defined as "ASRM, SART, and all SART-member Fertility Clinics and all AR Egg Agencies that agreed to comply with SART/ASRM rules on donor egg compensation and who paid for Donor Services at any time during the time period from April 12, 2007 to the present."  CAC ¶ 19.  The AR Egg Agencies that have agreed to comply with the SART/ASRM rules on donor egg compensation are agencies that provide SART-member fertility clinics AR Eggs.  See id. ¶ 75.

- 3 -

1  Providers are used to enable women whose ovaries do not produce enough healthy eggs to
2  become pregnant. Id. ¶ 37.
3       AR Egg Providers go through a screening and testing process before becoming
4  eligible to provide their eggs. CAC ¶ 38. The screening process requires potential AR Egg
5  Providers to first compile and disclose a detailed medical and psychological history about
6  themselves and their close blood relatives, including questions about their use of cigarettes,
7  alcohol, and both prescription and illegal drugs. Id. ¶ 39. AR Egg Providers are required to
8  have a physical examination, including a pelvic exam and screening for infectious diseases.
9  Id. ¶ 40. AR Egg Providers are also screened for inherited diseases, and undergo
10 psychological screening. Id.
11      In the event a potential AR Egg Provider passes the screening process, she must then
12 go through the egg donation process, which requires the AR Egg Provider to receive a
13 three-week course of hormone injections, aimed at stimulating egg production. CAC ¶¶ 41-
14 42. While receiving hormone treatment, AR Egg Providers must also receive frequent
15 blood tests and ultrasound examinations to track the developing eggs and to monitor
16 reaction to the hormones, which requires frequent doctor visits. Id. ¶ 43. When the eggs
17 are ready for retrieval, they are removed from the AR Egg Provider's ovaries in a surgical
18 procedure. Id. ¶ 45

19      **C.      The Donor Services Market**

20      Individuals seeking to acquire AR Eggs do so through one of four means: (1)
21 through an individual donating for the benefit of a close friend or family member; (2)
22 through a full-service fertility clinic's paid-provider recruitment program; (3) through an
23 egg-donor agency ("AR Egg Agency") that recruits through a paid provider program; or (4)
24 through a paid egg donor recruited directly by the person seeking to acquire the AR Eggs,
25 either independently or through  a broker, agent, or other intermediary. CAC ¶ 46.
26 According to Plaintiffs, since it is difficult (and frequently impossible) for an individual
27 seeking AR Eggs to find a desirable person willing to provide Donor Services for no
28 compensation, the majority of AR Eggs are acquired from women who are compensated for

their services.  Id. ¶ 47.  In fact, most fertility clinics and AR Egg Agencies actively recruit AR Egg Providers with the promise of compensation for their Donor Services, including the time, effort, discomfort, and health risks resulting from the medical procedures involved.  Id. ¶ 48.  The Donor Services market involves sales of approximately $80 million annually.  Id. ¶ 49.

### D.     The Illegal Agreement

The Donor Services market is largely self-regulated.  CAC ¶ 50.  There are no federal laws or regulations governing economic compensation for Donor Services.  Id. Plaintiffs are aware of only two states with laws governing compensation for Donor Services:  Louisiana, which bars such payments, and Indiana, which provides for a statutory cap on such payments.  Id.

ASRM has long been concerned about the compensation paid to AR Egg Providers for AR Eggs and has promulgated ethical guidelines concerning such compensation since at least 1994.  CAC ¶ 56.  Prior to 2000, ASRM's standards of practice merely stated that compensation for Donor Services "should not be so excessive as to constitute undue inducement" but neither ASRM nor SART had quantified a maximum (or indeed any) specific price.  Id. ¶ 57.  In 2000, the ASRM Ethics Committee promulgated a report entitled "Financial Incentives in Recruitment of AR Egg Providers" (the "2000 Maximum Price Report"), which specifically sets forth compensation guidelines for its members, i.e., the Maximum Price Rules.  Id. ¶¶ 59-60.  Specifically, the 2000 report states that "sums of $5000 or more require justification and sums above $10,000 go beyond what is appropriate."  Id. ¶ 60.

