Rosemary M. Rivas (State Bar No. 209147)
rrivas@finkelsteinthompson.com
**FINKELSTEIN THOMPSON LLP**
505 Montgomery Street, Suite 300
San Francisco, California 94111
Telephone: (415) 398-8700/Facsimile: (415) 398-8704

Michael G. McLellan (admitted pro hac vice)
mmclellan@finkelsteinthompson.com
**FINKELSTEIN THOMPSON LLP**
1077 30th Street NW, Suite 150
Washington, DC 20007
Telephone: 202-337-8000/Facsimile: 202-337-8090

Co-Lead Interim Counsel for Plaintiffs

[Additional Counsel listed on Signature Page]

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

LINDSAY KAMAKAHI and JUSTINE LEVY, on behalf of themselves and all others similarly situated,

Plaintiff,

vs.

AMERICAN SOCIETY FOR REPRODUCTIVE MEDICINE; SOCIETY FOR ASSISTED REPRODUCTIVE TECHNOLOGY,

Defendants.

Case No. 3:11-CV-1781 JCS **REDACTED**

**PLAINTIFFS' NOTICE OF MOTION AND MOTION TO CERTIFY CLASS; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**

**Hon. Joseph C. Spero**
**Date: October 3, 2014**
**Time: 9:30 a.m.**
**Courtroom: Courtroom G, 15th Floor**
**455 Golden Gate Ave.**
**San Francisco, CA 94102**

# TABLE OF CONTENTS

I. INTRODUCTION ..... 1

II. ARGUMENT ..... 4

A. Class Certification Legal Standard ..... 4

B. Rule 23(a) Requirements are Met ..... 5

1. Numerosity ..... 5

2. Commonality ..... 5

3. Typicality ..... 6

4. Adequacy ..... 6

C. Certification of the Proposed Donor Class is Appropriate Under Rule 23(b)(3). ..... 7

1. Common Questions of Law and Fact Predominate. ..... 7

2. A Rule 23(b)(3) Class is Superior to Other Methods of Adjudication ..... 16

D. Certification Of A Subclass For Injunctive Relief Pursuant To Rule 23(b)(2) Of The Federal Rules Of Civil Procedure Is Appropriate ..... 16

E. If This Court Does Not Certify The 23(b)(3) Class For All Purposes, It Should Certify The Question Of Whether Defendants' Agreement Violated The Antitrust Laws ..... 19

III. THIS COURT SHOULD APPOINT PLAINTIFFS AS CLASS REPRESENTATIVES AND INTERIM CO-LEAD COUNSEL AS CLASS COUNSEL ..... 24

IV. CONCLUSION ..... 25

# TABLE OF AUTHORITIES

## Cases

*Allen v. Dairy Farmers of Am., Inc.*, 5:09-CV-230, 2012 WL 5844871 (D. Vt. Nov. 19, 2012)............ 14

*Apple/AT&T iPad Unlimited Data Plan Litig.*, 10-2553, 2012 WL 2428248 (N.D. Cal.)...................... 19

*Amchem Prods v. Windsor*, 521 U.S. 591 (1997)........................................................................ 7

*Amgen Inc. v. Conn. Ret. Plans and Trust Funds*, 133 S. Ct. 1184 (2013)........................................ 4

*Arizona v. Maricopa County Med. Soc'y*, 457 U.S. 332 (1982)....................................................... 21

*Butler v. Sears, Roebuck & Co.*, 727 F.3d 796 (7th Cir. 2013)................................................ 22, 23

*Carnegie v. Household Int'l*, 376 F.3d 656 (7th Cir. 2004)...................................................... 21, 22

*Charron v. Pinnacle Grp. N.Y.*, 269 F.R.D. 221 (S.D.N.Y. 2010)................................................ 22

*Chiang v. Veneman*, 385 F.3d 256 (3d Cir. 2004)........................................................................ 24

*Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013)................................................................. 4, 15

*Cordes & Co. Fin. Servs. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91 (2d Cir. 2007)......................... 21

*Daniel v. Am. Bd. of Emergency Med.*, 269 F. Supp. 2d 159 (W.D.N.Y. 2003)................................ 14

*Eisen v. Carlisle & Jacquelin*, 417 U.S. 156 (1974)........................................................................ 4

*Ellis v. Costco Wholesale Corp.*, 285 F.R.D. 492 (N.D. Cal. 2012)................................................. 23

*Ellis v. Costco Wholesale Corp.*, 657 F.3d 970 (9th Cir. 2011)........................................................ 6

*Giles v. St. Charles Health Sys.*, 13-00019, 2013 U.S. Dist. LEXIS 152695 (D. Or. Oct. 22, 2013)...... 15

*Hanon v. Dataproducts Corp.*, 976 F.2d 497 (9th Cir. 1992))............................................................ 6

*In re Activision Sec. Litig.*, 621 F. Supp. 415 (N.D. Cal. 1985)......................................................... 19

*In re Apple/AT&T iPad Unlimited Data Plan Litigation*, 2012 WL 2428248 (N.D. Cal)...................... 18

*In re Chocolate Confectionary Antitrust Litig.*, 289 F.R.D. 200 (M.D. Pa. 2012)................................ 14

*In re Dynamic Random Access Memory Antitrust Litig.*, 02-1486, 2006 U.S. Dist. LEXIS 39841 (N.D. Cal. June 5, 2006........................................................................................................................ 9

*In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*, 256 F.R.D. 82 (D. Conn. 2009).... 16

*In re Flonase Antitrust Litig.*, 284 F.R.D. 207 (E.D. Pa. 2012)......................................................... 14

*In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305 (3d Cir. 2009)............................................... 9

*In re McKesson Governmental Entities Average Wholesale Price Litig.*,

767 F. Supp. 2d 263 (D. Mass. 2011) ........ 23
*In re Motor Fuel Temperature Sales Practices Litig.*, 292 F.R.D. 652 (D. Kan. 2013) ........ 20, 22
*In re NCAA Student Athlete Name and Likeness Licensing Litig.*, 09-1967, 2013 WL 5979327 (N.D. Cal. Nov. 8, 2013) ........ 17
*In re New Motor Vehicles Canadian Export Antitrust Litig.*, 522 F.3d 6 (1st Cir. 2008) ........ 8
*In re Pharm. Indus. Average Wholesale Price Litig.*, 230 F.R.D. 61 (D. Mass. 2005) ........ 23
*In re Static Random Access Memory (SRAM) Antitrust Litig.*, 264 F.R.D. 603 (N.D. Cal. 2009) ........ 16
*In re TFT-LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. 583 (N.D. Cal. 2010) ........ 5
*In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124 (2d Cir. 2001) ........ 22
*In re Whirlpool Corp. Front-Loading Washer Products Liab. Litig.*, 722 F.3d 838, (6th Cir. 2013) ........ 23
*In re Winstar Commc'ns Sec. Litig.*, 290 F.R.D. 437 (S.D.N.Y. 2013) ........ 14
*In re: High-Tech Employee Antitrust Litig.*, 11-2509, 2013 U.S. Dist. LEXIS 153752 (N.D. Cal. Oct. 24 2013) ........ *passim*
*Jacob v. Duane Reade, Inc.*, 293 F.R.D. 578 (S.D.N.Y. 2013) ........ 23
*Johnson v. Ariz. Hosp. & Healthcare Ass'n*, No. 07-cv-1292, 2009 U.S. Dist. LEXIS 122807 (D. Ariz. July 14, 2009) ........ 13
*Kaminske v. JP Morgan Chase Bank, N.A.*, No. CV 09-6352-JVS (RNBx), 2011 WL 521338 (C.D. Cal. Jan. 3, 2011) ........ 24
*Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979 (9th Cir. 2000) ........ 9
*Kohen v. Pac. Inv. Mgmt. Co.*, 571 F.3d 672 (7th Cir. 2009) ........ 9
*Levya v. Medline Industries*, 716 F.3d 510, 513-14 (9th Cir. 2013)) ........ 7, 15
*Local Joint Executive Bd. of Culinary/Bartender Trust Fund v. Las Vegas Sands, Inc.*, 244 F.3d 1152 (9th Cir. 2001) ........ 7
*McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.* 672 F.3d 482 (7th Cir. 2012), ........ 24
*Mejdrech v. Met-Coil Sys.* Corp, 319 F.3d 910 (7th Cir. 2003) ........ 23
*Merenda v. VHS of Mich., Inc.*, No. 06-15601, 2013 U.S. Dist. LEXIS 131006 (E.D. Mich. Sept. 13, 2013) ........ 14

*Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802 (7th Cir. 2012) ........ 13

*Moore v. Hughes Helicopters, Inc., Div. of Summa Corp.*, 708 F.2d 475 (9th Cir. 1983) ........ 4

*NLRB v. Express Publishing Co.*, 312 U.S. 426, 436 (1941) ........ 18

*Rodriguez v. Hayes*, 591 F.3d. 1105 (9th Cir. 2010) ........ 17

*Smilow v. Sw. Bell Mobile Sys., Inc.*, 323 F.3d 32 (1st Cir. 2003) ........ 23

*Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059, 1062 (9th Cir. 2001). ........ 8

*Soc'y for Individual Rights, Inc. v. Hampton*, 528 F.2d 905 (9th Cir. 1975) ........ 19

*United Steel, Paper & Forestry, Rubber, Mfg. Energy v. ConocoPhillips Co.*, 593 F.3d 802 (9th Cir. 2010) ........ 4

*Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227 (9th Cir. 1996) ........ 20

*Vallabhapurapu vs. Burger King, Corp.* 11-0667, 2012 WL 2568183 (N.D. Cal. July 2, 2012) ........ 19

*Wallace v. Powell*, 3:09-CV-286, 2013 WL 2042369 (M.D. Pa. May 14, 2013) ........ 23

*Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011) ........ 5

*Zenith v. Hazeltine*, 395 U.S. 100 (1969) ........ 17

*Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180 (9th Cir. 2001) ........ 16

**Rules & Statutes**

Fed. R. Civ. P. 23 ........ *passim*

15 U.S.C. § 26 ........ 3,17

**Other Authorities**

NEWBERG ON CLASS ACTIONS § 18.25 (4th ed. 2002) ........ 20

7AA Charles Alan Wright, Arthur Miller & Mary Kay Kane, *Federal Practice and Procedure: Civil* (3d ed. 2005) ........ 19, 20

Schwartzer, Taschima and Raggstaff, Cal. Practice Guide: Federal Civil Procedure before trial § 10:404 (2011) ........ 20

**NOTICE OF MOTION AND MOTION**

**TO THE PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on October 3, 2014 at 9:30 a.m., before the Honorable Joseph C. Spero, Magistrate Judge, at San Francisco Courthouse, Courtroom G, 15th Floor, 450 Golden Gate Avenue, San Francisco, CA 94102, Plaintiffs will and hereby do move for class certification pursuant to Rule 23 of the Federal Rules of Civil Procedure.

Plaintiffs seek certification of the following class pursuant to Federal Rule of Civil Procedure 23(b)(3):

> All women who sold Donor Services for the purpose of supplying human eggs to be used for assisted fertility and reproductive purposes ("AR Eggs"), within the United States and its territories at any time during the time period from April 12, 2007 to the present (the "Class Period") to or through:
>
> a. any clinic that was, at the time of the donation, a member of the Society for Assisted Reproductive Technology ("SART") and thereby agreed to follow the Maximum Price Rules, as set forth by SART and the American Society for Reproductive Medicine ("ASRM") (collectively "Defendants"); and/or
>
> b. any AR Egg Agency that was, at the time of the donation, agreeing to follow the Maximum Price Rules. ("Donor Class")[1]

Plaintiffs also seek certification of a subclass of the Donor Class pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure. The subclass is comprised of all women within the Donor Class who intend to sell Donor Services in the future to or through any clinic or AR agency agreeing to follow the Maximum Price Rules established by Defendants (the "Future Donor Subclass"). Plaintiffs also seek appointment of Plaintiffs as Class Representatives and Interim Co-Lead Counsel as Class Counsel.

---

[1] If the Court determines only one of these categories (i.e. only patients of clinics, or only patients of agencies) meets the requirements for class certification, Plaintiffs request certification of that category alone.

In the event the Court declines to certify either or both classes, in the alternative, Plaintiffs seek certification of an issue class pursuant to Fed. R. Civ. P. 23(c)(4), limited to adjudicating the question of whether Defendants violated the antitrust laws.

This motion is based on this Notice of Motion and Motion, the supporting Memorandum of Points and Authorities, and the expert report of Hal J. Singer ("Singer Report").

## STATEMENT OF ISSUES TO BE DECIDED

The issues to be decided are:

1. Whether the Court should certify the proposed Donor Class, as defined above and pursuant to Fed. R. Civ. P. 23(b)(3), given that Defendants concede they agreed upon and enforced maximum price caps for services provided by the Donor Class.
2. Whether the Court should certify the proposed subclass of Future Donors as defined above and pursuant to Fed. R. Civ. P. 23(b)(2) for the purposes of entering injunctive relief against Defendants because their conduct threatens harm to members of the Future Donor Subclass.
3. In the alternative, whether the Court should certify an issue class pursuant to Fed. R. Civ. P. 23(c)(4), limited to adjudicating the common question of whether Defendants' agreement violates the antitrust laws.
4. Whether the Court should appoint Plaintiffs and Interim Class Counsel as Class Representatives and Class Counsel, respectively.

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

This antitrust class action challenges a horizontal agreement, implemented through two professional organizations (both named as Defendants) to fix the maximum price paid as compensation to women ("AR Egg Providers") providing human eggs (or "oocytes") for use in artificial reproduction ("AR Eggs"). It names two defendants: (1) the American Society for Reproductive Medicine ("ASRM"), an organization "devoted to advancing knowledge and expertise in reproductive medicine," and (2) the Society for Assisted Reproductive Technology ("SART"), an affiliated society which bills itself as the "primary organization of professionals dedicated to the practice of assisted reproductive technologies in the United States" and whose members account for over ninety percent of the clinics engaged in the practice of assisted reproductive technologies in the United States.[2] Consolidated Amended Complaint ("CAC") ¶¶ 10-11; Answers ¶¶ 11-12.

ASRM and SART promulgated certain rules capping compensation to be paid to women providing AR Eggs ("Maximum Price Rules"), and required their member clinics to abide by those rules. Certain agencies serving those clinics ("AR Egg Agencies") also agreed to abide by those rules. Plaintiffs now seek to certify (1) a class of women providing AR Eggs and compensated through any fertility clinic that was a member of SART at the time of the donation, or through any AR Egg Agency that agreed to adhere to the Maximum Price Rules at the time of the donation, along with (2) a subclass of those women who intend to sell Donor Services through those entities in the future.

The Maximum Price Rules arise from Defendant ASRM's Ethics Committee (Answers ¶ 10), which, in 2000, promulgated a report entitled "Financial Incentives in Recruitment of AR Egg Providers." Answers at ¶ 59; *see also* McLellan Decl., Ex. 1. That report set "forth guidelines that reflect the ASRM Ethics Committees' recommendation on proper compensation for egg donors." Answers at ¶ 60. With respect to that compensation, the report stated that "sums of $5000 or more require justification and sums above $10,000 go beyond what is appropriate." *See* CAC ¶ 62, Answers ¶ 62; McLellan Decl., Ex. 1. ASRM reaffirmed those guidelines in 2007 in a new report entitled

[2] Plaintiffs' Complaint sought certification of a defendant class. Plaintiffs have determined not to seek such relief at this point.

"Financial Compensation of Oocyte Donors," Answers ¶ 63, which reiterated the language in its executive summary, stating "[t]otal payments to donors in excess of $5,000 require justification and sums above $10,000 are not appropriate." *See* McLellan Decl., Ex. 2.

Similarly, in 2002, ASRM's Practice Committee promulgated a report entitled "2002 Guidelines for gamete and embryo donation" that specifically stated "[c]ompensation to the donor should be in compliance with the ASRM Ethics Committee Report" referred to above. McLellan Decl., Ex. 3. The Practice Committee reiterated this in its "2006 Guidelines for gamete and embryo donation," which noted that "[c]ompensation to [AR Egg Providers] should be in compliance with the ASRM Ethics Committee report on the subject." Complaint ¶ 67, Answer ¶ 67; *see also* McLellan Decl., Ex. 4.

SART-member Fertility Clinics collectively agree to adhere to the Maximum Price Rules. As Defendants admit, "any clinic wishing to become a member of SART agrees to comply with ethical and professional standards promulgated by ASRM's Ethics Committee and Practice Committee as a condition of membership," Answers at ¶ 51, necessarily including the Maximum Price Rules. Similarly, SART-member Fertility Clinics "agree to '[a]dhere to all standards and recommendations' of ASRM's Practice and Ethics Committees as a requirement of their membership in SART." *Id.* at ¶ 69.

