Megan Dixon (Cal. Bar No. 162895)
HOGAN LOVELLS US LLP
3 Embarcadero Center
Suite 1500
San Francisco, CA 94111
Telephone: (415) 374-2300
Facsimile: (415) 374-2499
E-Mail: megan.dixon@hoganlovells.com

Robert F. Leibenluft (admitted *pro hac vice*)
William L. Monts III (admitted *pro hac vice*)
Benjamin F. Holt (admitted *pro hac vice*)
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004-1109
Telephone: (202) 637-5600
Facsimile: (202) 637-5910
E-Mail: robert.leibenluft@hoganlovells.com
william.monts@hoganlovells.com
benjamin.holt@hoganlovells.com

*Attorneys for Defendants*
*American Society for Reproductive Medicine and*
*Society for Assisted Reproductive Technology*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| LINDSAY KAMAKAHI and JUSTINE LEVY, individually, and on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>AMERICAN SOCIETY FOR REPRODUCTIVE MEDICINE and SOCIETY FOR ASSISTED REPRODUCTIVE TECHNOLOGY,<br><br>Defendants. | Case No. 3:11-CV-1781-JCS<br><br>**DEFENDANTS' NOTICE OF MOTION AND MOTION TO EXCLUDE THE OPINIONS OF DR. HAL J. SINGER ON CLASS CERTIFICATION; DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>**DATE**: January 23, 2015<br>**TIME**: 9:30 a.m.<br>**JUDGE**: Honorable Joseph C. Spero<br>**COURTROOM**: Courtroom G, 15th Floor<br>455 Golden Gate Ave.<br>San Francisco, CA 94102 |

**DOCUMENT SUBMITTED UNDER SEAL**

Hogan Lovells US
LLP
Attorneys At Law

Defendants' Motion to Exclude
Opinions of Dr. Hal J. Singer
Case No. 3:11-cv-1781-JCS

1

2

## NOTICE OF MOTION AND MOTION

**TO THE PARTIES AND THEIR ATTORNEYS OF RECORD:**

3

4

**PLEASE TAKE NOTICE** that on January 23, 2015, at 9:30 a.m., before the Honorable

5

Joseph C. Spero, Magistrate Judge, at the United States Courthouse, Courtroom G, 15th Floor,

6

450 Golden Gate Avenue, San Francisco, CA 94102, Defendants will and hereby do move for an

7

Order Excluding the Opinions of Dr. Hal J. Singer on Class Certification. Dr. Singer's initial

8

report was filed under seal on April 25, 2014, and his reply was filed under seal on August 29,

9

2014. This motion is based on this Notice of Motion and Motion, the supporting Memorandum

10

of Points and Authorities, all of the pleadings and documents on file in this action, and such other

11

matters as may be presented at or before the hearing.

12

13

Respectfully submitted,

14

By: _/s/ William L. Monts III_____

15

Megan Dixon (Cal. Bar No. 162895)
HOGAN LOVELLS US LLP

16

3 Embarcadero Center
Suite 1500

17

San Francisco, California 94111
Telephone: (415) 374-2300

18

Facsimile: (415) 374-2499

19

E-Mail: megan.dixon@hoganlovells.com

20

Robert F. Leibenluft (admitted *pro hac vice*)

21

William L. Monts III (admitted *pro hac vice*)
Benjamin F. Holt (admitted *pro hac vice*)

22

HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.

23

Washington, D.C. 20004-1109
Telephone: (202) 637-5600

24

Facsimile: (202) 637-5910
E-Mail: robert.leibenluft@hoganlovells.com

25

william.monts@hoganlovells.com
benjamin.holt@hoganlovells.com

26

27

*Attorneys for Defendants*

December 9, 2014
*American Society for Reproductive Medicine and*

28

*Society for Assisted Reproductive Technology*

HOGAN LOVELLS US
LLP
ATTORNEYS AT LAW

DEFENDANTS' MOTION TO EXCLUDE
OPINIONS OF DR. HAL J. SINGER
CASE NO. 3:11-cv-1781-JCS

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................................ii

ISSUE TO BE DECIDED ...............................................................................................................1

INTRODUCTION ............................................................................................................................1

LEGAL STANDARD.......................................................................................................................2

ARGUMENT ...................................................................................................................................4

I.      DR. SINGER'S REGRESSIONS ARE UNRELIABLE AND DO NOT FIT THE
        FACTS OF THE CASE ........................................................................................................5

        A.      Dr. Singer's Regression Analyses Provide No Reliable Basis for Measuring
                Classwide Impact From Common Evidence Across a Nationwide Class ...............6

        B.      Dr. Singer's Regressions Rest on Assumptions That Are Contrary to the
                Undisputed Facts ..................................................................................................12

II.     DR. SINGER'S "RIGID PRICING STRUCTURE" ANALYSIS DOES NOT
        SALVAGE HIS OPINIONS................................................................................................14

        A.      Dr. Singer's Conclusion That a "Rigid Pricing Structure" Exists Applies
                No Recognized Economic Principle.......................................................................15

        B.      Dr. Singer's "Rigid Pricing Structure" Analysis Ignores Actual
                Compensation Data and Substantial Variation in Compensation Across
                Clinics and Agencies ............................................................................................16

CONCLUSION ..............................................................................................................................18

Hogan Lovells US
LLP
Attorneys At Law

- i -

Defendants' Motion to Exclude
Opinions of Dr. Hal J. Singer
Case No. 3:11-cv-1781-JCS

1

## TABLE OF AUTHORITIES

2

3

*CASES*

4

*American Honda Motor Co. v. Allen,*
  600 F.3d 813 (7th Cir. 2010)................................................................4

5

*Atlantic Richfield Co. v. USA Petroleum Co.,*
  495 U.S. 328 (1990)............................................................................5

6

7

*Bell Atl. Corp. v. AT&T Corp.,*
  339 F.3d 294 (5th Cir. 2003)..........................................................6, 13

8

*Brunswick Corp. v. Pueblo Bowl-O-Mat. Inc.,*
  429 U.S. 477 (1977)............................................................................5

9

10

*Clark v. Takata Corp.,*
  192 F.3d 750 (7th Cir. 1999)..............................................................16

11

*Comcast Corp. v. Behrend,*
  133 S. Ct. 1426 (2013)......................................................................12

12

13

*Daubert v. Merrell Dow Pharms., Inc.,*
  509 U.S. 579 (1993)...........................................................2, 3, 13, 16