The Maximum Price Rules were calculated according to the market rates for sperm donation and then slightly adjusted upwards to account for the additional inconveniences of Donor Services.  CAC ¶ 61.  In 2007, ASRM reaffirmed the $5,000 and $10,000 Maximum Price Rules in a report entitled "Financial Compensation of Oocyte Donors" ("2007

1  Maximum Price Report"). Id. ¶ 63.[2] The rates called for by the Maximum Price Rules
2  have not increased since they were initially promulgated in 2000. Id.

3  All SART-member fertility clinics have agreed to adhere to the standards and
4  recommendations of ASRM's Practice and Ethics Committees as a requirement of their
5  membership in SART. CAC ¶ 69. Consistent with this obligation, SART-member fertility
6  clinics have agreed to abide by the Maximum Price Rules. Id. ¶ 70. AR Egg Agencies that
7  provide SART-member fertility clinics with AR Eggs have also agreed to comply with the
8  Maximum Price Rules. Id. ¶ 75.

9  Plaintiffs allege that by agreeing to comply with the Maximum Price Rules, SART-
10 member fertility clinics and AR Egg Agencies serving those clinics have successfully
11 suppressed the price of Donor Services to prices within the range set by the Maximum
12 Price Rules in violation of antitrust laws. CAC ¶¶ 97, 100. Plaintiffs assert that the price-
13 fixing agreement has eliminated price competition among "SART-member clinics in the
14 procurement of Donor Eggs, a necessary component in the provision of AR Services." Id. ¶
15 102. Plaintiffs further assert that "[b]y collectively agreeing to maintain artificially low
16 supply prices for Donor Eggs, Defendant Clinics have been able to reap anti-competitive
17 profits for themselves. Plaintiffs and the members of the Egg Donor Class have been
18 injured by the absence of a competitive market for the supply of Donor Eggs because they
19 have been paid less for Donor Services than they would have been paid absent the
20 Maximum Price Rules." Id. ¶ 103. According to Plaintiffs, because "the average hourly
21 rate Egg Donors receive for Donor Services is approximately the same as the hourly rate
22 received by sperm donors," and because "the process of donating eggs is far more painful

---

[2] Defendants request the Court take judicial notice of the 2007 Maximum Price Report. Def.'s Mtn. at 1 n. 1. Plaintiffs do not oppose Defendants request. Because the 2007 Maximum Price Report is a document upon which Plaintiffs' CAC "necessarily relies," it is subject to judicial notice. See Marder v. Lopez, 450 F.3d 445, 448 (9th Cir. 2006) ("A court may consider evidence on which the complaint 'necessarily relies' if: (1) the complaint refers to the document; (2) the document is central to the plaintiff's claim; and (3) no party questions the authenticity of the copy attached to the 12(b)(6) motion."). Accordingly, Defendants' request for judicial notice is GRANTED.

and risky than is the process for donating sperm, a price paid for Donor Services that does not account for those difference[s] must be artificially low."  Id. ¶ 104.

## II. DISCUSSION

### A. Legal Standard

A motion to dismiss under Federal Rule of Civil Procedure 12(b) (6) "tests the legal sufficiency of a claim." Navarro v. Block, 250 F.3d 729, 732 (9th Cir. 2001).  A complaint may be dismissed under Rule 12(b)(6) for failure to state a claim if the plaintiff fails to state a cognizable legal theory, or has not alleged sufficient facts to support a cognizable legal theory.  Balistreri v. Pacifica Police Dep't, 901 F.2d 696, 699 (9th Cir. 1990).  In determining whether a complaint states a claim on which relief may be granted, the Court "accept[s] as true all well-pleaded allegations of material fact, and construe[s] them in the light most favorable to the non-moving party." Daniels–Hall v. National Educ. Ass'n, 629 F.3d 992, 998 (9th Cir. 2010).  However, the Court is not required to accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." In re Gilead Sciences Securities Litigation, 536 F.3d 1049, 1055 (9th Cir. 2008).

The complaint is properly dismissed if it fails to plead "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949 (2009).  Thus, "for a complaint to survive a motion to dismiss, the non-conclusory 'factual content,' and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief." Moss v. U.S. Secret Serv., 572 F.3d 962, 969 (9th Cir. 2009). Where a complaint or claim is dismissed, leave to amend generally is granted, unless further amendment would be futile.  See Chaset v. Fleer/Skybox Int'l, 300 F.3d 1083, 1087-1088 (9th Cir. 2002); see also Lopez v. Smith, 203 F.3d 1122, 1127 (9th Cir. 2000) (if a

court dismisses the complaint, it should grant leave to amend, unless it determines that the pleading could not possibly be cured by the allegation of other facts).