Certain AR Egg Agencies also agree to the Maximum Price Rules. Following a letter solicitation by SART, those AR Egg Agencies signed an agreement affirming they would comply with the price cap. As one article published in SART's journal explained, SART's original solicitation letter stated "that all

outside agencies using SART member clinics are expected to abide by ASRM compensation guidelines for all donors they recruit," that the signed agreement between the AR Agencies and SART was an "abidance agreement" to those guidelines, and, "in return," for the abidance agreements, those AR Agencies had "their names posted on the SART web site as following compensation guidelines." McLellan Decl., Ex. 8, at 1001-2. That same article characterized that list of AR Agencies as a list of agencies "agreeing to compensation limits." *Id.*

The proposed Donor Class – consisting of women receiving compensation for AR Egg donations through the clinics and agencies described above – satisfies all the elements of Rules 23(a) and 23(b)(3). Plaintiffs, each of whom received compensation through a SART-member clinic or AR agency that agreed to follow Defendants' Maximum Price Rules, have claims that are typical of the Class. Plaintiffs and Class Members received artificially suppressed compensation as a direct result of the Maximum Price Rule developed and enforced by Defendants. There is no dispute as to whether the agreement existed. Rather, the central issues in the litigation are whether that agreement was illegal and, if so, the appropriate measure of damages, both of which are capable of being established with predominantly common evidence. For this reason, this Court should certify the Donor Class for all purposes under Fed. R. Civ. P. 23(b)(3). *See* § II(B) &(C), *infra.* If it determines impact and damages are not suitable for class resolution, it should nevertheless certify the issue of whether Defendants violated the antitrust laws for classwide resolution. § II(E), *infra.*

Similarly, the proposed class of future donors satisfies all of the elements for certification under Rule 23(b)(2). By enforcing the Maximum Price Rules, the Defendants have acted on grounds generally applicable to the class "so that final injunctive relief or corresponding declaratory relief is appropriate respect to the class as a whole." *See* Fed. R. Civ. P. 23(b)(2). Here, Plaintiffs seek to enjoin the enforcement of an anticompetitive rule – a rule that fixes the price at which Plaintiffs will be compensated for donor services. That rule threatens future antitrust injury to all members of the Future Donor Subclass and is appropriately enjoined under the Clayton Act. *See* 15 U.S.C. § 26 ("Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the

antitrust laws."). As such, this Court should grant Rule 23(b)(2) certification of the Future Donor Subclass. *See* § II(D).

## II. <u>ARGUMENT</u>

### A. <u>Class Certification Legal Standard</u>

Rule 23 of the Federal Rules of Civil Procedure governs class certification. In order to obtain class certification, Plaintiffs must first satisfy the requirements set forth in Rule 23(a), which allows a court to certify a class if: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims of defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). Any class seeking certification must also meet the requirements of at least one of Rule 23(b)'s subsections. *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013). In the present case, Plaintiffs seek certification of a class pursuant to Rule 23(b)(3), under which the Court must find "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other methods for fairly adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Plaintiffs also seek to obtain certification of a subclass of Future Donors under Rule 23(b)(2), which requires Plaintiffs to demonstrate that "the party opposing the class has acted or refused to act on grounds generally applicable to the class so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." *See* Fed. R. Civ. P. 23(b)(2)

Although the Court's class certification analysis may include "some inquiry into the substance of a case . . . it is improper to advance a decision on the merits to the class certification stage." *Moore v. Hughes Helicopters, Inc., Div. of Summa Corp.*, 708 F.2d 475, 480 (9th Cir. 1983). As the Supreme Court stated in *Amgen Inc. v. Conn. Ret. Plans and Trust Funds*, 133 S. Ct. 1184 (2013), "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage." *Id.* at 1194. Consequently, whether the Plaintiffs "will prevail on the merits" is irrelevant – the only consideration for the court in its certification analysis is "whether the requirements of Rule 23 are met." *United Steel, Paper & Forestry, Rubber, Mfg. Energy v. ConocoPhillips Co.*, 593 F.3d 802, 808 (9th Cir. 2010) (*quoting Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177-78 (1974)).

**B. Rule 23(a) Requirements are Met**

**1. Numerosity**

Plaintiffs seek to certify a class that consists of thousands of women who provided Donor Services between April 12, 2007 and the present, and a subclass of that class who intend to provide Donor Services in the future. The members of the proposed classes are dispersed throughout the United States making joinder of all class or subclass members impracticable under Rule 23(a)(1).

**2. Commonality**

In order to satisfy Rule 23(a)(2)'s typicality requirement, "Plaintiffs must show that the class members have suffered 'the same injury,' meaning that class members' claims must 'depend upon a common contention' of such a nature that 'determination of its truth or falsity will resolve an issue that is central to the validity of each [claim] in one stroke.'" *In re: High-Tech Employee Antitrust Litig.* ("*High-Tech*"), 11-2509, 2013 U.S. Dist. LEXIS 153752, at *32 (N.D. Cal. Oct. 24 2013) (quoting *Wal-Mart Stores, Inc. v. Dukes* ("*Dukes*"), 131 S. Ct. 2541, 2551 (2011)). The Court's finding of "[e]ven a single [common] question" is sufficient for satisfaction of the commonality requirement. *Dukes*, 131 S. Ct. at 2556. Courts have consistently held that where Plaintiffs allege an antitrust conspiracy, "the very nature of a conspiracy antitrust action compels a finding that common questions of law and fact exist." *High-Tech,* 2013 U.S. Dist. LEXIS 153752 at *33 (quoting *In re TFT-LCD (Flat Panel) Antitrust Litig.* ("*TFT-LCD*"), 267 F.R.D. 583, 593 (N.D. Cal. 2010), *amended in part by* 2011 Dist. LEXIS 84476 (N.D. Cal. July 28, 2011)). "[P]roof of an alleged conspiracy will focus on defendants' conduct and not on the conduct of individual class members." *TFT-LCD*, 267 F.R.D. at 310. Therefore, "[a]ntitrust liability alone constitutes a common question that 'will resolve an issue that is central to the validity' of each member's claim 'in one stroke.'" *High-Tech*, 2013 U.S. Dist. LEXIS 153752 at *34 (quoting *Dukes*, 131 S. Ct. at 2551).

The question of Defendants' antitrust liability is the common question that applies to every single member of both the Donor Class and Future Donor Subclass, all of whom have suffered damages and (in the case of future donors) are threatened with antitrust injury as a direct result of the illegal agreement enforced by Defendants and their member clinics and AR agencies. As Defendants have

readily admitted, they agreed upon and enforced the Maximum Price Rule this action seeks to challenge. The proposed class meets the Rule 23(a)(2) commonality requirement.

### 3. Typicality

Rule 23(a)(3)'s typicality requirement exists in order to be certain that the interests of the named class representatives are aligned with those of the class. *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 984-85 (9th Cir. 2011). Typicality is met where the class members have suffered the same or similar injury. *High-Tech*, 2013 U.S. Dist. LEXIS 153753 at *34. The injury incurred by the class members must have been caused by the same conduct and must not be unique to the class representatives. *Id.* (citing *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992)). "In antitrust cases, typicality usually will be established by plaintiffs and all class members alleging the same antitrust violation by defendants." *See High-Tech*, 2013 U.S. Dist. LEXIS 153753, at *35 (internal quotations omitted). Because all class members allege the same injury (suppressed compensation for providing Donor Services) arising from the same conduct (Defendants' agreement regarding and enforcement of Maximum Price Rules), Rule 23(a)(3)'s typicality requirement is met. *Id.* (in a suppressed compensation antitrust case, the typicality requirement met where all class members sustained the same injury from the same conduct, regardless of by whom compensation was paid).

### 4. Adequacy

"Legal adequacy of a class representative under Rule 23(a)(4) turns on two inquiries: (1) whether named plaintiffs and their counsel have any conflicts of interest with other class members, and (2) whether named plaintiffs and their counsel will prosecute the action vigorously on behalf of the class." *Id.* at *36-37 (internal quotations omitted). Here, neither named Plaintiff nor their counsel has any conflicts of interest with the class members. Named Plaintiffs and the Class have an identical interest in proving the Defendants' conduct artificially suppressed compensation for Donor Services and violated antitrust laws. The named plaintiffs and co-lead counsel in this case will fairly and adequately protect the interests of the class. Additionally, Plaintiffs have retained highly skilled and experienced counsel who have vigorously and successfully litigated many large antitrust class actions and thus were named Interim Co-Lead Counsel in this case. Plaintiffs and their counsel have met Rule 23(a)(4)'s adequacy requirement.