14

*Daubert v. Merrill Dow Pharms., Inc.,*
  43 F.3d 1311 (9th Cir. 1995).........................................................3, 12

15

16

*In re Graphics Processing Units Antitrust Litig.,*
  253 F.R.D. 478 (N.D. Cal. 2008) .........................................................8

17

*In re Hydrogen Peroxide Antitrust Litig.,*
  552 F.3d 305 (3d Cir. 2008)................................................................5

18

19

*In re New Motor Vehicles Canadian Export Antitrust Litig.,*
  522 F.3d 6 (1st Cir. 2008) ...................................................................5

20

*In re Photochromic Lens Antitrust Litig.,*
  2014 WL 1338605 (M.D. Fla. Apr. 3, 2014) ...................................10, 12

21

22

*In re Zurn Pex Plumbing Prods. Liab. Litig.,*
  644 F.3d 604 (8th Cir. 2011)...............................................................4

23

*Kumho Tire Co. v. Carmichael,*
  526 U.S. 137 (1999)............................................................................3

24

25

*Pecover v. Elec. Arts, Inc.,*
  2010 WL 8742757 (N.D. Cal. Dec. 21, 2010) .................................4, 12

26

*United States v. Sandoval-Mendoza,*
  472 F.3d 645 (9th Cir. 2006)...............................................................3

27

28

*Wal-Mart Stores, Inc. v. Dukes,*
  131 S. Ct. 2541 (2011).............................................................5, 10, 12

HOGAN LOVELLS US
LLP
ATTORNEYS AT LAW

- ii -

DEFENDANTS' MOTION TO EXCLUDE
OPINIONS OF DR. HAL J. SINGER
CASE NO. 3:11-CV-1781-JCS

*STATUTES*

15 U.S.C. § 1 ............................................................................................................... 1

15 U.S.C. § 15 ......................................................................................................... 4, 5

15 U.S.C. § 26 ............................................................................................................. 5

*RULES*

Fed. R. Civ. P. 23(a)(2) ............................................................................................... 2

Fed. R. Civ. P. 23(b)(3) ............................................................................................... 2

Fed. R. Evid. 702 ................................................................................................... 2, 15

HOGAN LOVELLS US
LLP
ATTORNEYS AT LAW

- iii -

DEFENDANTS' MOTION TO EXCLUDE
OPINIONS OF DR. HAL J. SINGER
CASE NO. 3:11-CV-1781-JCS

1

## ISSUE TO BE DECIDED

2        Should the Court exclude the opinions of Dr. Hal J. Singer under Rule 702 of the Federal

3    Rules of Evidence and *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993),

4    because they are the products of unreliable methodologies and do not fit with the facts in the

5    record?

6

## MEMORANDUM OF POINTS AND AUTHORITIES

7        Defendants American Society for Reproductive Medicine ("ASRM") and Society for

8    Assisted Reproductive Technology ("SART") (collectively, "Defendants") submit this

9    memorandum in support to their motion to exclude the opinions of Dr. Hal J. Singer.

10

## INTRODUCTION

11        This case is a putative antitrust class action brought on behalf of women who have

12    donated eggs for assisted reproductive procedures. Named Plaintiffs' ("Plaintiffs'") amended

13    complaint alleges that Defendant ASRM, an society of medical professionals performing assisted

14    reproductive procedures, has promulgated an ethics report, *see* "ASRM Ethics Committee

15    Report" entitled Financial Compensation of Oocyte Donors ("Ethics Report"),[1] addressing

16    compensation of egg donors. That Ethics Reports states that donor compensation above $5,000

17    requires justification and that compensation above $10,000 is not appropriate Consolidated

18    Amended Complaint ("Comp.") ¶¶ 60-63. Plaintiffs also allege that because SART, a

19    professional society of assisted reproductive medical clinics, imposes the compensation

20    provisions of the Ethics Report on its members and obtains the agreement of independent donor

21    agencies to adhere to those provisions as well, ASRM and SART have formed a price-fixing

22    conspiracy that caps compensation for egg donors in violation of section 1 of the Sherman Act.

23    15 U.S.C. § 1; *see* Comp. ¶¶ 105-09. Plaintiffs have moved for certification of nationwide class

24    of egg donors seeking both injunctive relief and treble damages.

25        In support of their motion, Plaintiffs have offered the opinions of Dr. Hal J. Singer, an

26

27    [1]     The Ethics Report is available on the ASRM website at
https://www.asrm.org/uploadedFiles/ASRM_Content/News_and_Publications/Ethics_Committee

28   _Reports_and_Statements/financial_incentives.pdf.

Hogan Lovells US
LLP
Attorneys At Law

- 1 -

Defendants' Motion to Exclude
Opinions of Dr. Hal J. Singer
Case No. 3:11-cv-1781-JCS

1  expert economist. Dr. Singer offers opinion testimony addressing two issues essential to

2  Plaintiffs' certification motion: commonality, Fed. R. Civ. P. 23(a)(2), and predominance. *Id.*

3  23(b)(3). He opines that Plaintiffs can show through common evidence that the compensation

4  provisions of the Ethics Report have a common impact on all members of the class and that

5  aggregate class damages may be calculated using common proof. Those opinions rest on two

6  foundations. *First*, based on data from one clinic and one donor agency in the San Francisco

7  area, Dr. Singer ran two "illustrative" regression analyses and opines that, if given sufficient data,

8  he can demonstrate classwide impact from common evidence and calculate aggregate class

9  damages. *Second*, based on analysis of mostly advertised compensation from various clinics and

10  donor agencies, Dr. Singer concludes that there is a "rigid pricing structure" for donor

11  compensation. Those opinions are the cornerstones of Plaintiffs' request for class certification.

12  While Defendants concede that Dr. Singer is qualified to testify as an expert economist,

13  his opinions in this case must be excluded under *Daubert v. Merrell Dow Pharmaceuticals, Inc.,*

14  509 U.S. 579 (1993). Dr. Singer's regressions and "rigid pricing structure" analysis rest on

15  unreliable methodologies. Moreover, neither squares with undisputed facts in the record.

16  Accordingly, neither meets the requirements for expert testimony set forth in *Daubert*, and his

17  opinions based on them are inadmissible.

18  ## LEGAL STANDARD

19  Under Rule 702 of the Federal Rules of Evidence, expert testimony is admissible if it

20  "will assist the trier of fact to understand the evidence or to determine a fact in issue." Expert

21  testimony must rest on "both . . . a reliable foundation" and be "relevant to the task at hand" to

22  satisfy Rule 702. *Daubert*, 509 U.S. at 597. Expert testimony failing either of those tests must be

23  excluded.