### B. Motion to Dismiss

The CAC alleges one claim for relief under § 1 of the Sherman Act. Specifically, Plaintiffs allege that Defendants have entered into a per se horizontal maximum price-fixing agreement ("Maximum Price Agreement") in violation of the Act. CAC ¶ 106. In the alternative, Plaintiffs allege that, if evaluated under the rule of reason, the Maximum Price Agreement is an unreasonable restraint of trade in violation of the Act. Id. ¶ 107.

In order to establish a claim under § 1 of the Act, a plaintiff must demonstrate: "(1) that there was a contract, combination, or conspiracy; (2) that the agreement unreasonably restrained trade under either a per se rule of illegality or a rule of reason analysis; and (3) that the restraint affected interstate commerce." Tanaka v. Univ. of S. Cal., 252 F.3d 1059, 1062 (9th Cir. 2001) (internal quotations and citations omitted). Defendants' motion to dismiss focuses on the second element. Defendants move to dismiss Plaintiff's Sherman Act claim to the extent it is predicated on a per se theory of liability on the ground that the CAC does not allege a cognizable legal theory. Defs.' Mtn. at 2, 6-17. Id. According to Defendants, Plaintiffs' per se theory of liability fails as a matter of law because the restraint on trade alleged in the CAC should be analyzed under the rule of reason. Id. In addition, Defendants contend that dismissal of Plaintiffs' alternative theory of liability under the rule of reason is appropriate because Plaintiffs' have failed to plead sufficient facts to establish a rule of reason claim. Id. at 2, 17-21. These arguments are addressed below.

#### 1. Methods of Antitrust Analysis

"The Sherman Act was designed to be a comprehensive charter of economic liberty aimed at preserving free and unfettered competition as the rule of trade. It rests on the premise that the unrestrained interaction of competitive forces will yield the best allocation of our economic resources, the lowest prices, the highest quality and the greatest material progress, while at the same time providing an environment conducive to the preservation of our democratic political and social institutions. . . . [T]he policy unequivocally laid down

- 8 -

by the Act is competition." Northern Pacific R. Co. v. United States, 356 U.S. 1, 4-5 (1958). Under § 1 of the Sherman Act, "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1. The Supreme Court has not taken a literal approach to this language, however. Texaco Inc. v. Dagher, 547 U.S. 1, 5 (2006). The Supreme Court has repeatedly recognized that by the language of the Sherman Act, " 'Congress intended to outlaw only *unreasonable* restraints.' " Id.

To determine whether an alleged restraint is unreasonable, the court must decide at the threshold whether it is per se illegal or whether it must be analyzed under the "rule of reason." Paladin Assoc., Inc. v. Mont. Power Co., 328 F.3d 1145, 1155 (9th Cir. 2003). The purpose of the analysis in both categories is to "form a judgment about the competitive significance of the restraint; it is not to decide whether a policy favoring competition is in the public interest, or in the interest of the members of an industry. Subject to exceptions defined by statute, that policy decision has been made by the Congress." National Soc. of Professional Engineers v. United States, 435 U.S. 679, 692 (1978). "Under the Sherman Act the criterion to be used in judging the validity of a restraint on trade is its impact on competition." Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla., 468 U.S. 85, 104 (1984) ("NCAA").

Under the rule of reason analysis, which presumptively applies, antitrust plaintiffs must demonstrate that a particular contract or combination is in fact unreasonable and anticompetitive before it will be found unlawful. Texaco, 547 U.S. at 5. The Ninth Circuit has explained, " '[t]he rule of reason weighs legitimate justifications for a restraint against any anticompetitive effects. We review all of the facts, including the precise harms alleged to the competitive markets, and the legitimate justifications provided for the challenged practice, and we determine whether the anticompetitive aspects of the challenged practice outweigh its procompetitive effects.' " California ex rel. Harris v. Safeway, Inc., 651 F.3d 1118, 1133 n. 10 (9th Cir. 2011). " 'The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether

it is such as may suppress or even destroy competition. To determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable.' " Continental T.V., Inc. v. GTE Sylvania Inc., 433 U.S. 36, 49 n. 15 (1977). A restraint violates the rule of reason if the harm to competition outweighs its procompetitive effects. Tanaka, 252 F.3d at 1063.