C. **Certification of the Proposed Donor Class is Appropriate Under Rule 23(b)(3).**

1. **Common Questions of Law and Fact Predominate.**

Central to the Rule 23(b)(3) predominance inquiry is analysis of "the legal or factual questions that qualify each class member's case as a genuine controversy" so the Court may decide "whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods v. Windsor*, 521 U.S. 591, 623 (1997). Essentially, the inquiry is whether or not questions of law or fact that are common to class members predominate over those that only affect individual members. *High-Tech*, U.S. Dist. LEXIS 153753 at *50. Thus, "[w]hen common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is clear justification for handling the dispute on a representative rather than on an individual basis." *Local Joint Executive Bd. of Culinary/Bartender Trust Fund v. Las Vegas Sands, Inc.*, 244 F.3d 1152, 1162 (9th Cir. 2001). In *Amchem*, the Supreme Court opined that "[p]redominance is a test readily met in certain cases…alleging violations of the antitrust laws." 521 U.S. at 625.

Even if a damages analysis requires individualized inquiries, this will not defeat class certification under Rule 23(b)(3). As the Court stated in *High-Tech,* "[t]he Ninth Circuit [holds] that even after *Comcast,* under Ninth Circuit law, the fact that damages calculations would require individualized inquiries does not defeat certification of a Rule 23(b)(3) class." *Id.* at *47 (citing *Levya v. Medline Industries*, 716 F.3d 510, 513-514 (9th Cir. 2013)); *see also Levya*, 716 F.3d at 514 ("Thus, '[t]he amount of damages is invariably an individual question and does not defeat class action treatment.'") (citations omitted).

The *High-Tech* court certified a class of plaintiffs alleging antitrust violations resulting from wage suppression. It found that determining whether questions of law or fact common to class members predominate begins with an analysis of the elements of the underlying cause of action in order to "determine which are subject to common proof and which are subject to individualized proof." *Id.* at *40-41 (quoting *TFT-LCD*, 267 F.R.D. at 311-313). In order "to establish an antitrust claim, plaintiffs typically must prove (1) a violation of antitrust laws, (2) an injury they suffered as a result of that violation, and (3) an estimated measure of damages." *In re New Motor Vehicles Canadian Export*

*Antitrust Litig.*, 522 F.3d 6, 19 n. 18 (1st Cir. 2008). Importantly, "plaintiffs [are] not required to demonstrate that common questions would predominate with respect to each element [of the claim]." *High Tech,* U.S. Dist. LEXIS 153753 at *45 (citing *Amgen*, 133 S. Ct. at 1196). "Rather, the inquiry is more holistic." *Id.* at *45-46.

**a. Antitrust Violation**

A violation of Section 1 of the Sherman Act is found if plaintiff shows "(1) that there was a contract, combination, or conspiracy; (2) that the agreement unreasonably restrained trade under either a per se rule of illegality or rule of reason analysis; and (3) that the restraint affected interstate commerce." *Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059, 1062 (9th Cir. 2001).

The first of these – "contract, combination, or conspiracy" – poses no concern. As the Court noted in its March 29, 2013 Order Denying Defendants' Motion to Dismiss (Dkt. No. 63), Defendants do not deny the existence of the agreement to suppress AR egg donor compensation as alleged by Plaintiffs, Order at p. 8, and their Answers and their 30(b)(6) testimony admits its existence. Answers at ¶¶ 51, 69; McLellan Decl., Ex. 6 at 37:20 – 38:2. This is not a case about clandestine agreements and varying efforts at concealment by widely dispersed conspirators. Rather, the agreement at issue is public, admitted by Defendants, clearly stated, and facially and openly sets a price cap on compensation for Plaintiffs and the Donor Class. Even if this were not so, common issues would nevertheless predominate because establishing the existence of the Maximum Price Rules would focus exclusively on the conduct of Defendants and their members, and not on the conduct of Plaintiffs.

Common questions also predominate on the overarching issue of whether the Maximum Price Rules "unreasonably restrained trade under either a per se rule of illegality or rule of reason analysis." *See Tanaka,* 252 F.3d at 1062. Given that this is a single question, with a single answer for every member of the class, it is clear that this element of Plaintiffs' case will be proven with common evidence. Indeed, in similar cases, defendants often concede common issues predominate on the issue of violation. *See, e.g. High-Tech*, 2013 U.S. Dist. LEXIS 153752, at *53 ("Defendants concede that adjudication of Defendants' alleged antitrust violations will turn on common legal and factual issues.").

Finally, the question of whether the agreement affected interstate commerce is, similarly, a common question with a single answer. Accordingly, common issues will predominate with respect to the question of antitrust violation.

**b. Antitrust Injury**

The question of whether class members suffered antitrust injury is also susceptible to class-wide proof. "Antitrust impact—also referred to as antitrust injury—is the fact of damage that results from a violation of antitrust laws." *In re Dynamic Random Access Memory Antitrust Litig.*, 02-1486, 2006 U.S. Dist. LEXIS 39841 at *7 (N.D. Cal. June 5, 2006) (internal quotations omitted). Antitrust injury naturally flows from a price-fixing arrangement such as the one at issue here. "When horizontal price fixing causes . . . sellers to receive less . . . than the prices that would prevail in a market free of the unlawful trade restraint, antitrust injury occurs . . . A buying cartel's low buying prices are illegal and bring antitrust injury and standing to the victimized suppliers." *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 988-99 (9th Cir. 2000).

At the class certification stage, demonstrating that common evidence will predominate on the issue of antitrust impact requires a focused and circumscribed inquiry: "[O]n a motion for class certification, the Court only evaluates whether the method by which plaintiffs propose to prove class-wide impact could prove such impact, not whether plaintiffs in fact can prove class-wide impact." *LCDs*, 267 F.R.D. at 311-13; *see also In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 311-12 (3d Cir. 2009) ( "Plaintiffs' burden at the class certification stage is not to prove the element of antitrust impact. . . . Instead, the task for plaintiffs at class certification is to demonstrate that the element of antitrust impact is capable of proof at trial through evidence that is common to the class rather than individual to its members."). Moreover, the "possibility or indeed inevitability" that "a class will often include persons who have not been injured by the defendant's conduct . . . . does not preclude class certification[.]" *Kohen v. Pac. Inv. Mgmt. Co.*, 571 F.3d 672, 677 (7th Cir. 2009).

As discussed more fully below, Plaintiffs will seek to show such injury through common evidence; evidence equally applicable to all class members. Plaintiffs' proposed proof consists of both record evidence and the report of Dr. Hal Singer, a leading economist with particular skill in analyzing common impact. *See* Singer Report at Appendix 2. With this evidence, Plaintiffs are able to

affirmatively "present[] a sufficiently reliable theory to demonstrate that common evidence can be used to demonstrate impact," thereby satisfying the narrow inquiry required at this stage. *High-Tech*, 2013 U.S. Dist. LEXIS 153752 at *71.

[redacted] The fear that SART-member clinics would compete with each other for donors, thus driving up the cost of Donor Services, led to Defendants' agreement to set a maximum price to be paid for AR Donor Services. Ninety percent of the AR clinics in the U.S. are signatories, and therefore bound by this illegal pricing scheme.[7] All of this evidence is common to the class, rather than individual to its members.

The Singer report also demonstrates that common evidence may be used to demonstrate impact. As Dr. Singer explains, economic theory predicts that the artificial constraint on Donor compensation embodied in the Maximum Price Rules would generate widespread economic harm by forcing compensation for such services below the level that would otherwise prevail in the absence of the restraint. Singer Report at ¶ 15. Documentary evidence and quantitative data common to all Class

---

[3] McLellan Decl. Ex. 6 at 120:4 – 121:1.

[4] *See, e.g.* McLellan Decl. Ex. 6 at 16:2-6 [redacted]

[5] McLellan Decl. Ex 9 [redacted]

[6] McLellan Decl. Ex. 1 at 3 ("[P]roviding financial incentives increases the number of oocyte donors.").