24  Expert testimony is reliable when "the knowledge underlying [the testimony] has a

25  reasonable basis in the knowledge and experience of the relevant discipline." *Id.* (citation

26  omitted). The expert proffering the opinion must put forth a reliable methodology from which the

27  proffered opinions were derived. Expert testimony is relevant when it "properly can be applied to

28  the facts in issue." *Id.* at 592-93. In other words, "the knowledge underlying [the testimony] has

HOGAN LOVELLS US
LLP
ATTORNEYS AT LAW

- 2 -

DEFENDANTS' MOTION TO EXCLUDE
OPINIONS OF DR. HAL J. SINGER
CASE NO. 3:11-CV-1781-JCS

1   a valid . . . connection to the pertinent inquiry." *United States v. Sandoval-Mendoza*, 472 F.3d

2   645, 654 (9th Cir. 2006) (citation omitted).  There must be a "fit" between the proffered

3   testimony and the facts of the case.  *See Daubert v. Merrill Dow Pharms., Inc*. 43 F.3d 1311,

4   1320 (1995).  These standards apply both to scientific and non-scientific expert testimony.

5   *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999) (noting that "there are many different

6   kinds of experts, and many different kinds of expertise").

7        Plaintiffs concede that *Daubert*'s strictures are fully applicable when expert testimony is

8   offered to support a motion for class certification.   *See* Pls. Memorandum of Points and

9   Authorities in Support of Motion to Strike Class Certification Report of Insoo Hyun (Dkt. #133)

10  at 2-3.   Moreover, as other courts in this district have noted, a *Daubert* inquiry at the class

11  certification stage serves a particularly useful function:

12       [U]ndertaking a full-blown *Daubert* analysis at the class certification stage makes

13       a great deal of practical sense.  It is well established that courts, in evaluating

14       whether class certification is appropriate, cannot engage in a so-called "battle of

15       the experts."   Thus, while courts cannot decide which parties' evidence is

16       ultimately more persuasive as to the merits of the case, they must nevertheless

17       make factual determinations regarding evidence as it relates to the requirements of

18       FRCP 23.  There would be scant, if any benefit to the FRCP 23 inquiry if courts

19       cannot ensure that competing testimony is relevant, admissible and in fact

20       proffered an expert.   While the court agrees that the persuasiveness of

21       competing expert opinions as to liability should be left to the trier of fact, it cannot

22       conclude that accepting *anyone's* testimony to establish commonality, typicality or

23       predominance is the proper way to ensure that FRCP 23's requirements have been

24       met.

25  *Pecover v. Elec. Arts, Inc.*, 2010 WL 8742757, at *4 (N.D. Cal. Dec. 21, 2010) (applying *Daubert*

26  principles to class certification) (emphasis in original); *see also American Honda Motor Co. v.*

27  *Allen*, 600 F.3d 813, 815-16 (7th Cir. 2010) ("when an expert's report is critical to class

28  certification . . . , a district court must conclusively rule on any challenge to the expert's

Hogan Lovells US
LLP
Attorneys At Law

- 3 -

Defendants' Motion to Exclude
Opinions of Dr. Hal J. Singer
Case No. 3:11-cv-1781-JCS

qualification or submissions prior to ruling on a class certification motion") (internal citation omitted); *cf. In re Zurn Pex Plumbing Prods. Liab. Litig.*, 644 F.3d 604, 614 (8th Cir. 2011) (concluding that district court did not err "by conducting a focused *Daubert* analysis which scrutinized the reliability of the expert testimony in light of the criteria for class certification and the current state of the evidence"). The *Pecover* court's observations have particular force in this case because fact discovery is now closed, and the parties have the benefit of a full record to place before this Court on class certification. In light of these principles and given Plaintiffs' concession as to their applicability in the class certification context, Dr. Singer's opinions are not admissible unless they satisfy *Daubert*.

## ARGUMENT

To understand why Dr. Singer's opinions are inadmissible, one must first understand what Plaintiffs' must prove on their underlying claim and how that fits into the class certification inquiry. To prevail on an antitrust claim, a private plaintiff must prove injury to her "business or property." 15 U.S.C. § 15. Not just any injury will do, however. The injury must be "antitrust injury," which is an injury "of the type the antitrust laws were designed to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat. Inc.*, 429 U.S. 477, 489 (1977). In other words, the injury must correspond to the reason for finding an antitrust violation. *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 342 (1990). The antitrust injury requirement is an element of a claim whether a private plaintiff seeks monetary or injunctive relief. *Brunswick*, 429 U.S. at 489 (antitrust injury required in treble damages actions under section 4 of the Clayton Act, 15 U.S.C. § 15); *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104 (1986) (private plaintiff seeking injunctive relief under Section 16 of the Clayton Act, 15 U.S.C. § 26, must show that it is threatened with antitrust injury). As Dr. Singer conceded, for any class to be certified, Plaintiffs must show that the "conduct that elevated the prices ended up touching all of the buyers in the class." Deposition of Hal J. Singer ("Singer Dep.") at 108:17-19 (attached as Exhibit 1 to the Declaration of William L. Monts III in Support of Defendants' Administrative Motion to Seal Portions of Defendants' Memorandum of Points and Authorities in Support of Their Motion to Exclude the Opinions of Dr. Hal J. Singer on Class Certification

HOGAN LOVELLS US
LLP
ATTORNEYS AT LAW

- 4 -

DEFENDANTS' MOTION TO EXCLUDE
OPINIONS OF DR. HAL J. SINGER
CASE NO. 3:11-CV-1781-JCS

("Monts Decl.")).  Plaintiffs must develop a methodology that, with evidence common to the class as a whole, can establish "in one stroke," *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011), whether absent class members have suffered or will likely suffer antitrust injury.  *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 311 (3d Cir. 2008) ("individual injury (also known as antitrust impact) is an element of the cause of action; to prevail on the merits, every class member must prove at least some antitrust impact resulting from the alleged violation"); *In re New Motor Vehicles Canadian Export Antitrust Litig.*, 522 F.3d 6, 20 (1st Cir. 2008) ("In antitrust class actions, common issues do not predominate if the fact of antitrust violation and the fact of antitrust impact cannot be established through common proof."); *Bell Atl. Corp. v. AT&T Corp.*, 339 F.3d 294, 302 (5th Cir. 2003) ("[W]here fact of damage cannot be established for every class member through proof common to the class, the need to establish antitrust liability for individual class members defeats Rule 23(b)(3) predominance.").  On that essential issue, Dr. Singer's opinions are the only evidence supporting Plaintiffs' certification motion.  Yet they fail both the reliability and relevancy prongs of *Daubert* and are therefore inadmissible to support class certification.