The rule of reason does not govern all restraints. Some types "are deemed unlawful per se." Leegin Creative Leather Prods., Inc. v. PSKS, Inc., 551 U.S. 877, 886 (2007). Per se liability is reserved for only those agreements that are "so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality." Texaco, 547 U.S. at 5; see also California ex rel. Harris, 651 F.3d at 1133 (restraints that have such predictable and pernicious anticompetitive effect, and such limited potential for procompetitive benefit, are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use). In characterizing conduct under the per se rule, the inquiry must focus on "whether the effect and . . . the purpose of the practice are to threaten the proper operation of our predominantly free-market economy-that is, whether the practice facially appears to be one that would always or almost always tend to restrict competition and decrease output. . . ." Broadcast Music, Inc. v. Columbia Broad. Sys., 441 U.S. 1, 19-20 (1979) ("BMI"); see NCAA, 468 U.S. at 103-104 ("Per se rules are invoked when surrounding circumstances make the likelihood of anticompetitive conduct so great as to render unjustified further examination of the challenged conduct.").

Restraints that are per se unlawful include horizontal agreements among competitors to fix prices or to divide markets. Leegin, 551 U.S. at 886; see Knevelbaard Dairies v. Kraft Foods, Inc., 232 F.3d 979, 986 (9th Cir. 2000) (foremost in the category of per se violations is horizontal price-fixing among competitors); United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 218 (1940) ("[F]or over forty years this Court has consistently and without deviation adhered to the principle that price-fixing agreements are unlawful per se

under the Sherman Act. . . ."). Horizontal price fixing is a per se violation regardless of whether the prices set are minimum or maximum. See Arizona v. Maricopa County Medical Society, 457 U.S. 332, 348 (1982) ("[H]orizontal agreements to fix maximum prices [are] on the same legal – even if not economic – footing as agreements to fix minimum or uniform prices.").[3]

Resort to per se rules is confined to restraints that would always or almost always tend to restrict competition and decrease output. Leegin, 551 U.S. at 886. To justify a per se prohibition, a restraint must have "manifestly anticompetitive" effects and "lack any redeeming virtue." Id. A "per se rule is appropriate only after courts have had considerable experience with the type of restraint at issue and only if courts can predict with confidence that it would be invalidated in all or almost all instances under the rule of reason." Id. at 886-887 (citations omitted); see Continental T.V., 433 U.S. at 58-59 ("[A] 'departure from the rule-of-reason standard must be based upon demonstrable economic effect rather than . . . upon formalistic line drawing.' "). Accordingly, the Supreme Court has expressed reluctance to adopt per se rules where the economic impact of certain practices is not immediately obvious. Leegin, 551 U.S. at 887; see also Texaco, 547 U.S. at 5; State Oil Co. v. Khan, 522 U.S. 3, 10 (1997); FTC v. Indiana Federation of Dentists, 476 U.S. 447, 458-459 (1986).

### 2. Analysis

#### a. Per Se Illegality

The CAC alleges a buyer-side conspiracy among purchasers of Donor Services to fix maximum prices for such services. CAC ¶¶ 1-3. While the traditional horizontal conspiracy case involves an agreement among sellers with the purpose of raising prices to supracompetitive levels, the Sherman Act also applies to abuse of market power on the

---

[3] "When horizontal price fixing causes buyers to pay more, or sellers to receive less, than the prices that would prevail in a market free of the unlawful trade restraint, antitrust injury occurs. This is seen most often in claims by overcharged buyers; as to underpaid sellers it is less common in the reported cases, but is equally true." Knevelbaard Dairies, 232 F.3d at 988. "[A] buying cartel's low buying prices are illegal and bring antitrust injury and standing to the victimized suppliers." Id. at 988-989.