[7] *See* http://www.sart.org/What_is_SART/.

  
members can be used to prove that (1) the Maximum Price Rules imposed a rigid "pricing structure" connecting the illegal agreement to all Class members, *id.* at ¶¶ 16-20; (2) donor compensation would have been higher without the constraint, *id.* at ¶ 15 & *passim*, and; (3) common econometric methods can be used to show and quantify the fact of economic harm on class members. *Id* at ¶¶ 25-52.

This type of common evidence was accepted by the Court in *High-Tech*, which held that "the documentary evidence and expert reports paint a picture of Defendants' business practices and the

[8] McLellan Decl. Ex. 6 at 145:12-19

[9] *See, e.g.* McLellan Decl., Ex. 6 at 35:16-24

[10] *See, e.g.* McLellan Decl., Ex. 6, at 64:23 – 65:2

market in which Defendants operate that suggests that common proof could be used to demonstrate the impact of Defendants' actions." 2013 U.S. Dist. LEXIS 153752 at *68. There, Plaintiffs alleged that the defendant employers entered into a conspiracy to eliminate competition among them for certain highly skilled technical employees so as to suppress employee compensation to artificially low levels. The conspiracy consisted of an interconnected web of express bilateral agreements among Defendants to abstain from actively soliciting each other's employees.

As in this case, plaintiffs there offered evidence that defendants viewed competition with each other for the services of high-tech employees as a significant problem, *id.* at *106, and that their agreements not to solicit each other's employees were adopted to address that problem, *id.* at *106-09 ("The evidence therefore indicates that Defendants sought to enter into anti-solicitation agreements in an effort to stifle increased competition for labor and rising wages."). In addition, as in this case, plaintiffs there offered evidence that the defendants "actively and aggressively enforced these anti-solicitation agreements, which further demonstrates their harmful effects." *Id.* at *77. Moreover, as here, the defendants "maintained formal compensation structures" and made efforts to rigidly adhere to these structures. *Id.* at *86.

Based on this documentary evidence, along with expert reports using statistical modeling, economic theory, and data, the *High Tech* court held that plaintiffs adequately demonstrated "that common questions will predominate over individual questions in determining the impact of the antitrust violations." *Id.* at * 69. Just as in *High Tech*, the documentary evidence here, coupled with economic theory, and the Singer report, sufficiently demonstrate the predominance of common questions.

In fact, Dr. Singer's report articulates how the methodologies and data that underlie any econometric analyses to prove impact would be common to the class, *see* Singer Report ¶¶ 25-30, Specifically, Dr. Singer describes how standard econometric models can be used to measure the relationship between: (1) the prices received by class members; and (2) the conduct at issue, after controlling for other observable factors that may also cause prices to vary. *Id.* In other words econometric models can be developed to measure the effect or impact of the challenged agreement on class member compensation. These models represent a common method, because the same model is applied to all class members, and is estimated using a database common to all class members.

One such model compares transactions before the Maximum Price Rules went into effect with those that occurred after, in order to assess whether, other things being equal, the Maximum Price Rules affected donor compensation ("before and after" model). Singer Report, ¶¶ 35-42. Another model, commonly known as the difference-in-differences ("DID") model, can be used if the available Donor compensation data show variations in the challenged conduct both over time and across clinics or agencies. *Id.* at ¶¶ 43-45.

Thus, in his report, Dr. Singer shows that there are multiple means through which Plaintiffs can "present[] a sufficiently reliable theory to demonstrate that common evidence can be used to demonstrate impact." *High-Tech*, 2013 U.S. Dist. LEXIS 153752 at *71. This is sufficient to satisfy Plaintiffs' burden at this stage. *Cf. Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802 (7th Cir. 2012) (plaintiffs' expert "claimed that he could use common evidence — the postmerger price increases Northshore negotiated with insurers — to show that all or most of the insurers and individuals who received coverage through those insurers suffered some antitrust injury as a result of the merger. That was all that was necessary to show predominance for purposes of Rule 23(b)(3)."). The methodologies Dr. Singer uses fall squarely within the roadmap widely accepted in antitrust cases. *See, e.g.*, *Johnson v. Ariz. Hosp. & Healthcare Ass'n*, No. 07-cv-1292, 2009 U.S. Dist. LEXIS 122807, *29-39 (D. Ariz. July 14, 2009) (finding predominance where conduct alleged to suppress bill rates for nurses generally and evidence showed that bill rates were correlated with nurse pay rates); *Merenda v. VHS of Mich., Inc.*,

No. 06-15601, 2013 U.S. Dist. LEXIS 131006 (E.D. Mich. Sept. 13, 2013) (finding predominance in suppressed wage case).

While Dr. Singer's report necessarily relies on data received to date, and contemplates further data discovery, this does not militate against certification. *Daniel v. Am. Bd. of Emergency Med.*, 269 F. Supp. 2d 159, 199 (W.D.N.Y. 2003) (certifying class when methodology contemplated "[e]mploying relevant data ***to be collected*** from the class during merit based discovery") (emphasis added). Indeed, many courts have granted certification based on incomplete data sets, noting that even where an expert's methodology "would have been even more reliable had he been provided with [additional data], 'it is important not to let a quest for perfect evidence become the enemy of good evidence.'" *In re Flonase Antitrust Litig.*, 284 F.R.D. 207, 233 (E.D. Pa. 2012) (citations omitted) (certifying class based on limited data). In *Hi-Tech*, for example, the Court found that the plaintiffs' expert's decision to use a single variable in his Conduct Regression was understandable because "the available [compensation] data regarding Defendants' compensation practices [is] 'limited.'" (citations omitted). *High-Tech*, 2013 U.S. Dist. LEXIS 153752, at *174. Plaintiffs in this case made extensive efforts to locate centralized sources of classwide compensation information, and it appears no such centralized data exists.[11] Thus, this Court should reject arguments based on an "alleged paucity of data," recognizing that Dr. Singer utilized all data currently available to him, and follow the traditional path of permitting certification based on such data. *Allen v. Dairy Farmers of Am., Inc.*, 5:09-CV-230, 2012 WL 5844871, at *15 (D. Vt. Nov. 19, 2012) (certifying class).[12]

---

[11] Donor and compensation data is in the hands of individual, non-party clinics and agencies, and Plaintiffs continue to collect such data as part of the ongoing discovery process in this case. As additional compensation data is discovered, Dr. Singer will update his econometric analyses. The information collected to date, however, demonstrates that sufficient data is available to develop econometric models to measure the effect or impact of the challenged agreement on class member compensation

[12] *See also In re Winstar Commc'ns Sec. Litig.*, 290 F.R.D. 437, 448 (S.D.N.Y. 2013) (certifying class when "[p]laintiff's expert . . . was unable to complete a formal event study for Winstar's bonds because she did not have trading data for each day of the class period."); *In re Chocolate Confectionary Antitrust Litig.*, 289 F.R.D. 200, 213 (M.D. Pa. 2012) (certifying class and noting "because list prices are not available for all Defendants for the entire period in question, Dr. McClave utilizes price data from a 'typical' customer—Walgreens, which is one of the largest purchasers of relevant product.").

**c. Damages**

In *Comcast*, the Supreme Court held that damages "[c]alculations need not be exact, but at the class-certification stage (as at trial), any model supporting a plaintiff's damages case must be consistent with its liability case, particularly with respect to the alleged anticompetitive effect of the violation." *Comcast*, 133 S. Ct. at 1433 (internal quotation marks omitted). After *Comcast*, the Ninth Circuit has held that "the fact that damages calculations would require individualized inquiries does not defeat certification of a Rule 23(b)(3) class. Thus, so long as 'damages will be calculated based on the [compensation] each [class member] lost due to [defendant]'s unlawful practices,' *Comcast* does not pose a barrier to class certification." *High-Tech*, 2013 U.S. Dist. LEXIS 153752 at *47 (citing and quoting *Levya*, 716 F.3d at 513-14.

Thus, after *Comcast*, "the predominance inquiry will…be satisfied if plaintiffs: (1) can establish that their damages arise out of the defendant's allegedly wrongful conduct; and (2) provide a methodology, even if not fully developed, for calculating damages that are capable of measurement on a classwide basis." *Giles v. St. Charles Health Sys.*, 13-00019, 2013 U.S. Dist. LEXIS 152695, *25-26 (D. Or. Oct. 22, 2013) (internal quotation marks omitted).