## I.      DR. SINGER'S REGRESSIONS ARE UNRELIABLE AND DO NOT FIT THE FACTS OF THE CASE.

Dr. Singer's regressions are the linchpin of his opinions, but they fail both prongs of the *Daubert* inquiry.  *First*, Dr. Singer's regressions are unreliable for determining common impact on a putative nationwide class.  Dr. Singer admits that his analysis is illustrative and applies only to Fertility Connections, a donor agency in the San Francisco area, and not to any other clinic or agency.  Thus, even assuming that the regressions are properly specified, they cannot determine whether the challenged Ethics Report had an impact on any absent class member donating at any other agency or clinic in the United States.  *Second*, Dr. Singer's regression models are not relevant because they are built on assumptions that contradict the undisputed facts in the case.  In designing his models, Dr. Singer has assumed that for a period of time Fertility Connections did not comply with the challenged Ethics Report.  But the unrebutted testimony of Sherri Barr, the agency's principal, establishes that Fertility Connections never believed that it was out of

1   compliance with the compensation provisions of the Ethics Report or even that it was bound by

2   them.  Ms. Barr's testimony also establishes that Fertility Connections always set its donor

3   compensation levels based on market factors and its own ethical considerations and those of the

4   clinics with which it worked and not based on any communications with Defendants.

5           A.      **Dr. Singer's Regression Analyses Cannot Reliably Demonstrate Classwide**

6                   **Impact From Common Evidence Across a Nationwide Class.**

7           The Court need not delve into the particulars of Dr. Singer's regression analyses to

8   conclude that his methodology is unreliable.  Even crediting his approach and assuming that his

9   models are properly specified, they apply only to Fertility Connections, a single donor agency out

10  of more than 300 agencies and clinics in the United States.  Dr. Singer's two regressions use

11  Fertility Connections data for the period April 2005 to December 2008 and attempt to determine

12  what effect the donor compensation provisions in the challenged Ethics Report had on the donor

13  compensation levels the agency paid.  Class Certification Report of Hal. J. Singer, Ph.D. ("Singer

14  Rep.") ¶¶ 31, 34-42 (attached as Exhibit 7 to Dkt. #119).  In one, Dr. Singer compares donor

15  compensation paid by Fertility Connections for periods in which it was supposedly adhering to

16  the compensation levels set forth in the challenged Ethics Report with donor compensation paid

17  in periods during which it supposedly was not following those guidelines.  *Id.*  In the second, he

18  compares the same data from Fertility Connections to data from Pacific Fertility Clinic, a clinic in

19  San Francisco with an internal donor program, in an effort to determine how donor compensation

20  at Fertility Connections "diverged from [Pacific Fertility Clinic's] compensation levels" when

21  Fertility Connections supposedly "ceased to comply" with the compensation levels in the

22  challenged Ethics Report.  *Id.* ¶ 43.

23          Even assuming that Dr. Singer's models are accurately specified, they say nothing about

24  impact and damage suffered by the putative class as a whole.  Dr. Singer has admitted that his

25  models are only "illustrative," *Id.* at 12-13, 24 (labeling analyses as "Illustrative Regressions,"

26  "Illustrative Before-After Regression" and "Illustrative Difference-In-Differences Regressions");

27  *id.* ¶¶ 38-39, 43-44 (substantive paragraphs referring to "illustrative before-after regression

28  model" and "illustrative difference-in-differences" specification or model).  He also admitted that

Hogan Lovells US
LLP
Attorneys At Law

- 6 -

Defendants' Motion to Exclude
Opinions of Dr. Hal J. Singer
Case No. 3:11-cv-1781-JCS

those illustrative regressions purport to measure impact and injury only among donors at Fertility Connections.  Singer Dep. at 113:10-14 (Monts Decl. Ex. 1) ("But I have not yet been asked and I don't feel comfortable yet at this point saying that I know that these experiences that I've looked at are, in fact, representative.  No one's asked me that yet.")[2]  He concedes that his models do not apply outside of the San Francisco area, much less to the entire purported nationwide class of donors for which Plaintiffs seek certification.[3]  To determine whether there was an impact on donors at any other clinic or agency, Dr. Singer would have to create new regression models that account for individual variation across each of the more than 300 clinics and agencies at which putative class members donated.  In each such regression model Dr. Singer would need to include variables accounting for the unique factors affecting donor compensation levels at each individual clinic or agency.  Moreover, even if one assumes that Dr. Singer could account for all of the relevant variables effecting donor compensation based on a smaller sampling of clinics and agencies, he would still have to make individualized inquiry at each clinic or agency to know which variables apply in any particular situation.  When such individualized inquiry is required to establish impact, the expert's model is not a reliable method for determining predominance.  *See In re Graphics Processing Units Antitrust Litig.*, 253 F.R.D. 478, 503-05 (N.D. Cal. 2008) (denying class certification because of "plaintiffs' failure to demonstrate a methodology for proving impact that is sufficiently common to the class").

Dr. Singer's handling of his Fertility Connections regressions amply demonstrates the problem.  In his original models for Fertility Connections, he did not include any variable for the ethnicity of the donor.  *See* Singer Rep. ¶ 38, Table 1 (listing variables included in the before-

---

[2]  *See also* Singer Dep. at 114:5-10 (Monts Decl. Ex. 1) ("I just asked you about the illustrative regression, and as I understand it, you haven't attempted to apply that analysis to the entire class at this stage of the game, the entire putative class?  A:  I have not.").

[3]  *See* Singer Dep. at 140:24-141:9 (Monts Decl. Ex. 1) ("Q:  Now, suppose that you had data from a clinic in Boston.  I'm making up a city.  Could you run the same regression with Fertility Connections and draw any conclusions from that?  A:  You might be able to.  I don't think it would be as good.  I certainly wouldn't be able to use this line, right?  Q:  Yeah.  I mean, would you control, then, for the geographic differences?  A:  I think you would have to revisit that issue, yes.").