- 11 -

1  buyer side - often taking the form of monopsony or oligopsony.[4]  Todd v. Exxon Corp., 275
2  F.3d 191, 201 (2d Cir. 2001).  The Supreme Court has recognized that a horizontal
3  conspiracy among buyers to stifle competition is as unlawful as one among sellers.
4  Mandeville Island Farms, Inc. v. Am. Crystal Sugar Co., 334 U.S. 219, 235 (1948) ("It is
5  clear that the agreement is the sort of combination condemned by the [Sherman] Act, even
6  though the price-fixing was by purchasers, and the persons specially injured . . . are sellers,
7  not customers or consumers.") (footnotes omitted); see also Telecor Communications, Inc.
8  v. Southwestern Bell Telephone Co., 305 F.3d 1124, 1134-1136 (10th Cir. 2002).

9        Here, the CAC alleges that the agreement among purchasers of Donor Services to
10 adhere to the Maximum Price Rules promulgated by ASRM's Ethics Committee is a
11 horizontal price-fixing agreement among competitors that eliminates price competition in
12 the procurement of Donor Services.  See CAC ¶¶ 1, 60, 63, 102.  The CAC further alleges
13 that the purpose and effect of the Maximum Price Agreement is to artificially suppress the
14 price for Donor Services, which has allowed "Defendant Clinics" to reap anti-competitive
15 profits for themselves.  Id. ¶¶ 103, 108.  According to Plaintiffs, they and the putative class
16 members have been injured by the lack of a competitive market for the supply of Donor
17 Services because they have been paid less for Donor Services than they would have been
18 paid absent the Maximum Price Rules.  Id. ¶¶ 103.

19       Defendants contend that dismissal of Plaintiff's per se theory of liability is
20 appropriate because the restraint on trade alleged in the CAC is not subject to per se
21 analysis as a matter of law.  Defs.' Mtn. at 6-17.  While Defendants recognize that "naked
22 agreements among competitors to set prices have been held per se illegal," Defendants
23 assert that "[e]ven when a challenged business practice may literally be 'price fixing,' per se
24 condemnation does not inevitably follow.  Id. at 8.  "Rather, it is necessary for the Court to
25

---

[4] "A monopsony is different from the usual form of monopolistic control in which suppliers utilize market power to restrict output and thereby raise prices.  In a monopsony, the buyers have market power to decrease market demand for a product and thereby lower prices."  Campfield v. State Farm Mut. Auto. Ins. Co., 532 F.3d 1111, 1118 (10th Cir. 2008).

- 12 -

characterize the challenged conduct as falling within or without that category of behavior to which . . . the label price fixing is applied." Id. at 9 (quotation marks omitted). According to Defendants, courts apply the rule of reason in the professional association context when the restraint is designed to pursue legitimate objectives of the association such as ethical, charitable or other non-economic goals, and the restraint does not increase profits of the association. Id. 8-10, 16. Defendants contend that the alleged conspiracy is inappropriate for per se treatment as a matter of law because the ethical guidelines setting the financial compensation of AR Egg donors (i.e., the Maximum Price Rules) are designed to: protect the health and safety of both egg donors and recipients by reducing the incentive of donors to conceal medical information; resolve social welfare concerns regarding the exploitation or undue inducement of donors and the devaluation of human life; and to expand the output and availability of donated oocytes to infertile persons or couples of varying economic means. See id. at 7-16, Exh. A. Defendants maintain that given the "procompetitive interests advanced by the ethical guidelines, and the fact that the guidelines do not serve to increase the profits of Defendants, the guidelines cannot be held per se illegal." Id. at 16-17.

The Court finds that Defendants' arguments are contrary to the allegations in the CAC and raise factual issues that are inappropriate for resolution on a motion to dismiss. See Brennan v. Concord EFS, Inc., 369 F.Supp.2d 1127, 1131, 1133 (N.D. Cal. 2005) ("Whatever the merits of the [defendants' procompetitive] arguments, they are intrinsically factual, contrary to plaintiffs' pleading and inappropriate for resolution at the motion to dismiss stage"). At this stage of the litigation, the Court concludes that resolution of the issue of which method of antitrust analysis to apply is premature. See NCAA, 468 U.S. at 104 n. 26 ("Indeed, there is often no bright line separating per se from Rule of Reason analysis. Per se rules may require considerable inquiry into market conditions before the *evidence* justifies a presumption of anticompetitive conduct." (emphasis added)); National Bancard Corp. v. VISA U.S.A., Inc., 779 F.2d 592, 596 (11th Cir. 1986) (while the decision as to whether to apply a per se or rule of reason analysis is a question of law, it is