Plaintiffs have met this burden. As Dr. Singer explains, calculation of aggregate damages would proceed formulaically, using methods and data common to the Class. Singer Report ¶¶ 46-52; *see also High Tech*, 2013 U.S. Dist. LEXIS 153752, at *165 (finding that plaintiffs had demonstrated reliable methods for computing class wide damages because common evidence and a regression approach could be used to create a model for quantifying the estimated cost to class members resulting from the challenged conduct). Aggregate damages are simply the product of (1) the number of Donor Services cycles routed through member clinics and agencies complying with the Maximum Price Rules; and (2) the estimated average suppression of Donor Services compensation per cycle attributable to the Challenged Conduct. This framework accurately estimates aggregate damages, despite the fact that levels of actual Donor compensation may vary across Class members. Singer Report ¶¶ 46, 51-52.

In addition, once damages have been computed in the aggregate, various approaches can be used to allocate the sum across individual Class members according to common and formulaic methods. As Dr. Singer explains, the regression models described in his report provide a common method for using

Class members' observable characteristics in the actual world to project their but-for compensation levels on a per-cycle basis. Singer Report, ¶¶ 51-52.

In short, Dr. Singer concludes that common evidence and a regression approach can be used to create a model for quantifying the estimated cost to Class members of Defendants' challenged conduct. Dr. Singer's damages theories, based on the same methodologies as their impact theories, predominate. It should also be noted that in analyzing the predominance question in price fixing cases, "courts repeatedly have held that the existence of the conspiracy is the predominant issue and warrants certification even where significant individual issues are present." *In re Static Random Access Memory (SRAM) Antitrust Litig.*, 264 F.R.D. 603, 611 (N.D. Cal. 2009) (citations omitted)

**2. A Rule 23(b)(3) Class is Superior to Other Methods of Adjudication**

In order to certify a class under Rule 23(b)(3), the Court must find that "a class action is superior to other methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). In an antitrust action, where common questions are found to predominate, Rule 23(b)(3)'s superiority requirement is met. *LCD*, 267 F.R.D. at 314. Additionally, in a case involving potentially thousands of class members as in this case, class treatment is undoubtedly superior where the court finds common issues of liability and impact to predominate. *Id.* As opposed to having individual plaintiffs file thousands of actions against the same Defendants with the same proof for the same antitrust violation, it is apparent that class treatment will make litigation infinitely more efficient, manageable, and less expensive for all parties involved. *In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*, 256 F.R.D. 82, 104 (D. Conn. 2009). Not only do Plaintiffs' interests weigh in favor of class treatment, but Defendants' do as well – certifying this class would enable Defendants to litigate in one fell swoop instead of in thousands of actions all over the country. *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1190-92 (9th Cir. 2001). For these reasons, litigating this action as a class is a superior method of adjudication under Rule 23(b)(3).

**D. <u>Certification Of A Subclass For Injunctive Relief Pursuant To Rule 23(b)(2) Of The Federal Rules Of Civil Procedure Is Appropriate</u>**

Plaintiffs also seek certification of a subclass of the Donor Class comprised of women within the Donor Class who intend to sell Donor Services in the future ("Future Donors"). A large percentage of

women who provide Donor Services on one occasion seek to do so on additional occasions in the future. Indeed [redacted] and Plaintiffs here will benefit from future injunctive relief.

A class may be certified under Rule 23(b)(2) where "the party opposing the class has acted or refuse to act on grounds generally applicable to the class so that final injunctive relief or corresponding declaratory relief is appropriate respect to the class as a whole." *See* Fed. R. Civ. P. 23(b)(2). Certification under Rule 23(b)(2) is appropriate in situations where "class members complain of a pattern or a practice that is genuinely applicable to the class as a whole." *See In re NCAA Student Athlete Name and Likeness Licensing Litig.*, 09-1967, 2013 WL 5979327, at *7 (N.D. Cal. Nov. 8, 2013). *See also Rodriguez v. Hayes*, 591 F.3d. 1105, (9th Cir. 2010) ("It is sufficient" to meet the requirements of Rule 23(b)(2) that "class members complain of a pattern of practice that is generally applicable to the class as a whole" even if some class members have not been injured by the challenged practice).

Here, Plaintiffs seek to enjoin the enforcement of an ongoing anticompetitive rule – a rule that fixes the price at which Defendants will purchase Donor Services from Plaintiffs. That rule threatens future antitrust injury to all members of the Future Donor class and is appropriately enjoined under the Clayton Act. *See* 15 U.S.C. § 26 ("Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws."). *See also Zenith v. Hazeltine*, 395 U.S. 100, 133 (1969) ("We see no reason that the federal courts, in exercising the traditional equitable powers extended to them by [section 16 of the Clayton Act] should not respond to the 'salutary principle that when one has been found to have committed acts in violation of a law he may be restrained from committing other related unlawful acts.'") (*quoting NLRB v. Express Publishing Co.*,

---

13 [redacted]

312 U.S. at 436). Enjoining the application of Defendants' Maximum Price Rules in the future to eliminate threatened injury to the members of the proposed subclass is necessary to effectuate the relief sought in this action.

Courts in the Ninth Circuit have repeatedly recognized that having separate classes for damages and injunctive relief claims is entirely appropriate. For example, in *In re NCAA,* Plaintiffs sought to certify one class under Rule 23(b)(2) to pursue declaratory and injunctive relief and another class under Rule 23(b)(3) to pursue monetary relief. 2013 WL 5979327, at *7. Although the Defendants argued that certification under Rule 23(b)(2) was inappropriate because Plaintiffs' "demand for damages predominates over any request for injunctive relief" the Court rejected that argument:

> Nothing in the Federal Rule or existing case law prevents [Plaintiffs] from seeking certification under both of these provisions. *See In re Apple/AT&T iPad Unlimited Data Plan Litigation,* [10-2553,] 2012 WL 2428248 (N.D. Cal) (explaining that "a court may certify a Rule 23(b)(2) class for injunctive relief, the separate class for individual damages or if the damage claims do not meet Rule 23(b)(3) standards certify a Rule 23(b)(2) class alone" (*citing* Schwartzer, Taschima and Raggstaff, Cal. Practice Guide: Federal Civil Procedure before trial §10:404 (2011))).

*Id.*

There, Plaintiffs sought to enjoin the continued enforcement of an NCAA regulation that prohibited current and former student athletes from entering into joint licensing deals for the use of their names, images and likenesses. In ruling that certification of the requested injunctive relief class was appropriate, the Court stated:

> Plaintiffs seek certification to pursue an injunction barring the NCAA from prohibiting current and former student-athletes from entering into group licensing deals for the use of their names, images, and likenesses in videogames and game broadcasts. Their request for this injunction is not merely ancillary to their demand for damages. Rather, it is deemed necessary to eliminate the restraints that the NCAA has allegedly imposed on competition in the relevant

> markets. Without the requested injunctive relief, all class members—including both current and former student-athletes—would potentially be subject to ongoing antitrust harms resulting from the continued unauthorized use of their names, images, and likenesses. Because an injunction would offer all class members "uniform relief" from this harm, class certification is appropriate under Rule 23 (b)(2)

Id at * 7 (citations omitted). *See also Apple/AT&T iPad Unlimited Data Plan Litig.*, 10-2553, 2012 WL 2428248 (N.D. Cal.) (February 26, 2012) ("there appears to be no bar to Plaintiffs seeking certification under Rule 23(b)(2) of a class pursuing only class-wide injunctive relief, regardless of how other claims in this case are treated."); *Vallabhapurapu vs. Burger King, Corp.* 11-0667, 2012 WL 2568183 (N.D. Cal. July 2, 2012) ("there is no rule against hybrid certification").

As in *NCAA*, an injunction is necessary to eliminate the restraints that Defendants have put on the sales of Donor Services. Without the injunction, future sellers of Donor Services would be subject to ongoing antitrust harm—the suppression of the prices paid for their services. As in NCAA "[b]ecause an injunction would offer all class members 'uniform relief' from this harm, class certification is appropriate under Rule 23 (b)(2)." *Id.* at *7 (citations omitted).