HOGAN LOVELLS US
LLP
ATTORNEYS AT LAW
- 7 -
DEFENDANTS' MOTION TO EXCLUDE
OPINIONS OF DR. HAL J. SINGER
CASE NO. 3:11-cv-1781-JCS

after regression and showing no variable for ethnicity); *id.* ¶ 43 (showing variables for difference-in-differences regression and showing no variable for ethnicity).   Indeed, Dr. Singer testified during his deposition that he had considered an ethnicity variable but determined that it was virtually impossible to control for ethnicity given the variety of ethnic backgrounds manifest in the Fertility Connections data.[4]   Yet Sherri Barr, the principal of Fertility Connections, subsequently stated in her declaration that ethnicity was a factor affecting the level of compensation at her agency at various times.   Declaration of Sherri Barr ("Barr Decl.") (Dkt. 127) ¶ 4.  Dr. Singer and the Plaintiffs, however, never bothered to ask Fertility Connections what factors actually drove the agency's compensation decisions.  Nevertheless, in light of Ms. Barr's testimony, Dr. Singer revised his Fertility Connections regression and attempted to add a variable to his model to control for ethnicity.  Reply Report of Hal J. Singer, Ph.D. in Further Support of Plaintiffs' Motion to Certify Class ("Singer Reply") ¶¶ 27-30 (attached as Exhibit 4 to Dkt. #134).   In other words, *after individualized inquiry*, Dr. Singer was forced to modify his regression to take into account unique factors affecting the compensation of donors at Fertility Connections.  This example puts in stark relief both the unreliability of Dr. Singer's methodology, and the fact that individualized inquiry is necessary to determine whether any putative plaintiff class members suffered impact.

Dr. Singer's attempted adjustment to his analysis based on the factors that Ms. Barr testified were relevant to Fertility Connections would need to be repeated for every clinic or agency across the nation based on the factors affecting compensation at that particular agency or clinic.  Some of those factors may well be the same as the factors affecting compensation at Fertility Connections.  But others may be different, and the mix of relevant factors affecting

---

[4]  Singer Dep. at 71:7-23 (Monts Decl. Ex. 1) ("Q:  Let me just ask, and this is a data question since you'll be far more familiar with it than I am, there was not a specific ethnicity attributed to each and every donor?  A:  There was, but the donor's mother and father.  Q:  It was both?  A: Yes.  And it was almost – it was too granular, in a sense, and I don't have the ability or it wasn't obvious to me how to shrink it down to something that was more manageable.  Q:  Do you have any belief about whether ethnicity would be important to the recipient?  A:  Oh, sure, it could.  Q: And how about race, if we draw that as something different from ethnicity?  A:  Sure, race could matter.").

Hogan Lovells US
LLP
Attorneys At Law

- 8 -

Defendants' Motion to Exclude
Opinions of Dr. Hal J. Singer
Case No. 3:11-cv-1781-JCS

1   donor compensation at one clinic or agency may or may not be the same as that affecting donor

2   compensation at any other clinic or agency.  Dr. Singer's original regressions control for such

3   variables as hair color, eye color and educational achievement, but do not include other

4   potentially relevant factors – height, athletic skill, musical talent and geographic location of the

5   donor and the agency or clinic obtaining the donation, for example – that might affect the

6   selection of any particular donor and the compensation paid to her.  Indeed, Dr. Singer concedes

7   that such variables might very well affect donor compensation[5] and that some variables *cannot* be

8   controlled for using a regression model.[6]  Dr. Singer claims to control for certain factors within

9   his analysis of the Fertility Connections data, but again provides no basis for applying that same

10  analysis or controlling for the same variables across all putative class members at all clinics and

11  agencies nationwide.

12          The need for individualized inquiry at different clinics and donor agencies belies any

13  notion that Dr. Singer's methodology can demonstrate common impact across a nationwide class

14  based on common proof applicable to all class members.  This clinic-by-clinic/agency-by-agency

15  approach is the antithesis of determining common impact across putative class members "in one

16  stroke."   *Dukes*, 131 S. Ct. at 2551.   To satisfy *Daubert*'s relevancy requirement, the

17  methodology chosen by the expert must be suitable to establishing the fact in question.  *See In re*

18  *Photochromic Lens Antitrust Litig.*, 2014 WL 1338605, at *23 (M.D. Fla. Apr. 3, 2014) ("Experts

19  are required to demonstrate their methodology is capable of using common evidence, yet Dr.

20  Singer does not even attempt to do so for an overwhelming majority of the class.").  At the class

---

[5]  Singer Dep. at 69:20-24 (Monts Decl. Ex. 1) ("And you know, I recognize that these eggs are not homogenous.  They can vary.  So that's why it is important to control for them in an analysis when you're trying to isolate the effect of the challenged conduct."); Singer Dep. at 68:12-19 (Monts Decl. Ex. 1) ("Q:  You've listed some here, hair color, eye color, body mass index.  Let's say someone's judgment about the physical beauty or appearance of someone, SAT scores, athletic talent, musical talent.  Would you expect those to play a role in the but-for world in determining the price of donor compensation?  A:  They could; they could.").

[6]  Singer Dep. at 69:9-15 (Monts Decl. Ex. 1) ("Q:  Okay.  So were there any recorded characteristics that said this is a particularly beautiful donor?  That often seems to be in the eye of the beholder.  A:  Right.  So you don't go by something as subjective – that would be hard to measure and create a variable.").

HOGAN LOVELLS US
LLP
ATTORNEYS AT LAW
- 9 -
DEFENDANTS' MOTION TO EXCLUDE
OPINIONS OF DR. HAL J. SINGER
CASE NO. 3:11-cv-1781-JCS

1    certification stage, the issue is whether Plaintiffs can demonstrate from common evidence that the

2    compensation provisions of the challenged Ethics Report had an effect on members of a single

3    class of egg donors *across the United States* for an approximately seven-year period.  Dr. Singer

4    appropriately concedes that his regression cannot do so.

5          Moreover, even if the individualized inquiry required by Dr. Singer's model did not make

6    his method unreliable, discovery has now closed and Dr. Singer and the Plaintiffs have not

7    adduced documents, data or testimony necessary to undertake the individualized inquiry his

8    model requires.  In his report, Dr. Singer said that he could apply his "illustrative" regression

9    more broadly "to larger and/or more diverse data sets from additional entities as they become

10   available."  Singer Rep. ¶ 29.  He opines that he is looking for experiments in which a clinic or

11   agency "changes status" or "was in and then wanted out" of SART.  Singer Dep. 83:13-23,

12   146:21-147:25 (Monts Decl. Ex. 1).  To that end, he testified that he believed that there were 50

13   agencies that "were members at one point and then asked to be removed."  *Id.* (Monts Decl. Ex.