1  predicated on a factual inquiry into the restraint's competitive effect).  Indeed, as the cases
2  cited by Defendants demonstrate, determining the method of antitrust analysis to apply is a
3  fact specific inquiry, which is generally determined at the summary judgment stage, see e.g.,
4  Dagher, 547 U.S. 1; Northwest Wholesale Stationers, Inc. v. Pacific Stationery and Printing
5  Co., 472 U.S. 284 (1985), or after a trial on the merits.  See e.g., BMI, 441 U.S. 1; NCAA,
6  468 U.S 85; Prof'l Eng'rs, 435 U.S. 679; United States v. Brown University in Providence
7  in State of R.I., 5 F.3d 658 (3d Cir. 1993).  Accordingly, for the reasons stated above,
8  Defendants' motion to dismiss Plaintiffs' Sherman Act claim to the extent it is predicated on
9  a per se theory of liability is DENIED.

### b. Rule of Reason

Under the rule of reason analysis, "[a]ntitrust law requires allegation of both a product market and a geographical market."  Newcal Indus., Inc. v. Ikon Office Solution, 513 F.3d 1038, 1045, n. 4 (9th Cir. 2008).  "In order to state a valid claim under the Sherman Act, a plaintiff must allege that the defendant has market power within a 'relevant market.'  That is, the plaintiff must allege both that a 'relevant market' exists and that the defendant has power within that market."  Id. at 1044.  There is no requirement that these elements be pled with specificity.  Id. at 1045.  An antitrust complaint therefore survives a Rule 12(b)(6) motion unless it is apparent from the face of the complaint that the alleged market suffers from a fatal legal defect.  Id.  And since the validity of the "relevant market" is typically a factual element rather than a legal element, alleged markets may survive scrutiny under Rule 12(b)(6) subject to factual testing by summary judgment or trial.  Id.  However, a complaint may be dismissed pursuant to Rule 12(b)(6) "if the complaint's 'relevant market' definition is facially unsustainable."  Id.

Defendants contend that Plaintiffs have failed to plead a cognizable § 1 Sherman Act claim because the allegations in the CAC regarding the relevant product market and relevant geographical market are insufficient.  Defs.' Mtn. at 17-21.  Defendants' arguments are discussed below.

///

**1**

### i. Relevant Product Market

"For antitrust purposes, a 'market is composed of products that have reasonable interchangeability for the purposes for which they are produced—price, use and qualities considered.'" Paladin Assoc., 328 F.3d at 1163 (citation omitted). The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." Brown Shoe Co. v. United States, 370 U.S. 294, 325 (1962). "Interchangeability implies that one product is roughly equivalent to another for the use to which it is put," while "[c]ross-elasticity of demand is a measure of the substitutability of products from the point of view of buyers." Queen City Pizza, Inc. v. Domino's Pizza, Inc., 124 F.3d 430, 437-438 n.6 (3d Cir. 1997) (internal quotation marks and citations omitted). "Where the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient and a motion to dismiss may be granted." Id. at 436.

The fact that this case involves a buyer-side conspiracy affects how the market is defined. Todd, 275 F.3d at 202. As the Second Circuit has explained:

> Normally, the market is composed of products that have reasonable interchangeability for the purposes for which they are produced - price, use and qualities considered. In economists' terms, two products or services are reasonably interchangeable where there is sufficient cross-elasticity of demand. Cross-elasticity of demand exists if consumers would respond to a slight increase in the price of one product by switching to another product. Thus, the inquiry is whether a hypothetical cartel would be substantially constrained from increasing prices by the ability of customers to switch to other producers.
>
> There is a danger in applying these factors mechanically in the context of monopsony or oligopsony. These factors are reversed in the context of a buyer-side conspiracy. In such a case, the market is not the market of competing sellers but of competing buyers. This market is comprised of buyers who are seen by sellers as being reasonably good substitutes. A greater availability of substitute buyers indicates a smaller quantum of market power on the part of the buyers in question.