### E. <u>If This Court Does Not Certify The 23(b)(3) Class For All Purposes, It Should Certify The Question Of Whether Defendants' Agreement Violated The Antitrust Laws.</u>

Rule 23(c)(4) of the Federal Rules of Civil Procedure provides that, "[w]hen appropriate, an action may be brought or maintained as a class action with respect to particular issues." *Id.* The Ninth Circuit recognizes that, under 23(c)(4), "[i]t is within the discretion of the trial judge . . . to limit the issues in a class action to 'those parts of a lawsuit which lend themselves to convenient use of the class action motif.'" *Soc'y for Individual Rights, Inc. v. Hampton*, 528 F.2d 905, 906 (9th Cir. 1975); *see also In re Activision Sec. Litig.*, 621 F. Supp. 415, 438 (N.D. Cal. 1985) (noting 23(c)(4) "imposes a duty on the court and gives it ample power to 'treat common things in common and to distinguish the

distinguishable'") (quoting 7A Wright & Miller, Federal Practice and Procedure: Civil § 1790).[14] Thus, under Ninth Circuit law, "[e]ven if the common questions do not predominate over the individual questions so that class certification of the entire action is warranted, Rule 23 authorizes the district court in appropriate cases to isolate the common issues under Rule 23(c)(4)(A) and proceed with class treatment of these particular issues." *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996). "For particular issues to be certified using Rule 23(c)(4), the requirements of Rule 23(a) and (b) need to be satisfied only with respect to those issues." *In re Motor Fuel Temperature Sales Practices Litig.*, 292 F.R.D. 652, 665 (D. Kan. 2013).

Courts considering issue certification frequently consider whether "adjudication of the certified issues would significantly advance the resolution of the underlying case, thereby achieving judicial economy and efficiency." *Valentino*, 97 F.3d at 1229. In analogous circumstances to those presented here, courts have recognized the substantial efficiencies gained by litigating the question of antitrust violation on a classwide basis.[15]

---

[14] The *Activision* court noted that "[c]ommentators on the Federal Rules note that the management devices contained in Rules 23(c) and (d) are particularly important in the context of class actions brought under 23(b)(3) because of the emphasis placed by Rule 23(b)(3) on judicial economy and procedural superiority," and went on to quote the Wright & Miller treatise: "'Since subdivision (c)(4) is designed to give the court maximum flexibility in handling class actions, its proper utilization will allow a Rule 23 action to be adjudicated that otherwise might have had to be dismissed or reduced to a nonrepresentative proceeding because it appears to be unmanageable.'" 621 F. Supp. at 438 (quoting 7A Wright & Miller § 1790).

[15] The *High-Tech* court surveyed such authorities in its class certification opinion:

> Given the considerable, compelling common proof Plaintiffs have submitted regarding Defendants' alleged antitrust violation, as well as the parties' actions indicating that they will vigorously litigate the question of whether Defendants engaged in an antitrust violation, this question is likely to be central to this litigation. At the very least, this aspect of the trial should not be understated. *See In re Static Random Access Memory (SRAM) Antitrust Litig.*, 264 F.R.D. 603, 611 (N.D. Cal. 2009) ("Plaintiffs need not show that there will be common proof on each element of the claim. 'In price-fixing cases, courts repeatedly have held that the existence of the conspiracy is the predominant issue and warrants certification even where significant individual issues are present.'" (quoting *Thomas & Thomas Rodmakers, Inc. v. Newport Adhesives & Composites, Inc.*, 209 F.R.D. 159, 167 (C.D. Cal. 2002))); see 6 Newberg on Class Actions § 18.25 (4th ed. 2002) ("[C]ommon liability issues such as conspiracy or monopolization have, almost invariably, been held to predominate over individual issues."); 7AA Charles Alan Wright, Arthur Miller & Mary Kay Kane, Federal Practice and Procedure, § 1781 (3d ed. 2005) ("whether a conspiracy existed is a common question that is thought to predominate over other issues in the case") . . . . As a result, the voluminous classwide proof of antitrust violation weighs in favor of a finding that common questions predominate.

*Hi-Tech*, 2013 U.S. Dist. LEXIS 153752, at *178.

Thus, as the Second Circuit noted in an antitrust case, "[e]ven if [a] district court concludes that the issue of injury-in-fact presents individual questions, however, it does not necessarily follow that they predominate over common ones and that class action treatment is therefore unwarranted." *Cordes & Co. Fin. Servs. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 108 (2d Cir. 2007).[16]  In this case, substantial efficiencies would be realized from class-wide adjudication of the simple question of whether the Maximum Price Rules violate the Sherman Act.  Accordingly, if this Court declines to grant full certification of Plaintiffs' claims, it should, in the alternative, grant certification of a 23(c)(4) class, limited to the question of whether Defendants' conduct violates the antitrust laws.  *Cf. Carnegie v. Household Int'l*, 376 F.3d 656, 661 (7th Cir. 2004) ("[I]t may be that if and when the defendants are determined to have violated the law separate proceedings of some character will be required to determine the entitlements of the individual class members to relief.  That prospect need not defeat class treatment of the question whether the defendants violated RICO.").

The facts of this case render it particularly suitable to such certification. While the parties may differ on its legality, all parties agree that (1) the challenged restraint (i.e. the Maximum Price Rules) exists, (2) that SART-member Fertility Clinics "agree to '[a]dhere to all standards and recommendations' of ASRM's Practice and Ethics Committees as a requirement of their membership in SART," Answers, ¶ 69, and (3) that some AR Egg Agencies agree to abide by those guidelines as well. ASRM Answers ¶ 77.  One law – the Sherman Act – governs all class member claims.  Given these undisputed facts, the question of whether Defendants violated the antitrust laws turns solely on the legality of the Maximum Price Rules, and this is an issue easily capable of litigation in one fell swoop, perhaps even at summary judgment.[17]  A violation issue class therefore necessarily satisfies the predominance, commonality, and typicality elements for certification:  "'[W]hen a Court chooses to

---

[16] The *Cordes* court went on to note that, "[o]n remand , . . . [plaintiffs] may seek certification of a class to litigate the first element of their antitrust claim—the existence of a Sherman Act violation—pursuant to Rule 23(c)(4)(A) . . . ." 502 F.3d 91, 109.

[17] It is well worth noting that, in non-class cases, the legality of similar restraints was litigated at the outset pursuant to motions for summary judgment, frequently only after limited discovery. *See, e.g. Arizona v. Maricopa County Med. Soc'y*, 457 U.S. 332 (1982) (reversing denial of summary judgment on legality of physician maximum fee schedules).

limit class certification only to certain common issues under Rule 24(c)(4), those issues necessarily predominate and satisfy the first element of Rule 23(b)(3).' It therefore goes almost without saying that the related requirements of commonality and typicality are also met, as they are here." *Charron v. Pinnacle Grp. N.Y.*, 269 F.R.D. 221, 241 (S.D.N.Y. 2010) (citations omitted). In any event, as described more fully in §§ II(B)(2), II(B)(3), and II(C)(1)(a), *supra*, the issue of violation is common and predominant, and the representatives are typical.

Here, the question of violation can easily be separated and litigated apart from impact and damages, and there will be no overlap in proof between the two. *Carnegie*, 376 F.3d at 663. (noting "[t]he question whether RICO was violated can be separated from the question whether particular intended victims were injured."). Moreover, it will advance the ultimate termination of the action. If Defendants prevail on the violation prong, this action will end, and Defendants will have established the legality of the Maximum Price Rules for all Class Members. Indeed, Defendants' affirmation that the Maximum Price Rules comply with the antitrust laws is "an argument not for refusing to certify the class but for certifying it and then entering a judgment that would largely exonerate [Defendants] —a course [they] should welcome, as all class members who did not opt out of the class action would be bound by the judgment." *Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 801 (7th Cir. 2013) cert. denied, 134 S. Ct. 1277 (U.S. 2014). If, on the other hand, Plaintiffs prevail on the violation prong, Class Members will be able to seek to individually prove injury and damages, and this Court will have broad discretion to craft procedures to do so.[18] "By quantum leaps, this approach will advance the resolution of plaintiffs' core claims on a class-wide basis." *In re Motor Fuel Temperature Sales Practices Litig.*, 292 F.R.D. 652, 667 (D. Kan. 2013)

Doing so would put the Court well in line with many other courts applying 23(c)(4) to certify liability-only classes, or classes limited to certain issues or elements of a putative class' claims. Indeed, the United States Supreme Court recently denied certiorari in a group of well-publicized cases involving

---

[18] "There are a number of management tools available to a district court to address any individualized damages issues that might arise in a class action, including: (1) bifurcating liability and damage trials with the same or different juries; (2) appointing a magistrate judge or special master to preside over individual damages proceedings; (3) decertifying the class after the liability trial and providing notice to class members concerning how they may proceed to prove damages; (4) creating subclasses; or (5) altering or amending the class." *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 141 (2d Cir. 2001).