14   1)  But the record is barren of evidence supporting that assertion, and Dr. Singer did not "have the

15   price data" for these agencies at the time of his deposition.  *Id.* at 84:3-12 (Monts Decl. Ex. 1).

16   Discovery is now closed, and Dr. Singer and the Plaintiffs still do not have any data – other than

17   the Fertility Connections data – that would permit them to evaluate impact or to even evaluate

18   whether removal is even related to the Ethics Report at issue.  *Id.* (Monts Decl. Ex. 1).  In short,

19   no facts suggest that the analysis used for donors at Fertility Connections can be replicated at any

20   other clinic or donor agency anywhere in the United States.  By choosing an approach requiring

21   individual analysis of agency and clinic data, Dr. Singer has undermined his own conclusions.

22   Even accepting his regressions as valid for donors at Fertility Connections, they have no

23   application to any other clinic or agency.

24         Compounding that problem, Dr. Singer admits that his regressions do not actually

25   calculate impact or damages for a nationwide class of donors.  *Id*. at 113:15:24 (Monts Decl. Ex.

26   1) ("What I've been asked to do was design basically a method – well, asked could one design a

27   method for showing the impact and would it involve any kind of individualized methods or

28   evidence.  And that I feel comfortable saying today.  Q:  But as to whether or not it actually

Hogan Lovells US
LLP
Attorneys At Law

- 10 -

Defendants' Motion to Exclude
Opinions of Dr. Hal J. Singer
Case No. 3:11-cv-1781-JCS

would show that, you don't know? A: I see that – yeah, I don't know it, and I - well, I don't know it today. I will leave it at that."). Indeed, during his deposition, he testified that he had not determined impact across the entire class and did not have the data to calculate aggregate damages for the class. *Id.* (Monts Decl. Ex. 1); *see also id.* at 84:3-12 (Monts Decl. Ex. 1).

Such a hypothetical, speculative approach is unreliable. At class certification, Plaintiffs may not merely promise to produce evidence at some point showing classwide impact and aggregate damages. *Photochromic Lens*, 2014 WL 1338605, at *23 (expert's theoretical assertions insufficient; referring to opinion of Dr. Singer). Instead, they "'must affirmatively demonstrate . . . compliance' with Rule 23." *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013) (quoting *Dukes*, 131 S. Ct. at 2551-52). Here, Dr. Singer's opinions offer no affirmative demonstration of anything but rather a tautology – namely, if he can get enough data and has enough time, he can show impact on class members and calculate aggregated damages using common econometric tools. *See, e.g.*, Singer Report ¶¶ 25-26 (noting that "[e]conometric models *can be used* to demonstrate common impact" and that applied in this case, "an econometric model would measure variation in the per-cycle compensation received for Donor Services as a function of individual donor characteristics, as well as a variable capturing the effect of the Challenged Conduct") (emphasis added). But that assertion, which could be found in any common econometric textbook, says nothing about whether Dr. Singer's illustrative models are actually capable of determining whether any members of the purported class suffered impact, and they cannot.

For Dr. Singer's opinions to be admissible, Plaintiffs "must explain the expert's methodology and demonstrate in some objectively verifiable way that the expert has both chosen a reliable . . . method and followed it faithfully." *Pecover*, 2010 WL 8742757, at *4 (applying *Daubert* principles to class certification) (quoting *Daubert v. Merrill Dow Pharms., Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995) (*Daubert II*). Yet there is nothing objectively verifiable about Dr. Singer's analyses at all. To the extent they offer illustrations, they apply only to a single donor agency. As noted above, Dr. Singer himself does not even claim that his Fertility Connections regressions can be applied reliably to any other clinic or agency. Instead, he opines only that, if

HOGAN LOVELLS US
LLP
ATTORNEYS AT LAW

- 11 -

DEFENDANTS' MOTION TO EXCLUDE
OPINIONS OF DR. HAL J. SINGER
CASE NO. 3:11-cv-1781-JCS

1   certain data exist and are obtainable, he could create additional analyses that apply to donors at

2   other clinics and agencies.  But such data would not be "common" to the class, and the data are

3   not in the record in any event.  Discovery is now closed, and nothing in the record suggests that

4   Dr. Singer's analysis could apply to any donors other than those at Fertility Connections.  Dr.

5   Singer's model simply does not provide a reliable methodology for determining the impact of the

6   compensation provisions of the challenged Ethical Report on all class members of the purported

7   nationwide class, or for calculating classwide damages, using evidence common to the class.

8          For an expert's opinion to be reliable and admissible, there must some indication, other

9   than the expert's assertion that he should be trusted, that the methodology chosen is, in fact,

10  applicable to all absent class members.[7]   Here, not only is there no evidence suggesting such

11  broad applicability, there is an explicit admission that the methodology has not and cannot be

12  applied to putative class members other than those who donated through Fertility Connections.

13  Dr. Singer's regressions and the opinions based on them, therefore, should be excluded.

14         **B.     Dr. Singer's Regressions Rest on Assumptions That Are Contrary to the**

15                  **Undisputed Facts.**

16         To be "relevant" and thus "helpful" under Rule 702, the expert must apply a reliable

17  methodology faithfully to the facts of record.  *Daubert*, 509 U.S. at 592-93.  Dr. Singer's opinions

18  also fail to meet that requirement because his Fertility Connections regression does not even

19  withstand scrutiny as applied to the facts of donors at that particular agency.