Id. (citations, alterations and quotation marks omitted). "Because market definition is a

**1** deeply fact-intensive inquiry, courts hesitate to grant motions to dismiss for failure to plead
**2** relevant product market." Id. at 199-200.
**3**     Here, the CAC alleges that "the Relevant Product Market is the market for the
**4** purchase of Donor Services" in the United States, and that the Defendant Class controls
**5** over 85% of that market. CAC ¶¶ 31-32. The CAC also alleges that SART's members
**6** comprise approximately 85% of the clinics engaged in assisted reproductive technologies in
**7** the United States. See id. ¶¶ 11, 55. In the section of the CAC titled "The Donor Services
**8** Market," Plaintiffs allege that persons seeking to acquire AR Eggs do so through one of
**9** four means: (1) through an individual donating for the benefit of a close friend or family
**10** member; (2) through a full-service fertility clinic's paid provider recruitment program; (3)
**11** through an AR Egg Agency that recruits through a paid provider program; or (4) through a
**12** paid egg donor recruited directly by the person seeking to acquire the AR Eggs, either
**13** independently or through a broker agent, or other intermediary. CAC ¶ 46. Plaintiffs
**14** further allege that because it is difficult for an individual seeking AR Eggs to find a
**15** desirable person willing to provide Donor Services for no compensation, the majority of
**16** AR Eggs are acquired from women who are compensated for their services. Id. ¶ 47.
**17** According to Plaintiffs, AR Eggs are a necessary component of human reproduction and
**18** there is no available substitute. Id. ¶ 35.
**19**     Defendants contend that dismissal of Plaintiff's rule of reason theory of liability is
**20** appropriate because Plaintiffs have failed to "plead *any* facts showing why [Donor
**21** Services] is the proper market, why the boundaries of the market are defined as they are, or
**22** whether the market encompasses all reasonably-interchangeable substitutes." Defs.' Mtn. at
**23** 19-20 (emphasis in original). The Court disagrees. Viewing the allegations in the light
**24** most favorable to Plaintiffs, the Court concludes that Plaintiffs have alleged sufficient facts
**25** to withstand Defendants' motion to dismiss. Plaintiffs have alleged facts defining the
**26**
**27**
**28**

relevant market as the market for the purchase of Donor Services in the United States.[5] Contrary to Defendants' contention, the allegations in the CAC do not "suggest" that the alleged relevant product market is limited to Donor Services purchased by clinics.

Nor have Defendants shown that the proposed relevant market "clearly" does not encompass all interchangeable substitute products even when all factual inferences are granted in Plaintiff's favor. Where, as here, a buyer-side conspiracy is alleged, the focus with respect to interchangeability is on the interchangeability of the buyers, that is, whether there are any reasonably good substitute buyers from the point of view of the sellers. In this regard, Defendants contend that dismissal is appropriate because there are "numerous" substitutes available to "prospective egg donors" that are not addressed by the CAC, including "blood, platelet, or plasma donation or paid clinical trials by hospitals, universities, companies, or research institutions." Defs.' Mtn. at 20. According to Defendants, the relevant market should include these other "alternative income-generating opportunities" because they are "close substitutes for egg donation." Id. The Court disagrees. The relevant market is typically a factual element rather than a legal element and Defendants have failed to show that the alleged market is "facially unsustainable" based on Plaintiffs' failure to include the substitutes they identified or any other substitutes. Defendants' factual contention that prospective egg donors treat the "alternative income-generating opportunities" identified by Defendants as good substitutes for egg donation is not appropriate for resolution at the pleading stage. See Image Tech. Servs. v. Eastman Kodak, 125 F.3d 1195, 1203 (9th Cir. 1997) ("Ultimately what constitutes a relevant

---

[5] To the extent Defendants argue in a footnote that Plaintiffs failed to allege market power, the Court disagrees. "A footnote is the wrong place for substantive arguments on the merits of a motion, particularly where such arguments provide independent bases for dismissing a claim not otherwise addressed in the motion." First Advantage Background Servs. Corp. v. Private Eyes, Inc., 569 F.Supp.2d 929, 935 n. 1 (N.D. Cal. 2008) (rejecting argument made in a footnote). The Court is not only concerned with the location of the argument but with the substance of the argument. Defendants' argument fails to demonstrate that the CAC's allegations regarding market power are "facially unsustainable." Viewing the facts in the light most favorable to Plaintiffs, the CAC alleges sufficient facts describing Defendants' position in the relevant market for Donor Services to plausibly conclude that Defendants have market power within that market. See e.g., CAC ¶¶ 11, 31-32, 46-47, 55.