allegedly defective washing machines, in which (post *Comcast*) the Sixth and Seventh Circuits affirmed 23(c)(4) certification limited to the question of whether the washing machines were defective, leaving individual questions of damages to individualized proceedings. *Butler*, 727 F.3d at 801 *cert. denied*, 134 S. Ct. 1277 (2014); *In re Whirlpool Corp. Front-Loading Washer Products Liab. Litig.*, 722 F.3d 838, 857 (6th Cir. 2013), *cert. denied*, 134 S. Ct. 1277 (2014). As the *Butler* court noted, "a class action limited to determining liability on a class-wide basis, with separate hearings to determine—if liability is established—the damages of individual class members, or homogeneous groups of class members, is permitted by Rule 23(c)(4) and will often be the sensible way to proceed." *Butler*, 727 F.3d at 800; *see also Ellis v. Costco Wholesale Corp.*, 285 F.R.D. 492, 544 (N.D. Cal. 2012), appeal dismissed (Jan. 16, 2013) ("[E]ven if individualized issues were to predominate with respect to Plaintiffs' monetary relief claims, the Court would utilize the mechanism under Rule 23(c)(4) to adjudicate those issues capable of classwide resolution separately.").[19]

Indeed, in appropriate cases, some courts grant 23(c)(4) certification limited solely to certain elements or facts relating to a plaintiffs' claim, leaving questions relating not just to the amount of, but to the fact of, damage for later proceedings – analogous to the circumstance here, where impact and damages would be left for later. For example, in *Mejdrech v. Met-Coil Sys. Corp.*, the 7th Circuit affirmed a 23(c)(4) certification in a chemical spill case where, "[m]indful that not only the amount but

---

[19] *See also McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 672 F.3d 482, 491 (7th Cir. 2012) ("Competing considerations can be reconciled in a "mass tort" case by carving at the joints of the parties' dispute. If there are genuinely common issues, issues identical across all the claimants, issues moreover the accuracy of the resolution of which is unlikely to be enhanced by repeated proceedings, then it makes good sense, especially when the class is large, to resolve those issues in one fell swoop while leaving the remaining, claimant-specific issues to individual follow-on proceedings."); *Smilow v. Sw. Bell Mobile Sys., Inc.*, 323 F.3d 32, 41 (1st Cir. 2003) ("Indeed, even if individualized determinations were necessary to calculate damages, Rule (23)(c)(4)(A) would still allow the court to maintain the class action with respect to other issues."); *Jacob v. Duane Reade, Inc.*, 293 F.R.D. 578, 592 (S.D.N.Y. 2013) (noting 23(b)(4) "can act as a tool that is appropriate and useful when classwide proof and predominance exist as to some, but not all issues" and certifying liability class."); *Wallace v. Powell*, 3:09-CV-286, 2013 WL 2042369 (M.D. Pa. May 14, 2013) (granting certification of liability class and noting "the § 1962(d) conspiracy claim focuses on the conduct of Defendants and whether Defendants 'conspire[d] to violate § 1962(c).'") (citations omitted); *In re McKesson Governmental Entities Average Wholesale Price Litig.*, 767 F. Supp. 2d 263, 269 (D. Mass. 2011) ("In addition, a court may certify a class on certain issues, like liability, while denying certification on other issues. *See* Fed. R. Civ. P. 23(c)(4)(A). The need for individualized damage proceedings does not ordinarily defeat predominance where there are still disputed common issues as to liability."); *In re Pharm. Indus. Average Wholesale Price Litig.*, 230 F.R.D. 61, 91 (D. Mass. 2005) ("However, the need for individualized proceedings on damages does not necessarily defeat class certification because the Court has the authority to certify a class for liability only pursuant to Rule 23(c)(4)(A) and decertify the class for damages.")

the fact of damage might vary from class member to class member, the district judge limited class treatment to [whether the defendant] caused contamination of the area in question." 319 F.3d 910, 911 (7th Cir. 2003) ("Whether a particular class member suffered any legally compensable harm and if so in what dollar amount are questions that the judge reserved for individual hearings."). Similarly, in *McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, the same court affirmed 23(c)(4) certification in an employment discrimination limited to the issue of whether the defendant engaged in practices creating a disparate racial impact, even though "hundreds of separate trials may be necessary to determine which class members were actually adversely affected by one or both of the practices and if so what loss each class member sustained." 672 F.3d 482, 490-91 (7th Cir. 2012). Such cases are analogous to the alternative relief requested here, *i.e.* class adjudication of the question of antitrust violation, with questions of impact and damages left to individual proceedings. *Cf. Chiang v. Veneman*, 385 F.3d 256, 267 (3d Cir. 2004) ("[C]ourts commonly use Rule 23(c)(4) to certify ***some*** elements of liability for class determination, while leaving other elements to individual adjudication–or, perhaps more realistically, settlement.") (emphasis added).

Because 23(c)(4) provides a vehicle for certification solely of the question of violation, and because such certification will materially advance the conclusion of the litigation, this Court should grant such certification in the event it declines to fully certify Plaintiffs' claims.

## III. THIS COURT SHOULD APPOINT PLAINTIFFS AS CLASS REPRESENTATIVES AND INTERIM CO-LEAD COUNSEL AS CLASS COUNSEL

This Court should appoint Plaintiffs as Class Representatives. Plaintiffs have carefully and diligently fulfilled their responsibilities in this litigation, including diligently responding to discovery, scheduling depositions to be taken following this Motions' filing, and providing all necessary information to their counsel.

This Court should also appoint Interim Co-Lead Counsel as Class Counsel. In appointing Class Counsel, the Court should apply the same standard it did in appointing Interim Lead Class Counsel. "In addition, the Court may consider 'any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class.'" *Kaminske v. JP Morgan Chase Bank, N.A.*, No. CV 09-6352-JVS (RNBx), 2011 WL 521338, at *2 (C.D. Cal. Jan. 3, 2011) (quoting Fed. R. Civ. P. 23(g)(1)(B)). Here,

the Court appointed Finkelstein Thompson LLP and Cafferty Faucher LLP (now known as Cafferty Clobes Meriwether & Sprengel LLP) as Interim Lead Class Counsel. *See* Dkt. 52 at 3-4 ("The Court has reviewed the evidence submitted by Plaintiff and concludes that Finkelstein Thompson LLP and Cafferty Faucher LLP possess sufficient experience, knowledge of the applicable law, and resources to represent the putative class in this matter."). These firms, which have diligently prosecuted the case and expended substantial resources in protecting the rights of the proposed Donor Class, should be appointed as Class Counsel.

## IV. CONCLUSION

Defendants do not deny the agreement and enforcement of an agreement to limit AR egg donor compensation for Donor Services. The only questions facing the Court are whether this agreement was illegal, and what damages Plaintiffs and the Class incurred. For the foregoing reasons, Plaintiffs respectfully request that the Court grant this motion, certify the Class, appoint Plaintiffs as class representatives, and appoint Interim Co-Lead Counsel as Class Counsel.

Dated: April 25, 2014

By: /s/ Michael G. McLellan (*pro hac vice*)
Michael G. McLellan

Rosemary M. Rivas
**FINKELSTEIN THOMPSON LLP**
505 Montgomery Street, Suite 300
San Francisco, California 94111
Telephone: (415) 398-8700
Facsimile: (415) 398-8704

Douglas G. Thompson
dthompson@finkelsteinthompson.com
Michael G. McLellan (pro hac vice)
mmclellan@finkelsteinthompson.com
**FINKELSTEIN THOMPSON LLP**
1077 30th Street NW, Suite 150
Washington, DC 20007
Telephone: 202-337-8000
Facsimile: 202-337-8090

Bryan L. Clobes
bclobes@caffertyclobes.com

Case3:11-cv-01781-JCS Document119-3 Filed04/25/14 Page33 of 33

Ellen Meriwether
emeriwether@caffertyclobes.com
**CAFFERTY CLOBES MERIWETHER & SPRENGEL LLP**
1101 Market Street, Suite 2650
Philadelphia, PA 19107
Telephone: 215-864-2800
Facsimile: 215-864-2810

Nyran Rose Rasche
nrasche@caffertyclobes.com
**CAFFERTY CLOBES MERIWETHER & SPRENGEL LLP**
30 North LaSalle Street
Suite 3200
Chicago, IL 60602
Telephone: 312.782.4880
Facsimile: 312.782.4485

*Co-Lead Counsel For Plaintiffs*

26
PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
Case No. 3:11-CV-1781 JCS