20         Dr. Singer testified that having a period in which Fertility Connections was following the

21  compensation provisions in the challenged Ethics Report and one in which it was not was crucial

22  to his regressions because that would allow him isolate the effects of the allegedly unlawful

23  agreement on donor compensation.  Singer at 83:1-3 (Monts Decl. Ex. 1) ("[W]e need to exploit

24  an experiment in which someone changes status.").  Dr. Singer apparently believed that he found

---

[7]  The Court need not decide whether an expert's model must actually show injury to each absent class member at the class stage, although there is support for that position.  *Bell Atl. Corp.*, 339 F.3d at 302.  At a minimum, the method for showing common impact must be *applicable* to all absent members and, when applied to any individual class member, must be able to show whether that class member has suffered any injury or not.  Dr. Singer's models fail that test.

such a period between March 2006 and December 2008 based solely on a letter that Fertility Connections sent to SART asking to be removed from the SART website. *See* Singer Dep. at 31:20-23 (Monts Decl. Ex. 1) (determining whether donor agency is adhering to compensation provisions of the Ethics Rule by "whether there was a letter or some other statement expressing a desire or request to be removed as a listed agency on the SART web site"). Indeed, Dr. Singer simply assumes, with no basis, that Fertility Connections severed ties with SART because of a desire to "escap[e] the constraint" of the Ethics Report. *Id.* at 39:24-40:20 (Monts Decl. Ex. 1) ("sitting here, it's hard for me to think of other reasons . . . as to why someone would ask to quit"). He never verified this assumption, however, with anyone from Fertility Connections or the evidence in the record. *Id.* at 34:17-24 (Monts Decl. Ex. 1). And his assumption contradicts the undisputed record facts.

Fertility Connection's principal, Sherri Barr, testified that her agency never changed its donor compensation levels based on any conversations with SART or ASRM and that at no time did any correspondence with SART, much less the removal from SART's website, have any effect on the agency's donor compensation decisions. Barr Decl. ¶¶ 7-10. That testimony is unrebutted. Indeed, Ms. Barr's declaration belies any notion that Fertility Connections was ever out of "compliance" or considered itself as having escaped the "constraint" of the compensation provisions in the challenged Ethics Report. As Ms. Barr testified, Fertility Connections always considered the compensation levels described in the challenged Ethics Report as a useful recommendation but not one by which it was bound. *Id.* ¶ 9. Fertility Connections set donor compensation based on its own ethical determinations and guidelines from clinics it served and on market factors. *Id.* ¶¶ 4, 6, 8-9. Thus, Dr. Singer's regressions assume a period in which Fertility Connections actively declined to adhere to the compensation provisions of the Ethics Report that never existed. While Dr. Singer may call his analysis a "before/after" analysis, there is no before and no after.

Ms. Barr's assertions are confirmed by Fertility Connections' data, which further demonstrates the lack of correspondence between the assumptions built into Dr. Singer's regressions, the undisputed facts, and Plaintiffs' theory of the case. Plaintiffs' complaint alleges

that the unlawful conduct at issue is an agreement among clinics and agency setting a "maximum price" at either $5,000 or $10,000.  *See* Comp. ¶¶ 60-63.  Yet throughout the entire period covered by Dr. Singer's regressions, Fertility Connections' payments to donors *always* exceeded $5,000 and were *always* below $10,000.  Therefore, depending on whatever theory Plaintiffs' ultimately adopt, *all* of Fertility Connections' payments were either "compliant" or "non-compliant" with the Ethics Report.  For example, if Plaintiffs' claim that the "maximum price" set by the challenged Ethics Report is $5,000, then Fertility Connections was never in "compliance." Conversely, if Plaintiffs claim that the "maximum price" is $10,000, then at no time during the period Dr. Singer analyzed was Fertility Connections out of "compliance."  In short, there is no point at which Fertility Connections "change[d] status" with respect to the Ethics Report – what Dr. Singer described as necessary in order for his regression to demonstrate impact to donors at Fertility Connections.  Singer Dep. at 83:1-5. (Monts Decl. Ex. 1).  Accordingly, Dr. Singer's regressions do not fit the facts of the case and are therefore not relevant to the class certification inquiry.  His opinions based on those regressions must be excluded.

## II.     DR. SINGER'S "RIGID PRICING STRUCTURE" ANALYSIS DOES NOT SALVAGE HIS OPINIONS.

Aside from his regression analyses, Dr. Singer opines that clinics and agencies maintain a "rigid pricing structure" for donor compensation.  This analysis does not salvage Dr. Singer's opinions and is likewise inadmissible under both the reliability and relevance prongs of *Daubert*. The "rigid pricing structure analysis" is unreliable because it rests on no discernible application of any recognized economic principle.  It is also irrelevant because it does not square with the undisputed facts of the case.  Dr. Singer concedes that the "rigid pricing structure" analysis does not show impact across all purported class members.  Singer Dep. at 100:12-21 (Monts Decl. Ex. 1).  Further, rather than using actual donor compensation payments to determine whether a "rigid pricing structure" exists, Dr. Singer relies largely on advertised compensation levels or a range of advertised compensation levels at various clinics and agencies.  A review of actual compensation levels, however, shows wide variation in payments to donors both within individual clinics and agencies and across clinics and agencies.  Dr. Singer's opinions based on his "rigid pricing

structure" analysis, therefore, are inadmissible.

### A. Dr. Singer's Conclusion That a "Rigid Pricing Structure" Exists Applies No Recognized Economic Principle.

Defendants do not challenge Dr. Singer's qualification as an economist.  He has the education and training that qualify him to render expert opinions in the area of economics.  But in order to render admissible opinions, he must apply accepted economic techniques and principles to reach his conclusions.  *Daubert,* 509 U.S. at 590 ("But, in order to qualify as 'scientific knowledge,' an inference or assertion must be derived by the scientific method.  Proposed testimony must be supported by appropriate validation—*i.e.,* "good grounds," based on what is known."); *Clark v. Takata Corp.*, 192 F.3d 750, 759 n.5 (7th Cir. 1999) ("A supremely qualified expert cannot waltz into the courtroom and render opinions unless those opinions are based upon some recognized scientific method and are reliable and relevant under the test set forth by the Supreme Court in *Daubert*.").  In short, to offer an admissible opinion, an expert's methodology must apply the tools of his or her expertise and training.  In the context of an antitrust case, an expert economist must apply economic analysis to reach a conclusion.  Dr. Singer's "rigid pricing structure" conclusion does not meet that requirement.

Dr. Singer conducted his "rigid pricing structure" "analysis" by simply plotting agency and clinic donor compensation on a chart.  The data plots were all over the map, varying from less than $4,000 to more than $16,000.  Singer Rep. at Figure 1.  Based on apparently nothing more than an "eyeball" test, however, Dr. Singer opined that the donor compensation rates at various clinics and agencies clustered visually within a specified range.  *See* Report of Thomas McCarthy, Ph.D. ("McCarthy Rep.") ¶ 61 (attached as Exhibit 19 to Dkt. #126) (Singer "rigid pricing structure" analysis "appears to be based on a visual inspection of the graph and does not appear to have any basis in analytic fact at all").  As such, he concludes that a "rigid price structure" exists.  This amorphous and unscientific methodology allows Dr. Singer to conclude that a "rigid pricing structure" exists even when there are significant variations in compensation both within a particular clinic or agency and across multiple clinics and agencies.