- 17 -

1  market is a factual determination for the jury."); Twin City Sportservice v. Charles O'Finley
2  & Co., 676 F.2d 1291, 1299 (9th Cir. 1982) ("The definition of the relevant market is
3  basically a fact question dependent upon the special characteristics of the industry
4  involved").

### ii.     Geographic Market

6  A geographic market is "the area of effective competition." Tanaka, 252 F.3d at
7  1063. Defining the scope of a geographic market is "a question of fact to be determined in
8  the context of each case in acknowledgment of the commercial realities of the industry
9  being considered." Gordon v. Lewistown Hosp., 423 F.3d 184, 212 (3d Cir. 2005); see
10 Oltz v. St. Peter's Community Hosp., 861 F.2d 1440, 1446 (9th Cir. 1988) (defining the
11 relevant geographic market is a factual inquiry ordinarily reserved for the jury).

12 Here, Plaintiffs assert that the relevant geographical market is the United States.
13 CAC ¶ 32. The CAC alleges that SART is an affiliated society to ASRM, which "bills
14 itself as the 'primary organization of professionals dedicated to the practice or assisted
15 reproductive technologies in the United States,' " and that "ASRM membership . . . consists
16 of medical professionals and corporations located throughout the United States." Id. ¶¶ 10-
17 11. The CAC further alleges that SART's members include over 392 practices representing
18 over 85% of the clinics engaged in the practice of assisted reproductive technologies in the
19 United States. Id. ¶¶ 11, 55. Additionally, the CAC alleges that there are hundreds of
20 members of the Defendant Class located throughout the United States, and that the
21 "Defendant Class members were engaged in an illegal anticompetitive scheme that was
22 directed at and had the intended effect of causing injury to persons residing in, located in,
23 or doing business throughout the United States, including this District." Id. ¶¶ 21-22.

24 Viewing the allegations in the light most favorable to Plaintiffs, the Court finds that
25 Plaintiffs have pled sufficient facts to survive Defendants' motion to dismiss. Plaintiffs
26 have alleged facts supporting their contention that the geographic market is national in
27 scope. Plaintiffs allege nationally coordinated conduct among entities located throughout
28 the United States to fix the price of Donor Services purchased in the United States. See

- 18 -

United States v. Grinnell Corp., 384 U.S. 563, 575 (1966) (concluding that geographic market for fire and police alarm service stations was national—despite service stations' limited service area of 25 miles—due to the defendant's national conduct, which included utilizing national agreements, nationally scheduling prices, rates, and terms, certification by national insurers, and nationwide contracting).

Defendants, for their part, have failed to demonstrate that the alleged relevant geographic market is "facially unsustainable."  Defendants contend that dismissal is appropriate because Plaintiffs have failed to allege facts showing that sellers of Donor Services sell their services nationwide, or facts showing that consumers of Donor Services "turn to donors located nationwide."  Defs.' Mtn. at 20-21.  Defendants further argue that the allegations in the CAC are insufficient because Plaintiffs have failed to allege that any member of the Defendant Class solicits or receives donors from outside its local area, or that any member of the Defendant Class markets to or provides oocytes to recipients residing outside its local area.  Id. at 21.  The Court finds that Defendants' arguments are insufficient to warrant dismissal.  Defendants have not cited any authority or provided compelling legal analysis showing that the alleged relevant geographic market suffers from a fatal legal defect.

### iii.   Summary

In sum, because it is not apparent from the face of the complaint that the alleged relevant market suffers from a "fatal legal defect" or that the CAC's relevant market definition is otherwise "facially unsustainable," Defendants' motion to dismiss Plaintiff's Sherman Act claim for failure to allege a relevant market is DENIED.

### III.   CONCLUSION

For the reasons stated above,

IT IS HEREBY ORDERED THAT:

1. Defendants' motion to dismiss is DENIED.

2. This Order terminates Docket 57.

IT IS SO ORDERED.

Dated: March 29, 2013

_____
SAUNDRA BROWN ARMSTRONG
United States District Judge