Whatever it may be called, this methodology is neither "scientific" nor "economic," and it

Hogan Lovells US
LLP
Attorneys At Law

- 15 -

Defendants' Motion to Exclude
Opinions of Dr. Hal J. Singer
Case No. 3:11-cv-1781-JCS

certainly does not "help the trier of fact" for an economist to make a visual inspection of data that the Court is perfectly capable of making for itself.   Fed. R. Evid.702.   Dr. Singer's visual inspection is malleable and can be altered to fit virtually any factual scenario or support virtually any conclusion.   It appears to contain no fixed definitions or parameters and rest on no accepted or standard testing procedures.   Perhaps most important, Dr. Singer applies no discernible economic principles to connect this supposed "rigid pricing structure" to his conclusion that adherence to the compensation levels in the Ethics Report will affect donor compensation levels across all members of the purported plaintiff class.   As Dr. Singer concedes, there is no evidence that donor compensation moves in parallel *across* clinics or agencies pursuant to some "structure" – rigid or not.   Singer Dep. at 92:8-13 (Monts Decl. Ex. 1) ("So you shouldn't take rigid pricing structure to mean identical pricing across clinics.   It's that within a clinic, there's a price, and that's basically what you're going to get.").   In short, Dr. Singer did not apply accepted principles of economics.   Accordingly, his methodology is not reliable.   His opinion on this point should be excluded as well.

## B.   Dr. Singer's "Rigid Pricing Structure" Analysis Ignores Actual Compensation Data and Substantial Variation in Compensation Across Clinics and Agencies.

Dr. Singer rests his "rigid pricing structure" analysis on compensation data from approximately 30 clinics and agencies.   Underscoring the malleability of the concept, in most cases, he uses list or advertised prices instead of *actual* compensation paid to various donors within those clinics and agencies.   For example, with respect to Pacific Fertility Clinic, he uses "Agency Fee Schedules."   *See, e.g.*, Singer Rep. ¶¶ 17-19.   Dr. Singer admitted that he did not talk to any of the clinics or agencies in his analysis to determine whether their actual transaction prices deviated from list or advertised prices.   Singer Dep. at 89:8-90:6 (Boston IVF) (Monts Decl. Ex. 1); 91:24-92:1 (IVF New Jersey) (Monts Decl. Ex. 1).   With other clinics and agencies, he uses a minimum and maximum price range, rather than an actual compensation levels paid to donors.   The actual data from those clinics, however, show that very few donors were paid at the advertised minimum or advertised maximum and that wide variation exists in actual payments.

With still other clinics, he applies the most common rate paid to donors, which amounts to a form of averaging and thus masks variations in payments to donors that are apparent from review of the actual transaction data.  As Defendants' expert, Dr. Thomas McCarthy, noted in his report, there is wide variation in actual compensation paid to donors across clinics and across the nation. *See* McCarthy Rep. ¶ 61.  While most of the observations in Dr. Singer's data fall within the $5,000-$10,000 range, the majority of observations are actually different from $5,000 and $10,000, and fully 17 percent of the observations fall outside the range altogether. *Id.* Far from showing a "rigid pricing structure," the actual compensation data show precisely the opposite.

The "rigid pricing structure" analysis suffers from two other fatal factual infirmities. Although Dr. Singer's report asserts that the "rigid pricing structure" could be used to show common impact from the Ethics Report across all purported class members, he abandoned that contention during his deposition.  He testified that the "rigid pricing structure" exists only *within* clinics and agencies, not *across* clinics and agencies.  Singer Dep. at 92:8-13 (Monts Decl. Ex. 1). Therefore, at bottom, the "rigid pricing structure" analysis amounts to nothing more than an unremarkable proposition that clinics and agencies – like any other purchaser of any product or service – only have a single "average" price or a single "maximum" and "minimum" price.  Such analysis is not the stuff of reliable expert testimony.

Finally, Dr. Singer conceded that the "rigid pricing structure" has no bearing no whether there is impact across all purported class members:

> Q:      Isn't this consistent with also competitive pricing?  Don't you see competitive prices cluster at certain levels?
>
> A:      It very well may be.  So that means that in competitive markets, you might have pricing structures.  This isn't proof of anticompetitive effects. *This isn't proof of impact.*

Singer Dep. at 100:13-19 (Monts Decl. Ex. 1) (emphasis added).  If the "rigid pricing structure" analysis is not "proof of impact," as Dr. Singer has admitted, then it has no relevance to the inquiries for which his opinions are offered.  It should be excluded.

1

**CONCLUSION**

2        For the foregoing reasons, Defendants respectfully request that the Court exclude the

3    expert opinions of Dr. Hal J. Singer offered on Plaintiffs' class certification motion.

4                                          Respectfully submitted,

5

6

7    December 9, 2014                        *s/ William L. Monts III*
                                             Megan Dixon (Cal. Bar No. 162895)
8                                            HOGAN LOVELLS US LLP
                                             3 Embarcadero Center
9                                            Suite 1500
                                             San Francisco, CA 94111
10                                           Telephone:  (415) 374-2300
                                             Facsimile:  (415) 374-2499
11                                           E-Mail:  megan.dixon@hoganlovells.com

12

13                                           Robert F. Leibenluft (admitted *pro hac vice*)
                                             William L. Monts III (admitted *pro hac vice*)
14                                           Benjamin F. Holt (admitted *pro hac vice*)
                                             HOGAN LOVELLS US LLP
15                                           555 Thirteenth Street, N.W.
                                             Washington, D.C. 20004-1109
16                                           Telephone: (202) 637-5600
                                             Facsimile: (202) 637-5910
17                                           E-Mail:  robert.leibenluft@hoganlovells.com
                                             william.monts@hoganlovells.com
18                                           benjamin.holt@hoganlovells.com

19
                                             *Attorneys for Defendants*
20                                           *American Society for Reproductive Medicine and*
                                             *Society for Assisted Reproductive Technology*
21

22

23

24

25

26

27

28

HOGAN LOVELLS US
LLP
ATTORNEYS AT LAW

- 18 -

DEFENDANTS' MOTION TO EXCLUDE
OPINIONS OF DR. HAL J. SINGER
CASE NO. 3:11-CV-1781-JCS