1

2

3

4                          UNITED STATES DISTRICT COURT

5                         NORTHERN DISTRICT OF CALIFORNIA

6

7    LINDSAY KAMAKAHI,                          Case No.  11-cv-01781-JCS

            Plaintiff,

8

         v.                                     **ORDER REGARDING MOTIONS TO**
9                                               **EXCLUDE EXPERT OPINIONS AND**
                                                **MOTION FOR CLASS**
10   AMERICAN SOCIETY FOR                        **CERTIFICATION**
     REPRODUCTIVE MEDICINE, et al.,
11          Defendants.                         Re: Dkt. Nos. 133, 165, 141

12   **I.      INTRODUCTION**

13            This is a putative class action brought on behalf of women who donated eggs (sometimes

14   referred to as oocytes) through fertility clinics and donation agencies that agreed to comply with

15   ethical guidelines set by Defendants American Society for Reproductive Medicine ("ASRM") and

16   Society for Assisted Reproductive Technology ("SART").  Plaintiffs Lindsay Kamakahi and

17   Justine Levy allege that Defendants' guidelines regarding "appropriate" compensation for egg

18   donors constitute a horizontal price fixing agreement in violation of Section 1 of the Sherman Act.

19   Plaintiffs now seek to certify a plaintiffs' class.  Plaintiffs and Defendants each seek to exclude an

20   opposing expert's opinions pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S.

21   579 (1993).  The Court held a hearing on January 23, 2015.  For the reasons stated below,

22   Plaintiffs' motion to exclude the opinions of Dr. Insoo Hyun is DENIED, Defendants' motion to

23   exclude the opinions of Dr. Hal Singer is GRANTED, and Plaintiffs' Motion for Class

24   Certifications is GRANTED IN PART and DENIED IN PART.[1]

25

26

27

28        [1] The parties have consented to the jurisdiction of the undersigned magistrate judge for all
     purposes pursuant to 28 U.S.C. § 636(c).

United States District Court
Northern District of California

United States District Court
Northern District of California

## II.     BACKGROUND

### A.     The Defendants

ASRM is an organization "devoted to advancing knowledge and expertise in reproductive medicine."  Consolidated Am. Compl. ("CAC," dkt. 63) ¶ 10; Answers[2] ¶ 10.  ASRM's membership consists of medical professionals and corporations located throughout the United States.  CAC ¶ 10; Answers ¶ 10.  ASRM has an Ethics Committee and a Practice Committee that establish standards for its members; the central function of the Ethics Committee is the publication of "ethics reports" setting forth certain ethical standards for reproductive professionals, while the central function of the Practice Committee is to promulgate guidelines and standards to be followed by reproductive professionals.  CAC ¶ 10; Answers ¶ 10.

SART "is an affiliated society to ASRM."  CAC ¶ 11; Answers ¶ 11.  It considers itself as the "primary organization of professionals dedicated to the practice of assisted reproductive technologies in the United States."  CAC ¶ 11; Answers ¶ 11.  According to its website, SART's members include over 392 practices (including many in this District), representing over 85% of the clinics engaged in the practice of assisted reproductive technologies in the United States.  CAC ¶ 11; Answers ¶ 11.  SART's mission is "to set and to help maintain the standards for assisted reproductive technologies, including guidelines regarding ethical considerations, laboratory practice and proper advertising."  CAC ¶ 11; Answers ¶ 11.

### B.     Egg Donation and the Challenged Guidelines

"Many women in the U.S. rely on assisted reproductive technologies to have children.  The main form of assisted reproduction is *in vitro* fertilization ('IVF'), which, in some circumstances, requires the use of third-party egg donors."  Hyun Report (dkt. 126-1, under seal) ¶ 10; *see also* CAC ¶ 36; Answers ¶ 36.  Egg donors are subject to a screening process that requires them to "compile and disclose a detailed medical and psychological history about themselves and their close blood relatives" and undergo medical testing.  CAC ¶ 38−40; *see also* Answers ¶¶ 38−40.  If approved, donors "undergo hormone injections aimed at stimulating egg production and . . . are

---

[2] Defendants filed materially identical Answers.  *See generally* Answer by ASRM to Pls.' CAC (dkt. 64); Answer by SART to Pls.' CAC (dkt. 65).  Where relevant, this Order uses a single citation to both Answers.

usually advised against behaviors such as unprotected sex, smoking, drinking, and taking certain prescription drugs." Answers ¶ 42, *see also* CAC ¶ 42. In the course of hormone treatment, donors "must also receive frequent blood tests and ultrasound examinations . . . requiring frequent doctor visits," and may experience side effects including "mood swings, fluid retention, and enlarged ovaries." CAC ¶¶ 43−44; *see also* Answers ¶¶ 43−44. The process culminates in a surgical procedure to retrieve eggs from the donor's ovaries. CAC ¶ 45; Answers ¶ 45. Many women who donate eggs through fertility clinics or donor agencies receive monetary compensation.

In 2000, ASRM promulgated a report that "sets forth guidelines that reflect the ASRM Ethics Committee's recommendation on proper compensation for egg donors." Answers ¶¶ 59−60; McLellan Decl. (dkts. 119-4 / 119-6)[3] Ex. 1. In 2007, ASRM "reaffirmed the findings of the 2000 ethics guidelines in a report entitled 'Financial Compensation of Oocyte Donors." Answers ¶ 63; McLellan Decl. Ex. 2. Both reports (collectively, the "Guidelines") include general principles of how compensation should be determined. For example, the 2000 report states that "compensation should not vary according to the number or quality of oocytes retrieved or the donor's ethnic or other personal characteristics." McLellan Decl. Ex. 1 at 219. The Guidelines also set limitations on the amount of compensation that is appropriate. The 2000 report states that "at this time sums of $5,000 or more require justification and sums above $10,000 go beyond what is appropriate." *Id.* The 2007 report similarly states that "at this time sums of $5,000 or more require justification and sums above $10,000 are not appropriate." *Id.* Ex. 2 at 308.

Fertility clinics that are members of SART agree to follow ASRM guidelines as a condition of membership. CAC ¶ 69; Answers ¶ 69. SART also encourages egg donation agencies that recruit donors to follow the Guidelines, and has (at least at times) provided a list on its website of agencies that signed an agreement to do so. Answers ¶¶ 76−80. In 2006, SART

---

[3] A number of documents cited in this Order have been filed under seal. For documents where the record contains both a sealed version and a redacted public version, this Order cites both ECF docket numbers separated by a slash, with the sealed version listed first. Where no redacted version of a sealed document is available, this Order cites only the sealed docket number and indicates that the document was filed under seal.

United States District Court
Northern District of California

advised agencies that they would be removed from SART's website if they failed to comply with the requirements of membership. *Id.* ¶ 78.

### C. The Named Plaintiffs and Their Claims

Plaintiffs Kamakahi and Levy are individuals who donated eggs at SART member clinics and received compensation. CAC ¶ 9. Plaintiffs allege in this action that the $5,000 and $10,000 limits regarding "appropriate" compensation constitute an unlawful horizontal price fixing agreement in violation of the Sherman Act, 15 U.S.C. § 1, and that these limits resulted in artificially low levels of compensation for Plaintiffs and other egg donors. *See* CAC ¶¶ 106, 109. They do not challenge any other provision of the Guidelines. *See id.*; Cert. Reply (dkts. 134-3 / 136) at 1−2.[4] Plaintiffs seek treble damages, costs, and attorneys' fees, as well as an injunction barring further use of the appropriate price guidelines. CAC ¶¶ E, F.

### D. Procedural History

This action originated in April of 2011 with Kamakahi filing a complaint on behalf of herself and similarly situated donors against the present Defendants and Pacific Fertility Center, the clinic where Kamakahi donated eggs. Kamakahi Compl. (dkt. 1). After Kamakahi declined to consent to the jurisdiction of a magistrate judge, the case was assigned to Judge Armstrong. Dkt. 6. Levy filed a separate class action complaint against Defendants in August of 2011. Levy Compl. (case no. 4:11-cv-03803, dkt. 1). Judge Armstrong granted a motion to consolidate the two cases in March of 2012 and appointed Plaintiffs' counsel as interim lead class counsel. Dkt. 52.

Plaintiffs filed their operative Consolidated Amended Complaint, which does not name Pacific Fertility Center as a defendant, in April of 2012. *See generally* CAC. Defendants moved to dismiss, contending that the Guidelines should be evaluated in the context of the rule of reason rather than as an alleged per se violation of the Sherman Act, and that Plaintiffs failed to

---

[4] This Order resolves three motions, and therefore must distinguish citations to the briefing for each motion. Briefs relating to Plaintiffs' Motion for Class Certification are cited as "Cert. Mot.," "Cert. Opp'n," and "Cert. Reply." Briefs relating to Plaintiffs' Motion to Strike the Class Certification Report of Dr. Insoo Hyun are cited as "Mot. re Hyun," "Opp'n re Hyun," and "Reply re Hyun." Briefs relating to Defendants' Motion to Exclude the Opinions of Dr. Hal J. Singer are cited as "Mot. re Singer," "Opp'n re Singer," and "Reply re Singer."

United States District Court
Northern District of California

adequately plead a rule of reason claim.  *See generally* Mot. to Dismiss (dkt. 57).  Defendants

argued that Plaintiffs alleged market definition—egg donor services in the United Stated—was

insufficient as to both the product definition and geographic definition.  *Id.* at 17−21.  On March

29, 2013, Judge Armstrong denied Plaintiffs motion, holding that Plaintiffs adequately pled a per

se theory of liability and that Plaintiffs' market definition was neither legally defective nor

"facially unsustainable."  Order Denying Mot. to Dismiss CAC (dkt. 63).[5]

By stipulation of the parties, the case was referred to the undersigned magistrate judge for

all purposes on June 10, 2013.  Dkts. 74−77.

### E.  The Present Motions

#### 1.  Motion for Class Certification

Plaintiffs now seek to certify a class defined as follows:

> All women who sold Donor Services for the purpose of supplying
> human eggs to be used for assisted fertility and reproductive
> purposes ("AR Eggs") within the United States and its territories at
> any time during the time period from April 12, 2007 to the present
> (the "Class Period") to or through:
>
> a.  any clinic that was, at the time of the donation, a member of
> [SART] and thereby agreed to follow the Maximum Price Rules, as
> set forth by SART and [ASRM]; and/or
>
> b.  any AR Egg Agency that was, at the time of the donation,
> agreeing to follow the Maximum Price Rules.

Cert. Mot. (dkts. 119-5 / 141) at 1.[6]  Plaintiffs request that if the Court determines that "only one

of these categories (i.e. only patients of clinics, or only patients of agencies) meets the

requirements for class certification," the Court certify a class consisting of only the category that

qualifies.  *Id.* at 1 n.1.  As a further alternative, if the Court finds that the case as a whole is not

suitable for resolution as a class action, "Plaintiffs seek certification of an issue class . . . limited to

adjudicating the question of whether Defendants violated the antitrust laws."  *Id.* at 2.

Plaintiffs contend that the proposed class meets each requirement of Rule 23(a) of the

United States District Court
Northern District of California

---

[5] *Kamakahi v. Am. Soc'y for Reproductive Med.*, No. C 11-01781 SBA, 2013 WL 1768706 (Mar. 29, 2013).

[6] The CAC also contemplates certification of a defendant class of clinics and agencies, CAC ¶¶ 19−28, but Plaintiffs move only to certify a plaintiff class of donors.  *See generally* Cert. Mot.

Federal Rules of Civil Procedure, and that, under Rule 23(b), common issues predominate such that a class action is superior to other methods of adjudicating the controversy.  For their predominance argument, Plaintiffs first cite the issue of whether the Guidelines violate the Sherman Act, an issue they claim can be resolved solely through classwide proof.  *Id.* at 8−9.  Plaintiffs also argue that documentary evidence and regression analysis by their expert witness Dr. Hal Singer can show through classwide proof that each class member was injured, *id.* at 9−14, and the extent of each class member's damages, *id.* at 15−16.

Defendants oppose class certification.  *See generally* Cert. Opp'n (dkts. 126-4 / 126-3).  They argue that Kamakahi's claim is not typical of the proposed class because her donor agreement with Pacific Fertility Center includes an arbitration clause, and that other purported class members may have unique arbitration agreements that would need to be addressed individually.  *Id.* at 7−8.  Defendants also contend that there are conflicts of interest among the class based on varying opinions as to whether donors with more desirable personal traits should receive greater compensation, *id.* at 8−9, and that the portion of the class defined as donors through agencies (as opposed to clinics) that agreed to follow the Guidelines is not ascertainable, *id.* at 9.

As for predominance, Defendants argue that Plaintiffs cannot use Dr. Singer's analysis to show that each class member was injured, in part because his regressions cannot reliably be applied to clinics and agencies beyond the specific agencies from which he reviewed data.  *Id.* at 11−23.  They also claim that Plaintiffs' documentary evidence is insufficient to show that each class member was injured, *id.* at 24−25, and argue that as a matter of law, an antitrust action cannot be certified under Rule 23(b)(3) unless such a showing can be made using common evidence.  *Id.* at 10−11 (citing, *e.g.*, *Bell Atl. Corp. v. AT&T Corp.*, 339 F.3d 294, 302 (5th Cir. 2003).  Defendants suggest that not only might some class members not have been injured, but some might have benefited from the Guidelines because absent the Guidelines, they would not have been selected to donate at all.  *Id.* at 22.

Defendants make similar arguments regarding Plaintiffs' inability to calculate class members' damages through classwide proof.  *Id.* at 27−28.  According to Defendants, Plaintiffs'

1    inability to show that class members suffered impact and damages also forecloses certification of

2    an issue class to address whether the Guidelines violate the antitrust law

3        Plaintiffs also move for certification of a subclass pursuant to Rule 23(b)(2) of the Federal

4    Rules of Civil Procedure, seeking injunctive relief on behalf of "all women within the Donor Class

5    who intend to sell Donor Services in the future to or through any clinic or AR agency agreeing to

6    follow the Maximum Price Rules established by Defendants." Cert. Mot. at 1. Defendants oppose

7    certification of the subclass, arguing that the named plaintiffs do not intend to donate eggs again in

8    the future and therefore lack standing to seek injunctive relief and to represent other donors who

9    do intend to donate again. Cert. Opp'n at 28−30. Defendants also claim that there are conflicts of

10    interest among the proposed future donor subclass because some members may benefit from the

11    Guidelines. *Id.* at 31.

12       **2. Motions to Exclude Expert Reports**

13        Each party moves to exclude expert testimony that the other offers as relevant to the

14    question of whether impact and damages can be shown on a class-wide basis.[7]

15        Defendants submit a report by Dr. Insoo Hyun, Ph.D., a bioethicist, that discusses

16    principles of medical ethics and presents justifications for the Guidelines based on such principles.

17    *See generally* Hyun Report. Plaintiffs argue that Dr. Hyun's report improperly addresses the

18    merits of the case rather than issues of class certification, and that his conclusions are not based on

19    a scientific method. *See generally* Mot. re Hyun (dkt. 133). Defendants counter that Dr. Hyun's

20    testimony is relevant to understanding factors that would affect physicians' decisions regarding

21    donor compensation if the challenged provision of the Guidelines were not present, Opp'n re

22    Hyun (dkt. 139) at 3−7, and is based on reliable methods and qualifications, *id.* at 7−9.

23        Plaintiffs submit three reports by Dr. Hal Singer, Ph.D. an economist, which present

24    methods and analysis that Plaintiffs believe can show impact and damages through classwide

25    proof. *See generally* Singer Report (dkt. 119-7); Singer Reply Report (dkt. 134-4); Singer Supp'l

26

27        [7] A third expert—Dr. Thomas McCarthy, Ph.D., an economist who authored two reports for

28    Defendants—is not the subject of a *Daubert* motion. *See generally* McCarthy Report (dkt. 126-19, under seal); McCarthy Supp'l Report (dkts. 167-4 / 167-3).

1 Report (dkt. 151-6) (each under seal).  Dr. Singer analyzed compensation data from three egg

2 donor agencies that affirmatively renounced their agreements to comply with the Guidelines, and

3 prepared regression models to isolate the effect of that decision.  *See* Singer Report ¶¶ 45, 58;

4 Singer Supp'l Report ¶ 6.  Defendants argue that Dr. Singer's analysis is unreliable because it

5 cannot be applied to other clinics and agencies, and because it rests on improper assumptions and

6 fails to include relevant variables.  Mot. re Singer (dkt. 165) at 5−14.  Defendants also attack, as

7 inaccurate and unsupported by economic analysis, Dr. Singer's conclusion that clinics and

8 agencies employ a "rigid pricing structure."  *Id.* at 14−17.  Plaintiffs dispute Defendants'

9 arguments and further contend that such arguments properly go to weight rather than

10 admissibility.  *See generally* Opp'n re Singer (dkt. 162).

## III. LEGAL STANDARDS

12   The parties' motions require the Court to resolve two separate but related inquiries: (1)

13 whether the court should consider certain expert reports in deciding the question of class

14 certification; and (2) whether a class should be certified.  Although the parties' *Daubert* motions

15 are a threshold issue to Plaintiffs' class certification motion, the "relevance" prong of the *Daubert*

16 inquiry depends on what the parties will need to show to support or defeat class certification, and

17 the class certification questions of predominance and commonality in turn depend on the elements

18 of Plaintiffs' underlying antitrust claim.  This Order therefore discusses each of the three relevant

19 legal standards—for antitrust claims under the Sherman and Clayton Acts, class certification under

20 Rule 23, and expert testimony under Rule 702 and *Daubert*—before analyzing the parties'

21 motions.

### A. Legal Standard for Plaintiffs' Underlying Antitrust Claim

23   The merits of Plaintiffs' substantive claim are not presently before the Court, but the nature

24 of the underlying claim is relevant to understanding what Plaintiffs will need to show to prevail,

25 which in turn informs the two present issues.  The Court therefore briefly addresses the underlying

26 cause of action.

27   Plaintiffs bring this action under section 1 of the Sherman Act, which prohibits

28 "contract[s], combination[s]  in the form of trust or otherwise, or conspirac[ies], in restraint of

United States District Court
Northern District of California

1  trade," 15 U.S.C. § 1, and under the Clayton Act, which grants private parties harmed by such

2  restraints the right to sue for damages and injunctive relief, *id.* §§ 15(a), 26. Courts have long held

3  that the Sherman Act is not as broad as its literal language might suggest, and "that Congress

4  intended to outlaw only *unreasonable* restraints." *Texaco v. Dagher*, 547 U.S. 1, 5 (2006)

5  (quoting *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997)) (emphasis in *Texaco*). Courts

6  "presumptively appl[y] rule of reason analysis, under which antitrust plaintiffs must demonstrate

7  that a particular contract or combination is in fact unreasonable and anticompetitive before it will

8  be found unlawful." *Id.* Certain "plainly anticompetitive" agreements, however, including

9  "[p]rice-fixing agreements between two or more competitors, otherwise known as horizontal

10 price-fixing agreements," are considered unlawful *per se*. *Id.* "Horizontal price fixing is a per se

11 violation regardless of whether the prices set are minimum or maximum." *Knevelbaard Dairies v.*

12 *Kraft Foods, Inc.*, 232 F.3d 979, 988 (9th Cir. 2000) (citing *Arizona v. Maricopa Cnty. Med.*

13 *Soc'y*, 457 U.S. 332 (1982)). Plaintiffs contend that the challenged compensation guidelines

14 constitute such an agreement. Compl. ¶¶ 3, 106. In the alternative, Plaintiffs argue that the

15 compensation guidelines are anticompetitive and unlawful under the rule of reason. *Id.* ¶ 107.

16       The Clayton Act states that "any person who shall be injured in his business or property by

17 reason of anything forbidden in the antitrust laws may sue therefor." 15 U.S.C. § 15(a). In much

18 the same way that the facially broad language of the Sherman Act has been construed as

19 addressing only certain types of agreements, however, "[t]he Supreme Court has held that

20 Congress did not intend to afford a remedy to everyone injured by an antitrust violation."

21 *Knevelbaard Dairies*, 232 F.3d at 987 (citing *Associated Gen. Contractors of Cal., Inc. v. Cal.*

22 *State Council of Carpenters*, 459 U.S. 519, 535 (1983)). In other words, it is not enough that a

23 plaintiff has been injured; the plaintiff also "must have 'antitrust standing.'" *Knevelbaard Dairies*,

24 232 F.3d at 987. That question turns on the following factors: "(1) the nature of the plaintiff's

25 alleged injury; that is, whether it was the type the antitrust laws were intended to forestall; (2) the

26 directness of the injury; (3) the speculative measure of the harm; (4) the risk of duplicative

27 recovery; and (5) the complexity in apportioning damages." *Id.* (quoting *Am. Ad Mgmt., Inc. v.*

28 *Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1054 (9th Cir. 1999)).

*United States District Court*
*Northern District of California*

9

The first of these factors—the nature of the injury—is the most important.  "A showing of antitrust injury is necessary, but not always sufficient, to establish [antitrust] standing . . . ." *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 110 n.5 (1986); *see also Am. Ad Mgmt.*, 190 F.3d at 1055.  This factor itself has four required elements: "(1) unlawful conduct, (2) causing an injury to the plaintiff, (3) that flows from that which makes the conduct unlawful, and (4) that is of the type the antitrust laws were intended to prevent." *Am. Ad Mgmt.*, 190 F.3d at 1055.  The remaining factors also inform the decision, but "a court need not find in favor of the plaintiff on each factor" other than antitrust injury.  *Id.*

## B.    Legal Standard for Class Certification

In the federal courts, class actions are governed by Rule 23 of the Federal Rules of Civil Procedure.  Under that Rule, a party seeking class certification must demonstrate that "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a).  Further, although not explicitly discussed in the Rule, "an implied prerequisite to class certification is that the class must be sufficiently definite; the party seeking certification must demonstrate that an identifiable and ascertainable class exists." *Xavier v. Philip Morris USA Inc.*, 787 F. Supp. 2d 1075, 1089 (N.D. Cal. 2011).  In short, a party must show numerosity, commonality, typicality, adequacy, and ascertainability.

A proposed class must also satisfy at least one of the subsections of Rule 23(b).  Plaintiffs in this action primarily invoke Rule 23(b)(3), which provides that a class that meets the requirements of Rule 23(a) may be certified where "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  Plaintiffs also seek to certify a subclass of future donors for injunctive relief  under Rule 23(b)(2), which permits certification where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."

Fed. R. Civ. P. 23(b)(2).

"The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2550 (2011) (internal quotation marks and citation omitted). "In order to justify a departure from that rule, a class representative must be part of the class and possess the same interest and suffer the same injury as the class members." *Id.* "A party seeking class certification must affirmatively demonstrate his compliance with [Rule 23]—that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." *Id.* at 2551. "Rule 23 does not set forth a mere pleading standard." *Id.*

"Before certifying a class, the trial court must conduct a 'rigorous analysis' to determine whether the party seeking certification has met the prerequisites of Rule 23." *Mazza v. Am. Honda Motor Co., Inc.*, 666 F.3d 581, 588 (9th Cir. 2012) (citation omitted). Such analysis, however, is not a "license to engage in free-ranging merits inquiries [regarding the ultimate outcome of the case] at the certification stage." *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1194−95 (2013). Rather, "[m]erits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Id.* (citation omitted).

If the Court determines that Plaintiffs cannot maintain a class action for all purposes, Plaintiffs seek to certify a class "with respect to particular issues" pursuant to Rule 23(c)(4), specifically, "whether Defendants' agreement violates the antitrust laws." Cert. Mot. at 2; 19−24. "Even if the common questions do not predominate over the individual questions so that class certification of the entire action is warranted, Rule 23 authorizes the district court in appropriate cases to isolate the common issues under Rule 23(c)(4)(A) and proceed with class treatment of these particular issues. *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996). Courts faced with a proposed issue class should consider "whether the adjudication of the certified issues would significantly advance the resolution of the underlying case, thereby achieving judicial economy and efficiency." *Id.* at 1229. In at least some circumstances, it is appropriate to certify a class to "accurately and efficiently resolve the question of liability, while leaving the

11

potentially difficult issue of individualized damage assessments for a later day." *Jimenez v. Allstate Ins. Co.*, 765 F.3d 1161, 1164 (9th Cir. 2014) (affirming a district court order that took this approach, without explicitly citing Rule 23(c)(4)).

### C.   Legal Standard for Expert Testimony

Rule 702 of the Federal Rules of Evidence permits a party to offer testimony by a "witness who is qualified as an expert by knowledge, skill, experience, training, or education." Fed. R. Evid. 702. This Rule embodies a "relaxation of the usual requirement of firsthand knowledge," *Daubert*, 509 U.S. at 592,[8] and requires that certain criteria be met before expert testimony is admissible. The Rule sets forth four elements, allowing such testimony only if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. These criteria can be distilled to two overarching considerations: "reliability and relevance." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011). The inquiry does not, however, "require a court to admit or exclude evidence based on its persuasiveness." *Id.*

When a party seeks to exclude expert testimony or reports at the class certification stage, courts apply the *Daubert* standard to evaluate the challenged evidence. *Id.* The reliability prong requires the court to "act as a 'gatekeeper' to exclude junk science," and grants the court "broad latitude not only in determining whether an expert's testimony is reliable, but also in deciding how to determine the testimony's reliability." *Id.* (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137,

---

[8] *See* Fed. R. Evid. 602 ("A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. . . . This rule does not apply to a witness's expert testimony under Rule 703."); Fed. R. Evid. 703 ("An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted.").

United States District Court
Northern District of California

145, 147–49, 152).  Evidence should be excluded as unreliable if it "suffer[s] from serious methodological flaws."  *Obrey v. Johnson*, 400 F.3d 691, 696 (9th Cir. 2005).

The relevance prong looks to whether the evidence "fits" the issues to be decided: "scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes," and "[e]xpert testimony which does not relate to any issue in the case is not relevant." *Daubert*, 509 U.S. at 591.  "Where an 'expert report' amounts to written advocacy . . . akin to a supplemental brief, a motion to strike is appropriate because this evidence is not useful for class certification purposes."  *Williams v. Lockheed Martin Corp.*, No. 09CV1669 WQH (POR), 2011 WL 2200631, at *15 (S.D. Cal. June 2, 2011) (citation omitted; ellipsis in original).

In this case, both of the challenged expert reports are offered to inform the commonality and predominance inquiries: specifically, whether damages and antitrust impact can be demonstrated through common proof.  *See* Opp'n re Hyun at 3−4; Opp'n re Singer at 1.  The Court must therefore decide whether the reports reliably assist the resolution of those issues.

## IV.    ANALYSIS OF MOTIONS TO EXCLUDE EXPERT OPINIONS

### A.    Plaintiffs' Motion to Exclude Report of Dr. Insoo Hyun

Plaintiffs argue that Dr. Hyun's report is improper advocacy, that it addresses the merits of the case rather than class certification issues, and that it lacks a foundation of reliable principles or methods.  Defendants counter that this report is relevant to understanding how physicians' ethical obligations to their patients would affect compensation on a case-by-case basis.  According to Defendants, such individual ethical decisions are not captured in Plaintiffs' model of damages and preclude class certification, and Dr. Hyun's expertise as a bioethicist is relevant to understanding the nature of such obligations.

### 1.   Dr. Hyun's Report Primarily Addresses Irrelevant Issues

Plaintiffs are correct that Dr. Hyun's report primarily addresses merits issues that are not relevant to class certification.  Dr. Hyun states in his report that he was "asked by counsel for the Defendants to describe the ethical issues surrounding egg donor compensation for fertility treatment and to explain the purposes and value of having professional ethical guidelines in general, and in particular the purposes and value of the [ASRM] guidelines for egg donor

compensation." Hyun Report ¶ 4.  In his response to this request, Dr. Hyun concludes that the Guidelines "provide a valuable resource to fertility clinics," *id.* ¶ 5, "fit within a long-standing practice," *id.* ¶ 6, and "are well justified on ethical, professional, and public policy grounds," *id.* ¶¶ 9, 80.

Dr. Hyun's report opens with a survey of foreign regulations of donor compensation.  *See id.* ¶¶ 10−15.  Defendants present no argument that this is relevant to class certification, and the Court need not address it in detail.

Dr. Hyun next addresses the role of professional guidelines in general.  He states that guidelines such as the ASRM Guidelines challenged here "are meant to offer helpful ethical guidance, not the final word on sensitive topics." *Id.* ¶ 18.  According to Dr. Hyun, the challenged provision "does not set strict payments limits on donor compensation," based in part on the phrasing of the Guidelines—specifically, the use of the term "appropriate," as opposed to "a stronger term like 'ethical' or 'morally right.'" *Id.* ¶ 31.  Dr. Hyun also cites various disclaimers by ASRM that its guidelines "are not intended to be a protocol to be applied in all situations," and thus concludes that the Guidelines "are meant to leave room for individual interpretation and judgment." *Id.* ¶¶ 19, 26.  Essentially, this portion of Dr. Hyun's report argues that the Guidelines are not actually an agreement to fix prices.  It therefore addresses a core issue of the merits of Plaintiffs' claim, which could be relevant at a later stage of the case but is not relevant to certification.

Much of Dr. Hyun's report is devoted to justifying the Guidelines.  He discusses, for example, different structures for compensating donors of biomaterials, and sets forth an ethical argument that compensation should not create non-altruistic motivations for donation.  *Id.* ¶¶ 45−52.  According to Dr. Hyun, "removing any upper limits on compensation for donors' burdens would make it very difficult to protect altruism from being pushed entirely aside inadvertently by market forces." *Id.* ¶ 57.  He also justifies the Guidelines as protecting the physical and psychological welfare of donors and children, *id.* ¶¶ 58−63, the free choice and informed consent of donors, *id.* ¶¶ 64−65, the "professionalism" of doctors, *id.* ¶¶ 66−70, and "fair

14

access to IVF treatment," *id.* ¶¶ 71−72.[9]   To the extent that these conclusions may be relevant to this case, the question of whether the Guidelines are justifiable on any of these grounds is a class-wide inquiry into the merits.  Again, this portion of Dr. Hyun's report has little if any bearing on class certification.

### 2.  Dr. Hyun's Report Is Nevertheless Relevant to Class Certification

Defendants' Opposition to Plaintiffs' Motion to Strike cites Dr. Hyun's conclusions regarding the various ethical concerns associated with donor compensation for a different purpose than Dr. Hyun presents them.  While Dr. Hyun largely presents the ethical considerations as *justification* for the challenged provision limiting the value of "appropriate" compensation, Defendants argue that Dr. Hyun's opinions are relevant to understanding the factors physicians would consider *in the absence of* the challenged provision.  *See* Opp'n re Hyun at 4 ("Most importantly for class certification purposes, Dr. Hyun explains that physicians *must* confront these bioethical questions . . . .").  Similarly, while Dr. Hyun analyzes whether independent ethical guidelines and obligations would operate in conjunction with or perhaps supersede the challenged compensation limits, Defendants use that analysis to argue that the persistence of those obligations in a "but-for" world lacking the challenged provision undermines the model Plaintiffs have proposed to calculate damages on a class-wide basis.  *See id.* at 5 (arguing that "Plaintiffs' impact and damages model does not—and cannot—take into account numerous individualized issues, including ethical considerations, that may affect donor compensation").

Although it does not appear to be the focus of his report, Dr. Hyun does provide a basis to conclude that physicians may base donor compensation in part on the physicians' personal ethical opinions.  Dr. Hyun states that "medical professional must exercise their own personal judgment in determining what counts as harms, benefits, and the patients best interests."  Hyun Report ¶ 21.

---

[9] The final section of Dr. Hyun's report discusses policy concerns associated with varying donor compensation based on the individual donors' traits.  Hyun Report ¶¶ 73−77.  Plaintiffs do not challenge the portion of the Guidelines prohibiting payment for traits—Plaintiffs' claim targets only the portion setting forth specific limits on "appropriate" compensation.  Cert. Reply at 1−2.  To the extent that this section of Dr. Hyun's report might be intended to justify the specific compensation limits as a safeguard against compensation for traits, that—like Dr. Hyun's other justifications of the challenged provision—is a class-wide merits issue that raises no bar to class certification.

He also states that due to the nature of the egg donation procedure, "egg donors become *patients*," triggering physicians' "ethical commitments of non-maleficence and beneficence," and that physicians' ethical obligations "demand" that "payments to women who provide eggs for fertility treatment must be fair but not so high as to end up harming the patients and donors." *Id.* ¶ 28−29. Dr. Hyun discusses how location- or patient-specific circumstances might affect a physician's determination of reasonable compensation. *Id.* ¶ 36. He also discusses how such determinations may be affected by broader considerations, such as a desire to ensure that egg donors are primarily motivated by altruism, or physicians' professional discomfort with "us[ing] their medical training and expertise to help maximize profits for healthy egg donors" instead of providing medical care or treatment. *See id.* ¶¶ 56−57, 68. Taken together, this testimony could support a conclusion that physicians' ethical judgments influence compensation levels in ways that may not be responsive to market forces, and could vary among different doctors. The potential effect of that factor is relevant to understanding whether Dr. Singer's statistical models can accurately predict the value of donor compensation in the absence of the Guidelines, which is in turn relevant to whether damages and impact can be shown through classwide proof.

### 3. Dr. Hyun Is Qualified to Testify and Employed Reliable Methods

Plaintiffs also argue that Dr. Hyun's report is inadmissible because Dr. Hyun is not an economist and does not apply econometric methods. *See* Mot. re Hyun at 4−6. This argument is unavailing because Defendants do not offer Dr. Hyun's report to show, on its own, the ultimate economic effect of physicians' ethical judgments. Opp'n re Hyun at 5 ("Contrary to Plaintiffs' assertions, Defendants did not ask—and Dr. Hyun did not provide—testimony on the 'economic effect' of these independent ethical decisions."). For Defendants' purpose—identifying factors that physicians might consider when setting prices—Dr. Hyun's credentials and training as a bioethicist are highly relevant. *See* Hyun Report ¶¶ 1−3 (describing Dr. Hyun's qualifications). Similarly, Dr. Hyun's methods, which include surveying the literature of his profession and drawing on his own experience in the field of bioethics, appear to be appropriate in this context.

### 4. Dr. Hyun's Report is Admissible

Plaintiffs' motion to strike presents a close question. Much of Dr. Hyun's report focuses

16

1    on issues that are not relevant at this stage, parts of his testimony border on improper legal

2    advocacy, and Plaintiffs are correct that "[i]f Defendants intended for Dr. Hyun to opine on the

3    question of whether any variation in compensation to egg donors is derived in part from

4    individualized ethical decisions, they should have requested he do so." Reply re Hyun (dkt. 143)

5    at 3 (citation and internal quotation marks omitted). The Court nevertheless concludes that,

6    however inartfully presented, Dr. Hyun's report is sufficiently relevant and reliable to be

7    admissible for the very limited purpose for which Defendants seek to use it. Plaintiffs' motion to

8    strike is therefore DENIED.

9        **B.    Defendants' Motion to Exclude Opinions of Dr. Hal Singer**

10        Plaintiffs offer three reports by their expert economist, Dr. Singer, also addressing the

11   issue of whether damages and impact can be shown through class-wide proof. Dr. Singer's initial

12   report primarily addresses compensation data from a single egg donation agency during periods

13   when the agency agreed to comply with the Guidelines and periods when it did not. *See generally*

14   Singer Report (dkt. 119-7; under seal). The report also addresses, in an appendix, a second agency

15   that Dr. Singer views as a "statistical outlier" due to its "specializing in a luxury niche of the

16   market." *Id.* ¶ 28 n.51; *see id.* App. 3. Based on the data from these agencies, Dr. Singer prepared

17   regression models that purport to isolate the effect of the Guidelines on donor compensation

18   rates.[10] *See id.* ¶ 30. Plaintiffs also submit a reply report by Dr. Singer (dkt. 134-4; under seal)

19   addressing critiques by Defendants' expert Dr. McCarthy, and a supplemental report (dkt. 151-6;

20   under seal) analyzing data from a third donation agency. Dr. Singer "conclude[d] that proof of

21   impact is amenable to common evidence and methods, as are the calculation and allocation of

22   aggregate damages." Singer Report ¶ 53.

23        Defendants move to exclude Dr. Singer's opinions as both unreliable and irrelevant. For

24   the reasons stated below, the Court finds that Dr. Singer's reports are unreliable to the extent that

25

---

26   [10] "A regression is a statistical tool designed to express the relationship between one variable, such as price, and explanatory variables that may affect the first variable. Regression analysis can

27   be used to isolate the effect of an alleged conspiracy on price, taking into consideration other factors that might also influence prices, such as cost and demand." *In re High-Tech Emp.*

28   *Antitrust Litig.* ("*High-Tech*"), 985 F. Supp. 2d 1167, 1207 n.15 (N.D. Cal. 2013) (citation omitted).

*United States District Court*
*Northern District of California*

they purport to show that damages or impact can be established through class-wide proof.  To the extent that Dr. Singer can model the effects of the Guidelines only within the specific agencies that he examined, such models are irrelevant to class certification.[11]  The Court therefore GRANTS Defendants' motion to exclude Dr. Singer's reports.

**1. Dr. Singer's Regressions Show Different Effects of the Guidelines at Different Agencies**

As Dr. Singer acknowledges, his regressions analyze only the specific agencies that he had compensation data for.  When asked at his deposition whether the regressions "demonstrate a generalized effect across all class members," Dr. Singer initially stated that to the extent the data from those agencies represents "a random sample and is, therefore, representative of the effect that was felt, the answer yes."  Mot. re Singer Ex. 1 (Singer Dep.) 113:1−9.  That answer, of course, begs the question of whether the data is in fact random or representative, and Dr. Singer immediately when on to state that that he does not know whether that is the case:

> A: . . .  But I haven't been asked yet and I don't feel comfortable yet at this point saying that I know that these experiences that I've looked at are, in fact, representative.
> What I've been asked to do was design basically a method - - well, asked could one design a method for showing the impact and would it involve any kind of individualized methods or evidence.  And that I feel comfortable saying today.
>
> Q:    But whether or not it actually would show that, you don't know?
>
> A:    I see that -- yeah, I don't know it, and I -- well, I don't know it today.  I will leave it at that.

*Id.* 113:10−24.

Although Plaintiffs need only show a *method* of proving damages and impact through common proof—whether class members were *actually* damaged is a merits question—Dr. Singer's reports fail to show that such a method exists.  Dr. Singer constructed his regressions

---

[11] In an academic sense, the ability to show damages within a single agency could perhaps be said to be *relevant* to showing classwide damages, despite being *insufficient* on its own.  *See Obrey*, 400 F.3d at 695 (stating that a "statistical study may fall short of proving the plaintiff's case, but still remain relevant to the issues in dispute").   In this case, however, where there is no other evidence that could tie agency-specific models to any method of classwide proof across hundreds of agencies and clinics, it is a distinction without a difference.

United States District Court
Northern District of California

based on the "natural experiment" resulting from agencies that at one point agreed to follow the Guidelines and later disavowed them. *See* Singer Report ¶ 12. He suggested that a more robust model could be produced if Plaintiffs gathered data from additional clinics. *Id.* ¶ 28. However, Plaintiffs themselves state that they were able to identify "three (and only three) such 'switcher' agencies, each of which signed an agreement to adhere to the Maximum Price Rules, then subsequently sent a letter to ASRM withdrawing from that agreement." Opp'n re Singer at 4−5 (citations to record omitted).

If these three agencies showed a uniform effect of the challenged price restrictions, it is perhaps conceivable that a factfinder could find them sufficient to extrapolate that effect to all other clinics and agencies, although the small sample size raises serious questions. But that is not the case: the regressions for these three agencies produced significantly different conclusions as to the impact of adhering to the Guidelines. *See* Singer Report ¶¶ 45, 58; Singer Supp'l Report ¶ 6 (reporting effects of approximately $300 to $940, $1,400, and $2,800 for the three agencies respectively). Neither Plaintiffs nor Dr. Singer explain the variation between the agencies, nor do they explain with any specificity how these disparate results could be applied to other agencies or clinics.

### 2. A Rigid Pricing Structure Within Individual Clinics and Agencies Does Not Assist in Determining Damages or Impact Across Different Clinics and Agencies

Plaintiffs seem to suggest that a "rigid pricing structure" that Dr. Singer observed could be relevant to proving damages and impact through common proof. *See, e.g.*, Cert. Reply at 12−15. There is no support for that conclusion.

Plaintiffs focus on the "rigidity" of pricing within individual clinics and agencies, not across the market as a whole. *See id.* at 12 ("There is little evidence of variation in the amount *each clinic* paid to its egg donors, nor of deviation between the posted price and the amount actually paid." (emphasis added)). Dr. Singer stated as much at his deposition: "[Y]ou shouldn't take rigid pricing structure to mean identical pricing across clinics. It's that within a clinic, there's a price, and that's basically what you're going to get." Singer Dep. 92:8−13. According the Plaintiffs, Defendants' argument (supported by Dr. McCarthy's testimony and analysis) "that the

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1    pricing data shows variations across different clinics" does not "matter[]."  Cert. Reply at 13.  The

2    Court therefore likewise focuses on whether a rigid pricing structure within individual clinics and

3    agencies aids in determining damages or impact through class-wide proof.[12]

4           Dr. Singer stated that the pricing structure provides a "mechanism" by which

5    anticompetitive effects could be "transmit[ted] . . . to a substantial portion of all class members,"

6    Singer Reply Report ¶ 81, but does explain how this mechanism works across different clinics and

7    agencies that are not part of the same pricing structure, nor does he claim that it renders his

8    regressions applicable to any clinics or agencies other than the three he analyzed.

9           Plaintiffs' reliance on *In re High-Tech Emp. Antitrust Litig.* ("*High-Tech*") is misplaced.

10   *See generally* 985 F. Supp. 2d 1167 (N.D. Cal. 2013).  That case involved claims that seven

11   prominent technology companies conspired not to recruit each other's employees through cold

12   calls, thus suppressing employee compensation.  *Id.* at 1221.  The rigid compensation structures

13   that Judge Koh found relevant were necessary in that case to show that while only some class

14   members might be directly exposed to a practice (there, cold calls from competing employers) it

15   could nevertheless affect other class members as well.  *See High-Tech*, 985 F. Supp. 2d at

16   1210−13, 1221−22.  Here, that is not an issue.  There is no question that all class members'

17   compensation was similarly subject to the Guidelines—this is not case of discrete incidents (like

18   cold calls to a particular employee) reverberating to affect a class.  Further, the rigid compensation

19   in *High-Tech* appears to have been relevant to showing that such an effect could spread to

20   employees *within each company*, not necessarily across different companies.  *See id.*  The issue

21   here is whether Plaintiffs can show through common proof the amount by which the Guidelines

22   reduced class members' compensation, if any, across hundreds of clinics and agencies.  *See*

23   Compl. ¶ 11 ("According to its website, SART's members include over 392 practices . . . .").

24   Neither Plaintiffs nor Dr. Singer articulated how a rigid pricing structure within individual clinics

25

26          [12] To the extent that Plaintiffs separately argue that compensation is "rigid" across all clinics,
     the record does not adequately show such a price structure.  The compensation rates that Dr.
27   Singer compiled for different egg donor agencies show significant variation, albeit generally
     below $10,000 per donation.  *See* Singer Report at 12 (Figure 1); Singer Reply Report at 51
28   (Figure 2).

and agencies contributes to such proof.

### 3. Plaintiffs Have Not Shown That Additional Data Is Available or Would Enable Classwide Proof

Dr. Singer suggests that a common "regression model [could] be estimated using a common database of Donor Services transactions encompassing multiple clinics and/or AR Egg Agencies, spanning time geography, and donor characteristics," Singer Report ¶ 28, but there is no indication that such data exists: Plaintiffs identified "only three" agencies suitable to serve as natural experiments. *See* Opp'n re Singer at 4−5. Plaintiffs have not suggested that any model can derive the effect of the Guidelines from data from other clinics or agencies, which do not present the same contrast of first agreeing to and later disavowing the Guidelines.[13] Without more data—data that, it seems, does not exist—there is no way to explain the discrepancy in impact among the three agencies Dr. Singer analyzed. The mere suggestion that more data could improve the model is insufficient, at least without any showing that the data is available. *See In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 318 (3d Cir. 2008) ("The evidence and arguments a district court considers in the class certification decision call for rigorous analysis. A party's assurance to the court that it intends or plans to meet the requirements is insufficient."); *see also In re Graphics Processing Units Antitrust Litig.*, 253 F.R.D. 478, 506 (N.D. Cal. 2008) ("After eight months of discovery, plaintiffs should have the data to formulate their regression analysis with more precision.").

### 4. Agencies That Withdraw from the Guidelines May Not Be Representative of All Clinics and Agencies

Finally, even if Plaintiffs could control for all variation among the "switcher" agencies, such agencies are likely not representative of clinics and agencies that never withdrew from their agreements to follow the Guidelines. Dr. Singer's report states that "an agency that 'quits,' by abandoning the Maximum Price Rules, is likely motivated by a desire to pay higher compensation

---

[13] Dr. Singer stated that clinics and agencies cannot yield suitable data unless they affirmatively withdrew from compliance with the Guidelines, even if data is available from before they agreed to them: "An agency may be able to capture some or all of the benefits of the low compensation rates imposed by the Challenged Conduct without formally agreeing to the Maximum Price Rules. Accordingly, the initial decision to comply with SART's guidelines may not capture the effect of the Challenged Conduct." Singer Report ¶ 30.

than is allowed by the Maximum Price Rules." Singer Report ¶ 30.  This is a reasonable conclusion, and it underlies Dr. Singer's decision to focus on withdrawals as opposed to initial agreements to follow the Guidelines.  It also, however, attributes a motivation to the agencies from which he derived his sample data that other agencies apparently do not share, at least not to the same extent—if they did, presumably the other agencies would have "quit" too.  Dr. Singer testified that his regressions can only "demonstrate a generalized effect across all class members" if the sample agencies are random and representative, Singer Dep. 113:1−9, but because data is only available from the agencies with sufficiently strong incentives to abandon the Guidelines, they are neither random nor representative.

* * *

Dr. Singer's inability to extrapolate results from the sample agencies to other agencies and clinics is probably not the only impediment to proving class-wide damages or impact using his regressions.  For example, while Plaintiffs insist that their claim is limited to the "appropriate" price thresholds and does not challenge the remainder of the Guidelines, Cert. Reply at 1−2, Dr. Singer's "natural experiment" fails to reflect that limitation because it is based on agencies that withdrew their agreement to comply with the Guidelines as a whole. *Cf. Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1433 (2013) (reversing certification of damages class where "the model failed to measure damages resulting from the particular antitrust injury on which . . . liability [was] premised," and instead also included the effects of market distortions not at issue).  Defendants proffer other purported limitations of Dr. Singer's models, including whether his use of donor traits in the regressions is appropriate. *See, e.g.*, Cert. Opp'n at 20.  Given the infirmities discussed above, the Court need not address these additional arguments. The Court GRANTS Defendants' motion to exclude Dr. Singer's opinions, because his analysis does not reliably support his conclusion that impact or damages are subject to classwide proof, and because absent such a showing, his reports are not relevant to the issue of class certification.

## V.   ANALYSIS OF MOTION FOR CLASS CERTIFICATION

### A.   The Past-Donor Class Warrants Certification

The Court first addresses the primary class that Plaintiffs seek to certify: women who

provided egg donor services to or through fertility clinics that were members of SART or egg

donation agencies that agreed to follow the challenged Guidelines. *See* Cert. Mot. at 1. As

discussed below, the Court finds that this class is appropriate for certification on the issue of

whether the challenged limitations on compensation violate the Sherman Act. The Court is not

satisfied at this time that class treatment is appropriate for the issues of damages and antitrust

impact, and reserves the question of how to determine those issues until after adjudication of the

whether a violation occurred.[14] *See Jimenez v. Allstate Ins. Co.*, 765 F.3d 1161, 1168−69 (9th Cir.

2014) (affirming a district court order that certified a class for the determination of liability and

bifurcated damages proceedings).

### 1. The Requirements of Rule 23(a) Are Satisfied

#### a. Numerosity

Plaintiffs satisfy the numerosity requirement if "the class is so large that joinder of all

members is impracticable." Fed. R. Civ. P. 23(a)(1); *see also Hanlon v. Chrysler Corp.*, 150 F.3d

1011, 1019 (9th Cir. 1998). Although the requirement is not tied to any fixed numerical threshold,

courts have routinely found the numerosity requirement satisfied when the class comprises 40 or

more members. *See E.E.O.C. v. Kovacevich "5" Farms*, 2007 WL 1174444, at *21 (E.D. Cal.

Apr. 19, 2007). Plaintiffs assert that the proposed class consists of "thousands of women . . .

dispersed throughout the United States." Cert. Mot. at 5. Defendants do not challenge that the

class is sufficiently numerous or that joinder would be impracticable. *See* Cert. Opp'n at 7

(challenging only typicality and adequacy in the context of Rule 23(a), as well as the related issue

of ascertainability). The Court is satisfied that the proposed class is sufficiently numerous to

satisfy Rule 23(a)(1).

#### b. Commonality

The commonality requirement of Rule 23(a)(2) is met where "the class members' claims

---

[14] The Court recognizes that antitrust impact is a question of statutory standing and therefore, strictly speaking, a component of liability rather than damages. Defendants' counsel conceded at the hearing that an issue class may be certified even where liability will not be fully determined by the classwide issue. In this case, the only aspect of antitrust impact that appears to be disputed is whether each class member was impacted at all—a question that goes hand in hand with the issue of damages. The question is *not* whether, if such an injury exists, it is an *antitrust* impact.

1    'depend upon a common contention' such that 'determination of its truth or falsity will resolve an

2    issue that is central to the validity of each [claim] with one stroke.'" *Mazza*, 666 F.3d at 588

3    (internal citation omitted) (citing *Wal-Mart*, 131 S. Ct. at 2551).   Thus, plaintiffs seeking to certify

4    a class must "demonstrate 'the capacity of classwide proceedings to generate common answers' to

5    common questions of law or fact that are 'apt to drive the resolution of the litigation.'" *Id.* (citing

6    *Wal-Mart*, 131 S. Ct. at 2551).   "The commonality preconditions of Rule 23(a)(2) are less rigorous

7    than the companion [predominance] requirements of Rule 23(b)(3)." *Hanlon*, 150 F.3d at 1019.

8    "[C]ommonality only requires a single significant question of law or fact." *Mazza*, 666 F.3d at

9    589 (citing *Wal-Mart*, 131 S. Ct. at 2556).

10         In this case, Defendants do not challenge Plaintiffs' Motion on the basis of commonality.

11   *See* Cert. Opp'n at 7.   Defendants concede that SART member clinics agreed to adhere to the

12   Guidelines.   Answers ¶ 69.   Plaintiffs claim rests on the question of whether the Guidelines

13   constitute an unlawful price fixing agreement.   "Courts consistently have held that the very nature

14   of a conspiracy antitrust action compels a finding that common questions of law and fact exist."

15   *In re Rubber Chems. Antitrust Litig.*, 232 F.R.D. 346, 351 (N.D. Cal. 2005) (citation omitted).

16   The Court is therefore satisfied that whether the Guidelines violate the antitrust laws is a question

17   common to all class members and susceptible to resolution by common proof, and thus meets Rule

18   23(a)(2)'s commonality requirement.   *Cf. Wal-Mart*, 131 S. Ct. at 2553 (finding insufficient

19   commonality where "significant proof that Wal-Mart operated under a general policy of

20   discrimination" was "entirely absent").

21              **c.   Typicality**

22         In assessing typicality, under Rule 23(a)(3), courts consider "whether other members have

23   the same or similar injury, whether the action is based on conduct which is not unique to the

24   named plaintiffs, and whether other class members have been injured by the same course of

25   conduct." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir.1992); *see also Wal-Mart*,

26   131 S. Ct. at 2550 ("a class representative must be part of the class and possess the same interest

27   and suffer the same injury as the class members").   The typicality and commonality requirements

28   "tend to merge" because "[b]oth serve as guideposts for determining whether under the particular

United States District Court
Northern District of California

24

circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Wal-Mart*, 131 S. Ct. at 2551 n.5 (2011) (citing *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157−58 n.13 (1982)).

Defendants argue that Kamakahi's claim is not typical of the class because she signed an agreement with the clinic where she donated that includes an arbitration clause. *See* Opp'n at 7 (citing Holt Decl. Ex. 2 (dkt. 126-7, under seal)).  Defendants suggest that "many other egg donors likely [also] have unique arbitration provisions in their agreements with clinics or agencies." *Id.* According to Defendants, the need to resolve individual arbitration agreements should foreclose class certification. *Id.* at 7−8.

The clinic where Kamakahi donated is not a party to this action,[15] and Defendants are not signatories to the arbitration agreement between Kamakahi and the Clinic. *See* Holt Decl. Ex. 2. The Ninth Circuit addressed such a scenario in *Murphy v. DirecTV, Inc.*, 724 F.3d 1218 (9th Cir. 2013).  That case concerned an "arbitration clause in the customer service agreement between DirecTV and individuals who believed they purchased their DirecTV equipment from Best Buy stores," and "whether Best Buy, which [was] not a party to that agreement, [was] entitled to the benefit of the arbitration clause." *Id.* at 1223.  The Ninth Circuit held that "generally only signatories to an arbitration agreement are obligated to submit to binding arbitration," and even though "Plaintiffs alleged in their complaint concerted action on the part of DirecTV and Best Buy," Best Buy failed to establish any basis to stray from that rule. *Id.* at 1229 (internal quotation marks omitted).  Accordingly, the plaintiffs' claims against Best Buy were not subject to arbitration:

> Plaintiffs agreed to arbitrate their claims against DirecTV.  They did not agree to arbitrate their claims against Best Buy. Notwithstanding the parties' many imaginative legal arguments, in this case they remain bound by the agreements they made and not by any they did not make.

*Id.* at 1234.

---

[15] The parties did not address in briefing whether the individual clinics and agencies are necessary parties to this action, and stipulated at the hearing that they are not.  The Court therefore finds no reason to address that issue.

Here, Defendants have advanced no argument why Kamakahi's claim against Defendants is subject to her arbitration agreement with the non-party clinic. *See* Cert. Opp'n at 7−8. As for other class members, Defendants' speculate only that some of them may have "arbitration provisions in their agreements *with clinics or agencies.*" *See id.* at 7 (emphasis added). There is no evidence or even suggestion that any class representative or member signed an agreement *with the Defendants* compelling arbitration of their claims. The Court therefore does not find that the arbitration provision in Kamakahi's donor agreement, which appears to have no bearing on this case, renders her claim atypical.

Defendants do not otherwise challenge the typicality of Kamakahi or Levy as class representatives. *See id.* at 7−8. The Court finds that this "action is based on conduct which is not unique to the named plaintiffs," i.e, the Guidelines limiting appropriate compensation, and that such conduct is applicable to the class as a whole. *See Hanon*, 976 F.2d at 508. The typicality requirement is therefore satisfied.

### d. Adequacy

Rule 23(a)(4), which requires that the class representatives "fairly and adequately protect the interests of the class," is satisfied if the proposed representative plaintiffs do not have conflicts of interest with the proposed class and are represented by qualified and competent counsel. *Ellis v. Costco Wholesale Corp.*, 285 F.R.D. 492, 535 (N.D. Cal. 2012).

In this case, Defendants argue that a conflict of interest arises from class members' differing opinions as to whether donor's traits should affect their compensation. Cert. Opp'n at 8−9. Defendants point to deposition testimony from both named Plaintiffs indicating that Kamakahi considers such variation in compensation inappropriate, while Levy believes it to be reasonable. *Id.* at 8 & n.1 (citing Holt Decl. Exs. 4, 5 (dkts. 126-9, 126-10, under seal)). The argument therefore appears to be that Levy is an inadequate representative for class members who oppose traits-based compensation, and Kamakahi is inadequate for those who do not.

Plaintiffs' claim in this case "challenge[s] *only* the provision that caps compensation at $5,000 (without justification) and in any event, at no more than $10,000." Cert. Reply at 2; *see also* Compl. ¶¶ 2, 59−64, 108. This case does not challenge the separate guideline prohibiting

United States District Court
Northern District of California

compensation based on traits.  Cert. Reply at 1.  As Defendants acknowledge, the issue of compensating for traits would only arise, if at all, in the context of determining and apportioning damages.  *See* Cert. Opp'n at 9 (discussing Dr. Singer's damages model, which takes into account certain donor traits).

Defendants cite no evidence that any class members actually have conflicting opinions as to how damages should be apportioned.  Kamakahi's deposition testimony concerned agencies and clinics advertising higher compensation for donors from certain ethnic groups—a practice that "seemed a little too . . . strange for [her]."  Holt Decl. Ex. 4 at 72:7−22.  It is not clear from Kamakahi's discomfort with such advertising that, if evidence ultimately showed that the challenged compensation restrictions affected some donors differently from others, Kamakahi would oppose taking that into account in awarding damages.  Levy testified that "donors should be paid what the recipients are willing to pay them," and that she "suppose[d]" that compensation for traits is "reasonable if it's an issue of supply and demand."  Holt Decl. Ex. 5 at 71:18−19, 72:1−2. Her view that it may be reasonable to consider traits when negotiating compensation does not, however, necessarily indicate that she would oppose a resolution of this case—which neither challenges the guideline prohibiting traits-based compensation  nor is itself a market transaction— that does not differentiate among donors based on traits.  It is of course *conceivable* that the named Plaintiffs could disagree on the appropriate measure of damages, but Defendants have not identified evidence of any actual conflict of interest.

"Mere speculation as to conflicts that may develop at the remedy stage is insufficient to support denial of initial class certification."  *Cummings v. Connell*, 316 F.3d 886, 896 (9th Cir. 2003) (quoting *Soc. Servs. Union, Local 535 v. County of Santa Clara*, 609 F.2d 944, 948 (9th Cir. 1979)).  Even if there were an *actual* conflict as to the calculation of damages in this case, Defendants have identified no conflict of interest that would render the named Plaintiffs inadequate to represent interests of the class with respect to whether the Guidelines violate the Sherman Act.  Defendants also do not challenge the adequacy of class counsel.  The Court therefore finds that Rule 23(a)(4) does not bar certification of a class to determine whether a violation occurred.

### 2.  Ascertainability

"In order for a proposed class to satisfy the ascertainability requirement, membership must be determinable from objective, rather than subjective, criteria."  *Xavier*, 787 F. Supp. 2d at 1089 (citing *In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24, 30 (2d Cir. 2006)).  Ascertainability is necessary to avoid "satellite litigation" and "unmanageable individualized inquiry," but may often be satisfied by "defendant records on point to identify class members."  *See id.*

Here, "Defendants do not dispute that donors who donated through SART-member clinics are ascertainable."  Cert Opp'n at 9.  Defendants argue, however, that the subset of the proposed class who donated through agencies (as opposed to clinics) that agreed to follow the Guidelines cannot be efficiently ascertained.  *Id.*  According to Defendants, "[i]t is not possible to ascertain the donors recruited by these unknown agencies without adjudicating the individualized merits issue of whether any particular agency 'agreed' with the challenged guideline."  *Id.*  If the class were based on donor agencies' subjective intent to follow the challenged Guidelines, Defendants' concern would be valid.  The question is whether there is objective evidence to identify which agencies agreed to comply.

The record indicates that agencies signed agreements to comply with the Guidelines, and that Defendants maintained records of which agencies had agreed to comply.   Plaintiffs submit an example of a form letter sent by SART to a donor agency soliciting the agency's agreement to follow Defendants' guidelines (including the challenged compensation guideline), and a form agreement signed by the president of that agency agreeing to follow these guidelines.  McLellan Reply Decl. (dkts. 135 / 136) Ex. 10.  Plaintiffs also submit a spreadsheet maintained by Defendants that lists donor agencies and includes a column to track whether there is a "Signed form" for each agency.  *Id.* Ex. 9.[16]  The form contracts and list of agencies available here are comparable to the sort of employment records that routinely support class certification in wage-and-hour cases.  *See, e.g.*, *Akaosugi v. Benihana Nat'l Corp.*, 282 F.R.D. 241, 255 (N.D. Cal. 2012).  The fact that determining class membership would involve reviewing these records does

---

[16] Plaintiffs also cite two other lists of donor agencies that Defendants produced during discovery, but it is not clear from the face of these documents that they include only agencies that agreed to follow the Guidelines.  *See* McLellan Reply Decl. Exs. 12, 13.

United States District Court
Northern District of California

1    not render the class unascertainable.

2        Although there appear to be sufficient records to determine which agencies agreed to

3    follow the Guidelines and when they entered such agreements, agencies that later terminated their

4    agreements may require more attention to resolve ambiguities in when such terminations

5    occurred.[17]   The record suggests, however, that only a handful of agencies terminated their

6    agreements with SART during the class period—Plaintiffs identified only three as appropriate

7    sources of data for Dr. Singer's analysis (which required such agencies so that Dr. Singer could

8    compare compensation before and after termination), and Defendants have not identified any

9    others.  Particularly in the context of certifying an issue class, the Court is not persuaded that these

10   agencies render the ascertainment of a class "unmanageable."  *See Xavier*, 787 F. Supp. 2d at

11   1089.  The Court therefore finds that the proposed class satisfies the ascertainability requirement.

### 3.   Common Questions Predominate as to Whether the Gudelines Violate the Sherman Act, but Not as to Damages and Antitrust Impact

12

13       "The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently

14   cohesive to warrant adjudication by representation."  *Amchem Prods., Inc. v. Windsor*, 521 U.S.

15   591, 623 (1997).  Rule 23(b)(3) "is far more demanding" than the commonality test under Rule

16   23(a)(2).  *Id.* at 624.  The Supreme Court has noted, however, that "[p]redominance is a test

17   readily met in certain cases alleging . . . violations of the antitrust laws," *id.* at 625, and the Ninth

18   Circuit has consistently "held that 'there is clear justification for handling the dispute on a

19   representative rather than an individual basis' if 'common questions present a significant aspect of

20   the case and they can be resolved for all members of the class in a single adjudication.'"  *Mazza*,

21   666 F.3d at 589 (quoting *Hanlon*, 150 F.3d at 1022).  "In this circuit . . . damage calculations

22   alone cannot defeat certification."   *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 513 (9th Cir 2013)

23   (holding that a district court's denial of class certification on the basis that "highly individualized"

24   damage calculations defeated predominance was a reversible error of law).

25

26

27

---

28       [17] *See* Singer Report ¶¶ 36−37, 55−58 (discussing difficulties that Dr. Singer encountered in
determining when two clinics ceased to be bound by the Guidelines).

United States District Court
Northern District of California

United States District Court
Northern District of California

### a. Class Treatment Is Appropriate as to Whether the Guidelines Violate the Sherman Act

Here, Defendants appear to have conceded in their opposition brief that the question of whether the Guidelines violate the Sherman Act is subject to common proof. *See* Cert. Opp'n at 10 (identifying only "antitrust impact and damages" as issues unsuitable for resolution by common evidence).[18]  For the same reasons stated above in the context of Rule 23(a)(2) commonality, the Court finds this to be a "question of law or fact common to class members." *See* Rule 23(b)(3). The Court further finds that it is "a significant aspect of the case and . . . can be resolved for all members of the class in a single adjudication .'" *Mazza*, 666 F.3d at 589.  If, on the merits, the Court determines that the appropriate price limitations in the Guidelines do not violate the antitrust laws, all class members' claims would be wholly resolved and judgment would be entered for Defendants.  If they do violate the antitrust laws, that determination alone would not resolve Plaintiffs' claims, but resolving that issue through a single adjudication would be far more efficient that duplicative litigation by class members who may number in the thousands.

### b. Plaintiffs Fail to Demonstrate That Damages Are Subject to Classwide Proof

Dr. Singer's regression models constitute Plaintiffs' only proposed method of determining damages through classwide proof.  *See* Cert. Mot. at 15−16.  Having granted Defendants' motion to exclude Dr. Singer's expert reports, the Court finds that Plaintiffs have failed to show their ability to prove damages on a class basis.  The Court therefore turns to whether that failure bars certification of an issue class to determine whether the Guidelines violate the Sherman Act.

### c. A Need for Individual Determinations of Damages and Injury-in-Fact Does Not Defeat Certification of Whether the Guidelines Violate the Sherman Act

The Ninth Circuit has long held that "damage calculations alone cannot defeat certification." *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 513 (9th Cir. 2013) (citation omitted).

---

[18] At the hearing, defense counsel raised for the first time the possibility that local market conditions may be relevant to evaluating the Guidelines under the rule of reason if the Court determine that the Guidelines are not a per se violation of the Sherman Act, and that such considerations weigh against finding predominance even as to the question of violation.  The Court finds the unbriefed and uncertain possibility of geographic considerations insufficient to defeat certification.  In the event that local considerations become relevant, they could likely be addressed by modifying certification to create a manageable number of geographic subclasses.

1   Where the only bar to predominance is that calculation of damages is not feasible on a class-wide

2   basis, a court in this circuit must certify the class to determine liability class-wide, and may

3   "leav[e] the potentially difficult issue of individualized damage assessments for a later day." *See*

4   *Jimenez v. Allstate Ins. Co.*, 765 F.3d 1161, 1164 (9th Cir. 2014) (affirming a district court order

5   that took this approach). Declining to certify a class where "the only individualized factor [is] the

6   amount of [damages] owed" is reversible error. *See Leyva*, 716 F.3d at 510 (reversing denial of

7   certification on this basis). In the Ninth Circuit, this rule survives the Supreme Court's decision in

8   *Comcast*. *See Leyva*, 716 F.3d at 514 (distinguishing *Comcast*); *Jimenez*, 765 F.3d at 1168−69

9   (same, in part because reserving the question of damages "preserved the rights of [the defendant]

10  to present its damages defenses on an individual basis").[19]

11      Defendants argue in their Opposition[20] that the Court should nevertheless decline to certify

12  a class for determining whether the Guidelines violate the Sherman Act, for three reasons

13  intertwined with the question of damages: (1) predominance requires showing the fact (if not

14  amount) of damages to each class member through common proof; (2) the element of antitrust

15  impact requires showing the fact (if not amount) of damages to each class member through

16  common proof; (3) without a showing that each class member was damaged, the class lacks

17  standing.

18      For the same reasons discussed above regarding the *calculation* of damages, Plaintiffs have

19  not demonstrated an ability to show the *fact* of damage to each class member through common

20  proof. The documentary evidence that Plaintiffs offer is no more applicable to the class as a whole

21  than Dr. Singers' regressions are, but rather is specific to certain clinics and agencies, or at best to

22

23          [19] At least one district court has held that the Supreme Court's decision in *Comcast* abrogated
    the Ninth Circuit's rule that the need for individualized damages calculations cannot defeat
24  predominance. *Stiller v. Costco Wholesale Corp.*, 298 F.R.D. 611, 627 (S.D. Cal. 2014) ("The
    Supreme Court's decision in *Comcast* makes clear that individualized damages determinations can
25  defeat Rule 23(b)(3)'s predominance requirement."). That case, however, predates the Ninth
    Circuit's decisions in *Leyva* and *Jimenez*, which construed *Comcast* more narrowly. *See Jimenez*,
26  765 F.3d at 1167; *Leyva*, 716 F.3d at 513−15. This Court is bound by the Ninth Circuit's post-
    *Comcast* decisions and the rule that they reaffirm.
27          [20] At the hearing, Defendants' counsel conceded that the Court has discretion to certify an
    issue class in this case, but argued that an issue class would not advance an efficient resolution of
28  the case. That argument is addressed separately below.

clinics and agencies in certain geographic areas. *See, e.g.*, Cert. Reply at 15 (quoting a "SART member['s]" statement that "$5,000 seems like a low donor reimbursement *for the larger cities*" (emphasis added)). It might be possible to present documentary evidence showing the views of each and every SART member clinic, but given the number of clinics and agencies, such evidence would not be common proof. *See* Compl. ¶ 11 ("According to its website, SART's members include over 392 practices . . . ."). The large number of clinics and agencies distinguishes this case from *High-Tech*, where Judge Koh relied on documentary evidence from each conspirator as common proof addressing impact in a conspiracy consisting of only seven employers. *Cf. High-Tech*, 985 F. Supp. 2d at 1171, 1221.

The Court holds, however, that under the Ninth Circuit's rule set forth above, failure to demonstrate the ability to prove injury-in-fact through common evidence does not bar certification to determine whether a violation occurred, and addresses each of Defendants' arguments in turn.

### i. The Possibility That Some Class Members Suffered No Damages Does Not Defeat Predominance

Defendants cite a number of out-of-circuit cases for the proposition that in order to establish predominance, Plaintiffs must be able to show through common evidence that each class member in fact suffered *some* damages as a result of the challenged Guidelines. Cert. Opp'n at 11. The Fifth Circuit has "repeatedly held that where fact of damage cannot be established for every class member through proof common to the class, the need to establish antitrust liability for individual class members defeats Rule 23(b)(3) predominance." *Bell Atl. Corp. v. AT&T Corp.*, 339 F.3d 294, 302 (5th Cir. 2003). The Eight Circuit appears to have applied a similar rule in *Blades v. Monsanto Co.*, an antitrust case by a putative class of farmers who purchased genetically modified seeds, affirming a denial of class certification because the plaintiffs "[could] not prove classwide injury with proof common to the class" where "the market for seeds [was] highly individualized." 400 F.3d 562, 572 (8th Cir. 2005). The First and Third Circuits also take this approach. *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 311−12 (3d Cir. 2008); *In re New Motor Vehicles Canadian Export Antitrust Litig.*, 522 F.3d 6, 20 (1st Cir. 2008).

This requirement is not, however, consistent across all Circuits. The Second Circuit held

United States District Court
Northern District of California

in the context of a Sherman Act claim that "[e]ven if the district court concludes that the issue of injury-in-fact presents individual questions, however, it does not necessarily follow that they predominate over common ones and that class action treatment is therefore unwarranted." *Cordes & Co. Fin. Servs. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 108 (2d Cir. 2007) (remanding to allow the district court to determine whether questions of injury-in-fact did, in fact, predominate). The Seventh Circuit has addressed its view on the issue in some detail, albeit not in an antitrust context:

> What is true is that a class will often include persons who have not been injured by the defendant's conduct; indeed this is almost inevitable because at the outset of the case many of the members of the class may be unknown, or if they are known still the facts bearing on their claims may be unknown. *Such a possibility or indeed inevitability does not preclude class certification*, despite statements in some cases that it must be reasonably clear at the outset that all class members were injured by the defendant's conduct. Those cases focus on the class definition; if the definition is so broad that it sweeps within it persons who could not have been injured by the defendant's conduct, it is too broad.

*Kohen v. Pac. Inv. Mgmt. Co. LLC*, 571 F.3d 672, 677 (7th Cir. 2009) (emphasis added; citations omitted). The Tenth Circuit has also taken this approach. *DG ex rel. Stricklin v. Devaughn*, 594 F.3d 1188, 1201 (10th Cir. 2010) ("That a class possibly or even likely includes persons unharmed by a defendant's conduct should not preclude certification.") (citing *Kohen*, 571 F.3d at 677). That court concluded that "[s]o long as [the] challenged practices are based on grounds that apply generally to the class, class certification under Rule 23(b)(2) is proper." *Id.* The Fifth Circuit, while requiring common proof of the "fact of damage" in *Bell Atlantic*, 339 F.3d at 302, held in a later case that "[c]lass certification is not precluded simply because a class may include persons who have not been injured by the defendant's conduct." *Mims v. Stewart Title Guar. Co.*, 590 F.3d 298, 308 (5th Cir. 2009).

The parties have not cited, and the Court is not aware of, Ninth Circuit authority squarely adopting either approach. One of the recent Ninth Circuit cases that reaffirmed the damages calculation rule, however, also cited as "compelling" a Sixth Circuit decision holding that a class action may be maintained "even when some [class members] might have no harms at all." *Jimenez*, 765 F.3d at 1168−69 (summarizing *In re Whirlpool Corp. Front-Loading Washer Prods.*

33

1    *Liability Litig.*, 722 F.3d 838, 853−55 (6th Cir. 2013)).

2         *Jimenez* involved a claim that the defendant insurance company "had an 'unofficial policy'

3    of denying overtime payments while requiring overtime work." *See id.* at 1164.  The Ninth

4    Circuit considered whether the district court properly certified a class of claims adjusters for

5    liability purposes based on the theory that statistical sampling could prove the existence of such a

6    policy, "while leaving the potentially difficult issue of individualized damage assessments for a

7    later day." *Id.*  The analysis in *Jimenez* focuses on whether the inability to *calculate* damages for

8    each class member based on common proof defeats certification—the opinion does not explicitly

9    consider whether some class members might have no damages at all.  *See id.* at 1164−69.  It seems

10   possible, however, that some members of that class might not have suffered damages; for

11   example, there may have been some claims adjusters who did not work overtime during the class

12   period.[21]  The fact that this possibility did not alter the Ninth Circuit's decision to affirm class

13   certification, viewed in conjunction with the positive citation of the Sixth Circuit's *Whirlpool*

14   decision noted above, tends to suggest that this circuit does not subscribe to a rule that plaintiffs

15   seeking class certification must show the fact of damage by common proof.

16        Some district court decisions from within the circuit have suggested that injury-in-fact

17   must be subject to classwide proof.  *See, e.g.*, *In re Live Concert Antitrust Litig.*, 247 F.R.D. 98,

18   136 (C.D. Cal. 2007) (adopting the rule from *Bell Atlantic*, acknowledging that "the Ninth Circuit

19   does not appear to have addressed this precise issue").  The Court is not, however, aware of any

20   such decisions that have reconciled that approach with both the rule that "damage calculations

21   alone cannot defeat certification," *Leyva*, 716 F.3d at 513, and the Ninth Circuit's affirmance of

22   classes where such classwide proof appears to have been lacking, *see Jimenez*, 765 F.3d at

23   1164−69.  Absent authority from the Ninth Circuit to the contrary, the Court concludes that the

24   *Leyva* rule applies to require class certification, at least to determine liability issues amenable to

25

26   ───────────
     [21] The class in *Jimenez* was defined as "[a]ll current and former California-based 'Claims

27   Adjustors,' or persons with similar titles and/or similar job duties, who work(ed) for Allstate
     Insurance Company within the State of California at any time during the period from September
     29, 2006 to final judgment," with no definitional requirement that class members worked

28   overtime.  *See Jimenez v. Allstate Ins. Co.*, No. LA CV10-08486 JAK, 2012 WL 1366052, at *1
     (C.D. Cal. Apr. 18, 2012) (district court order affirmed on appeal).

classwide adjudication, even where individual determinations of damages may ultimately show that some class members suffered none.[22]

### ii. The "Antitrust Injury" Element of a Clayton Act Claim Does Not Impose a Heightened Injury-in-Fact Requirement

As discussed above, the Court holds that in general, a plaintiff need not show that each purported class member was damaged in order to certify a class.  Defendants suggest, however, that there is something special about antitrust cases that could impose such a requirement.  *See* Cert. Opp'n at 34.  The Court is not persuaded that antitrust cases warrant different treatment from any other case with respect to this issue.

The Second Circuit addressed the nature of the "antitrust injury" requirement in *Cordes*, explaining that it "poses two distinct questions:"

> One is the familiar factual question whether the plaintiff has indeed suffered harm, or "injury-in-fact." The other is the legal question whether any such injury is "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful."

*Cordes*, 502 F.3d at 106 (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)).  In that case, the court held that potential individual issues as to injury-in-fact did not necessarily bar certification of a class.  *Id.* at 108.

The question of injury-in-fact is "familiar," *see id.*, because it is not unique to antitrust—it is an element of Article III standing common to any federal claim.[23]  *See Lopez v. Candaele*, 630 F.3d 775, 785 (9th Cir. 2010) ("In order to invoke the jurisdiction of the federal courts, a plaintiff must establish 'the irreducible constitutional minimum of standing,' consisting of three elements: *injury in fact*, causation, and a likelihood that a favorable decision will redress the plaintiff's

---

[22] Defendants make much of the fact that Dr. Singer, at his deposition, testified that "as [he] understand[s] it . . . you need to be able to demonstrate that . . . the conduct that elevated the prices ended up touching all of the buyers in the class."  Singer Dep. at 108:16−19; *see* Cert. Opp'n at 11 (citing this testimony); Mot. re Singer at 4 (same).  Dr. Singer is an economist, not an attorney, and regardless, his opinion on the standard for class certification is not legal authority.  To the extent that all class members must have been "touched" by Defendant's alleged conduct in order to certify an issue class, the Court finds that requirement satisfied by the fact that all class members received compensation from clinics or agencies that agreed to follow the challenged Guidelines.

[23] Whether a lack of Article III standing bars certification in this case is discussed in the following section.

United States District Court
Northern District of California

alleged injury." (emphasis added; citation omitted)).  The Court is aware of no reason that it should be treated differently in an antitrust context than in any other, and for the reasons discussed above holds that failure to show the injury-in-fact prong of antitrust injury by classwide proof does not alone defeat certification.[24]

The parties' briefs focus on injury-in-fact, and generally do not address the second issue, whether any injury is "of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick*, 429 U.S. at 489.  The type of injury alleged in this case appears to be a typical antitrust injury: an artificially depressed rate of compensation, caused by a purported conspiracy to limit compensation.  *See Knevelbaard Dairies*, 232 F.3d at 988 ("When horizontal price fixing causes buyers to pay more, or sellers to receive less, than the prices that would prevail in a market free of the unlawful trade restraint, antitrust injury occurs.").  Defendants have not suggested that, if the Guidelines are ultimately found to violate the Sherman Act, such an effect on compensation would qualify as an antitrust injury— either in their present Opposition or in their Motion to Dismiss, which would have been an appropriate way to raise the issue.  *See* Mot. to Dismiss (dkt. 57); *cf. Knevelbaard Dairies*, 232 F.3d at 988 (considering the nature of the alleged injury in the context of a motion to dismiss).  There is no indication that members of the class suffered injuries that were different in kind, rather than in amount.  Nor do Defendants argue that any other special consideration relevant to antitrust standing requires individual adjudication.  *See Knevelbaard Dairies*, 232 F.3d at 987 (listing other factors relevant to assessing antitrust standing).  The Court therefore concludes that no individual issues related to the *qualitative* aspects of antitrust standing (as opposed to mere injury-in-fact) predominate over the classwide question of whether the Guidelines violate the Sherman Act.

---

[24] The Fifth Circuit appears to have adopted a rule that classwide injury-in-fact must be demonstrated in antitrust cases, but does not require such a showing in other cases.  *Compare Bell Atl. Corp.*, 339 F.3d at 302 (reciting longstanding rule requiring classwide injury-in-fact for antitrust cases), *with Mims v. Stewart Title Guar. Co.*, 590 F.3d 298, 308 (holding in a non-antitrust case that "[c]lass certification is not precluded simply because a class may include persons who have not been injured by the defendant's conduct.").  The Court is not aware of any Fifth Circuit opinion explaining a rationale for drawing that distinction.

United States District Court
Northern District of California

### iii. Standing of Class Members

Defendants briefly argue, without significant analysis or citation to authority, that "neither of the named plaintiffs—nor any other purported class member—would have standing to bring such a claim individually." *See* Cert. Opp'n at 35 & n.43.  According to Defendants, standing is lacking because "Plaintiffs present no evidence that *anyone*, including the two named Plaintiffs, was injured."[25]  *Id.* at 35.  Defendants contend that without such a showing, "certifying an issue class . . . would be no different than permitting someone who has never donated eggs to seek an advisory opinion that the challenged guidelines violate the antitrust laws."  *Id.*

Whether the challenged conduct in fact injured the named plaintiffs and other class members is a merits question.  The Court finds the Seventh Circuit's discussion of this issue persuasive:

> If the case goes to trial, th[ese] plaintiff[s] may fail to prove injury. But when a plaintiff loses a case because he cannot prove injury the suit is not dismissed for lack of jurisdiction.  Jurisdiction established at the pleading stage by a claim of injury that is not successfully challenged at that stage is not lost when at trial the plaintiff fails to substantiate the allegation of injury; instead the suit is dismissed on the merits.

*Kohen*, 571 F.3d at 677 (citing *ACLU of Ill. v. City of St. Charles*, 794 F.2d 265, 269 (7th Cir. 1986)).  Defendants here did not challenge Plaintiffs' standing at the pleading stage.  *See generally* Mot. to Dismiss (dkt. 57) (arguing only, and ultimately unsuccessfully, that Plaintiffs' Complaint was required to plead the elements of a rule of reason claim and failed to adequately do so).  Even if they had, it is sufficient that Kamakahi and Levy received compensation for egg donation services from clinics bound by the challenged Guidelines, and that they plausibly allege that the Guidelines reduced their compensation.  Whether the Guidelines actually had the effect of reducing their compensation goes to the merits of their claim, and is neither a jurisdictional question nor a necessary inquiry for class certification.

As for the unnamed class members, Ninth Circuit precedent is somewhat complex regarding what sort of showing is required.  On one hand, the Ninth Circuit has held that "[n]o

---

[25] While this is not necessarily an issue of predominance, the Court discusses it here because it relates to Defendants other arguments regarding the issue of class members' injury-in-fact.

United States District Court
Northern District of California

1    class may be certified that contains members lacking Article III standing," which in turn "requires

2    that . . . the plaintiff suffered an injury in fact." *Mazza*, 666 F.3d at 594 (citations omitted). On

3    the other hand, the Ninth Circuit has also held en banc that "[i]n a class action, standing is

4    satisfied if at least one named plaintiff meets the requirements." *Bates v. United Parcel Serv.,*

5    *Inc.*, 511 F.3d 974, 985 (9th Cir. 2007) (en banc). The latter rule also appears in a number of other

6    Ninth Circuit panel decisions. *See, e.g.*, *Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1021 (9th

7    Cir. 2011) ("[O]ur law [regarding standing] keys on the representative party, not all of the class

8    members, and has done so for many years."); *Casey v. Lewis*, 4 F.3d 1516, 1519 ("At least one

9    *named* plaintiff must satisfy the actual injury component of standing in order to seek relief on

10   behalf of himself or the class.").

11           While these rules present some tension, the rule stated in *Mazza* can be reconciled with the

12   rule of *Bates*. A rule that plaintiffs seeking certification must show that each class member has

13   standing would plainly contradict *Bates*, but it is not clear that *Mazza* contemplates such a

14   requirement.[26] *See Mazza*, 666 F.3d at 594. In light of the Ninth Circuit's repeated statements

15   that the issue of standing does not focus on individual class members, the Court construes *Mazza*

16   as holding only that a class cannot be defined in a way that facially disregards the requirements of

17   Article III standing—for example, regardless of whether the named plaintiffs personally have

18   standing, the Court could not in this case certify a class defined only as "individuals who oppose

19   limiting egg donor compensation." *See Kohen*, 571 F.3d at 677 ("[S]tatements in some cases that

20   it must be reasonably clear at the outset that all class members were injured . . . focus on the class

21   definition; if the definition is so broad that it sweeps within it persons who could not have been

22   injured by the defendant's conduct, it is too broad.")

23           The class here, limited to women compensated for egg donor services by clinics and

24   agencies bound by the challenged Guidelines, raises no such issue. Further, the class members

25   appear to individually have standing for the same reasons as Kamakahi and Levy. If some class

26

27           [26] The *Mazza* panel found that standing was satisfied in that case, so it is not clear from that
28   opinion what circumstances would violate the rule that it set forth. *See Mazza*, 666 F.3d at
     595−56.

United States District Court
Northern District of California

1    members are ultimately unable to prove injury at trial or summary judgment, that is an issue of the

2    merits, not jurisdiction.  *See id*.  And for the reasons discussed above, because the Court declines

3    at this time to certify the class for damages purposes, any individual issues of proving damages or

4    injury-in-fact present no impediment to addressing other questions of liability on a class-wide

5    basis.  *See Jimenez*, 765 F.3d at 1168 (holding that the district court's order bifurcating liability

6    and damages "preserved both [the defendant's] due process right to present individualized

7    defenses to damages claims and the plaintiffs' ability to pursue class certification on liability

8    issues").

9        **4.    Defendants Fail to Establish a "Substitution Effect" Sufficient to Defeat
             Certification**

10

11           Defendants argue that class treatment would be unmanageable "because certain donors

12    benefited from the challenged Guidelines and those donors cannot be identified and excluded from

13    the plaintiff class."  Cert. Opp'n at 22.  Specifically, Defendants point to Dr. McCarthy's

14    conclusion that if the Guidelines in fact suppress compensation, then in a but-for world "one

15    would expect that the increased compensation would have attracted other donors with

16    characteristics that would have been preferable to recipients," and thus "some women in the

17    current class would not have been selected at all at the higher price."  McCarthy Report ¶ 54.

18    According to Dr. McCarthy, such donors "likely are better off with the Compensation Guideline,

19    and their interests are directly opposed to other members of the purported Plaintiff class."  *Id*.

20           Defendants cite one case in which this sort of "substitution effect" contributed to a court's

21    decision to deny certification of a Rule 23(b)(3) class.  In *In re NCAA Student-Athlete Name &*

22    *Likeness Licensing Litigation*, Judge Wilken held that a purported class of student-athletes seeking

23    compensation for the use of their names, images, and likenesses was not manageable under Rule

24    23(b)(3) because if student-athletes were able to receive such compensation while in college, some

25    talented athletes would have remained in college longer rather than leaving early for professional

26    careers, and less talented athletes that were among the purported class in the actual world would

27    not have been selected for Division I teams in the but-for world where compensation was

28    available.  *In re NCAA Student-Athlete Name & Likeness Licensing Litig.*, No. C 09-1967 CW,

1    2013 WL 5979327, at *9 (N.D. Cal. Nov. 8, 2013).  In that case, however, the defense expert

2    "examined the experiences of more than one hundred Division I basketball players who left

3    college early between 2008 and 2010 to seek out opportunities to play professionally," and

4    "concluded that many of these players 'plausibly would have stayed in college' if they had been

5    permitted to participate in a competitive group licensing market, because the financial costs of

6    staying in school would have been lower."  *Id.* at *8.

7        Unlike in *NCAA*, there is no evidence in this case that any women "with characteristics that

8    would have been preferable to recipients" actually declined to serve as donors due to inadequate

9    compensation levels.  *See* McCarthy Report ¶ 54.  Defendants offer only the theory that such

10   substitution might occur.  *Id.*

11       To allow the specter of substitution to defeat class certification, without evidence that

12   substitution would actually occur, would have wide ranging effects on the ability to resolve

13   antitrust claims as class actions.  In effect, this would bar not only most (if not all) monopsony

14   price-ceiling claims, but also many claims of traditional price fixing by sellers: in any case where

15   the product at issue is a component part, defendant sellers could argue that reduced costs of inputs

16   in a but-for world could disrupt the plaintiff buyers' industry and lead to displacement of existing

17   buyers by new competitors.  Such an approach runs counter to the Supreme Court's counsel that

18   "[p]redominance is a test readily met" in antitrust cases.  *See Amchem*, 521 U.S. at 625.  "[T]his

19   circuit does not favor denial of class certification on the basis of speculative conflicts," and the

20   Court declines to deny certification based on the mere possibility of a substitution effect without

21   evidence that it would actually occur.  *Cummings*, 316 F.3d at 896.[27]

22

23

24

25       [27] For the same reason, the Court rejects Defendants' suggestion that certification should be
     denied because abolishing the challenged compensation guidelines could "trigger[] a legislative
26   response to set compensation at a certain level or to prohibit compensation altogether."  *See* Cert.
     Opp'n at 20 (citing McCarthy Report ¶¶ 48−49).  Legislatures could establish price restrictions in
27   any industry; to hobble enforcement of the antitrust laws based on the mere possibility of
     protective legislation would effectively nullify them.  While the Court expresses no opinion as to
28   whether such legislation is desirable in this instance, Defendants cannot base their arguments on
     hypothetical laws that do not presently exist.

United States District Court
Northern District of California

### 5.   The Past-Donor Class Warrants Certification to Determine Whether the Guidelines Violate the Sherman Act

Rule 23(c)(4) permits the Court to certify a class "with respect to particular issues." Fed. R. Civ. P. 23(c)(4).  A recent case involving food labeling addressed a similar scenario as here: the proposed class satisfied the Rule 23(a) requirements and common issues generally predominated as the claims, but the plaintiffs "failed to submit any evidence establishing that damages [could] be feasibly and efficiently calculated." *Lilly v. Jamba Juice Co.*, No. 13-CV-02998-JST, 2014 WL 4652283, at \*10 (N.D. Cal. Sept. 18, 2014).  Judge Tigar held that although *Comcast* foreclosed certification of a class for the purpose of determining damages, that did bar certification of a Rule 23(c)(4) case to determine liability. *Id.* at \*11.  The same is true here.

For the reasons discussed above, the Court finds that common questions predominate as to whether the Guidelines violate the Sherman Act, but that Plaintiffs have not demonstrated that damages or injury-in-fact can be shown by common evidence.  Resolving the violation issue on a classwide basis "would significantly advance the resolution of the underlying case, thereby achieving judicial economy and efficiency." *See Valentino*, 97 F.3d 1229.  "In price-fixing cases, courts repeatedly have held that the existence of the conspiracy is the predominant issue and warrants certification even where significant individual issues are present." *In re Static Random Access Memory (SRAM) Antitrust Litig.*, 264 F.R.D. 603, 611 (N.D. Cal. 2009) (citation omitted). Adjudicating once for all class members whether the Guidelines violate the Sherman Act would be far more efficient for both the parties and the courts than requiring Defendants to litigate the same issue against however many individual donors (or smaller classes of donors) may decide to proceed with their own claims if certification is denied.  Class adjudication also avoids the possibility of inconsistent outcomes.  Defendants presented arguments in their Motion to Dismiss that Judge Armstrong held were issues of fact better suited for a later stage of litigation. *See* Order Denying Mot. to Dismiss at 14, 17.  If Defendants prevail on these arguments at a classwide summary judgment or trial on the violation issue, that approach could resolve the controversy in their favor in a single proceeding. *See Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 799 (7th Cir. 2013) (noting that where a defendant has a classwide defense, class adjudication is "a course it should welcome, as all class members who did not opt out of the class action would be bound by

41

1    the judgment").

2           Defendants suggest that the same effect could be reached by "an individual lawsuit, which

3    would then have a preclusive effect in subsequent suits." Cert. Opp'n at 34.  It is doubtful,

4    however, that an individual lawsuit would have such an effect.  The Supreme Court addressed this

5    issue in *Taylor v. Sturgell*, and reaffirmed the rule that individual litigation rarely has a preclusive

6    effect as to non-parties:

7                    A person who was not a party to a suit generally has not had a "full
                     and fair opportunity to litigate" the claims and issues settled in that
8                    suit.  The application of claim and issue preclusion to nonparties
                     thus runs up against the "deep-rooted historic tradition that everyone
9                    should have his own day in court."  Indicating the strength of that
                     tradition, we have often repeated the general rule that "one is not
10                   bound by a judgment *in personam* in a litigation in which he is not
                     designated as a party or to which he has not been made a party by
11                   service of process."

12   *Taylor v. Sturgell*, 553 U.S. 880, 892−93 (2008) (declining to recognize a new "virtual

13   representation" exception).  There are six recognized exceptions to this rule: (1) a subsequent

14   litigant who agreed to be bound by the prior litigation; (2) a pre-existing legal relationship

15   between prior and subsequent litigants; (3) "certain limited circumstances" where the subsequent

16   litigant was "adequately represented" in the prior litigation, such as a "properly conducted class

17   action" or a suit brought by a guardian; (4) a subsequent litigant who "assumed control" over the

18   prior litigation; (5) a subsequent litigant who is merely a proxy for an earlier litigant; and (6)

19   special statutory schemes, such as in bankruptcy and probate proceedings.  *Id.* at 893−95 (citations

20   omitted).  Defendants have not argued that any of these exceptions would render their proposed

21   "individual lawsuit" preclusive as to non-party donors.  *See* Cert. Opp'n at 34.  The Court

22   therefore finds that such a lawsuit is unlikely to prevent duplicative and potentially inconsistent

23   litigation of the violation issue, and does not present a viable alternative to class adjudication.

24          Defendants also argue that the Supreme Court's decision in *Comcast* bars certification of

25   even an issue class based on deficiencies in Dr. Singer's regression models.  Cert. Opp'n at 36.

26   This argument makes little sense: if damages will not be adjudicated on a class basis, then the

27   strengths or weaknesses of Plaintiffs' damages model has no bearing on class certification.  Any

28   difficulty that individual class members may have showing damages is purely an issue of the

United States District Court
Northern District of California

42

1    merits.  "[T]he rule of *Comcast* is largely irrelevant '[w]here determinations on liability and

2    damages have been bifurcated' in accordance with Rule 23(c)(4) and the district court has

3    'reserved all issues concerning damages for individual determination.'"  *In re Deepwater Horizon*,

4    739 F.3d 790, 817 (5th Cir. 2014) (quoting *In re Whirlpool*, 722 F.3d at 860 (6th Cir. 2013)); *see*

5    *also Lilly*, 2014 WL 4652283, at *11.  Defendants' contention otherwise is unpersuasive  and

6    contrary to the weight of authority.

7           Taking into account Ninth Circuit precedent requiring certification where the only

8    individual issues are damages, *see Leyva*, 716 F.3d at 513, the Court concludes that the case

9    should be certified to determine whether the Guidelines violate the Sherman Act, and that the issue

10   of damages (and the related issue of injury-in-fact) should be bifurcated.  It is conceivable that

11   "some of the difficulties in determining individual damages may fall away after [violation] is

12   determined."  *Lilly*, 2014 WL 4652283, at *11.  "If necessary, the Court can appoint a . . . special

13   master to preside over individual damages proceedings or alternatively, decertify the class after the

14   [violation] trial and instruct class members on how to prove damages individually."  *Mendoza v.*

15   *Casa de Cambio Delgado, Inc.*, No. 07CV2579(HB), 2008 WL 3399067, at *7 (S.D.N.Y. Aug.

16   12, 2008).  It may also be feasible in this case to resolve damages for subclasses specific to

17   individual clinics or agencies.  On the other hand, there may be no need to adjudicate damages—

18   the parties might settle, or Defendants might prevail at the violation phase and be entitled to

19   judgment.  Time will tell.  The question of how damages and injury-in-fact should be adjudicated

20   is reserved until the violation phase is complete.

21       **B.     Plaintiffs Lack Standing to Seek Injunctive Relief**

22          In addition to the class of past donors seeking damages, Plaintiffs seek to certify a

23   subclass of past donors who intend to donate again in the future, in order to seek an injunction

24   pursuant to Rule 23(b)(2) barring further use of the challenged compensation limitations.  "Unless

25   the named plaintiffs are themselves entitled to seek injunctive relief, they may not represent a class

26   seeking that relief."  *Hodgers-Durgin v. de la Vina*, 199 F.3d 1037, 1045 (9th Cir. 1999) (en

27   banc). In this case, the proposed subclass cannot be certified because neither named plaintiff has

28   standing to seek an injunction.

United States District Court
Northern District of California

1    "Standing must be shown with respect to each form of relief sought, whether it be

2    injunctive relief, damages or civil penalties." *Bates*, 511 F.3d at 985 (citing *Friends of the Earth,*

3    *Inc. v. Laidlaw Envt'l Servs. (TOC), Inc.,* 528 U.S. 167, 185, (2000)).  The fact that Levy and

4    Kamakahi have donated eggs in the past and may bring a claim for damages therefore does not in

5    itself grant them standing to seek injunctive relief.  *See City of Los Angeles v. Lyons*, 461 U.S. 95,

6    103 (stating that in a claim for injunctive relief, "past wrongs do not themselves amount to that

7    real and immediate threat of injury necessary to make out a case or controversy").  In order to

8    establish standing to seek an injunction, a plaintiff must face an injury that is "actual or imminent,

9    not conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)

10   (citations and internal quotation marks omitted).  In other words, "he or she must demonstrate a

11   'very significant possibility of future harm.'"  *SRAM*, 264 F.R.D. at 610 (quoting *San Diego Cnty.*

12   *Gun Rights Comm. v. Reno*, 98 F.3d 1121, 1126 (9th Cir. 1996)).[28]

13   Levy specifically stated at her deposition that she does not plan to donate eggs again.  Holt

14   Decl. Ex. 5 at 81:10−12.  Although she expressed a desire to be "part of the process of removing

15   payment cap[s]" for other future donors, *id.* at 79:23−25, her concern for such donors does not

16   grant her standing to represent their interests.  In the context of a claim for retrospective relief, the

17   Supreme Court has held that class representatives "must allege and show that they personally have

18   been injured, not that injury has been suffered by other, unidentified members of the class to

19   which they belong and which they purport to represent." *Warth v. Seldin*, 422 U.S. 490, 502

20   (1975)).  It follows that in this case, Levy cannot proceed with a claim for injunctive relief on the

21   basis that "other, unidentified members of the class" intend to donate again in the future.  *See id.*;

22   *see also Lujan*, 504 U.S. at 563 ("But the 'injury in fact' test requires more than an injury to a

23   cognizable interest.  It requires that the party seeking review be himself among the injured."

24

25   [28]   Plaintiffs' Reply erroneously characterizes this standard as a "heightened requirement"
     inapplicable to antitrust actions.  Cert. Reply at 25−26.  The case they cite held only that
26   "plaintiffs need not show an 'imminent threat of irreparable injury,'" and found standing despite
     the defendants' argument that they had ceased the alleged conspiracy and were unlikely to resume
27   it.  *See In re TFT-LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. 583, 596 (N.D. Cal. 2010).  It did
     not hold that antitrust actions are exempt from the normal standing requirements for equitable
28   relief, and other cases that Plaintiffs cite confirm that antitrust plaintiffs seeking an injunction
     must satisfy the usual test for standing.  *E.g.*, *SRAM*, 264 F.R.D. at 610 (quoted above).

United States District Court
Northern District of California

44

1    (citation omitted)).

2          Kamakahi's intentions regarding possible future donations are less clear.  At her

3    deposition, she stated that it was "not impossible" but also not "on the top of [her] mind":

4                Q: Okay.  Do you have any intent of donating eggs in the future?

5                A: It's not impossible.

6                Q: Well do you -- let me -- that's a fair answer.  But let me ask, do
                  you as we sit here today, do you have any intent to donate eggs?
7
                 MR. McLELLAN: Objection.[29]
8
                 THE WITNESS: At the moment now it's not at the forefront of my
9                mind.  But I still believe that if people want to have a family and
                 aren't able to do so on their own and other means such as adoption
10               are very lengthy and surrogacy is a lot about trust issues and things
                 like that, I would say it's possible.  But it's not something today I
11               would say it's on the top of my mind.

12   *Id.* Ex. 4 at 98:8−23.  Although Kamakahi has not, like Levy, ruled out the possibility of donating

13   eggs in the future, the mere possibility that she will do so does not establish an "imminent" injury

14   sufficient to confer standing.

15         In *Lujan*, the Supreme Court considered whether a plaintiff environmental organization

16   had standing to challenge inaction by the federal government that purportedly violated the

17   Endangered Species Act and threatened endangered species in foreign countries.  *See* 504 U.S. at

18   562−63.  The plaintiff organization presented evidence that two of its members had traveled to

19   affected countries to observe wildlife and "intend[ed] to do so again."  *Id.* at 563−64.  One

20   member did not specify when she intended to return, and the other explicitly stated that she did not

21   know when she would return, except that it would not be within the next year.[30]  *Id.*  The Supreme

22   Court found these general statements of intent insufficient to confer standing.  *Id.* at 564.  As the

23   Court put it, "[s]uch 'some day' intentions—without any description of concrete plans, or indeed

24   even any specification of *when* the some day will be—do not support a finding of the 'actual or

25   imminent' injury that our cases require."  *Id.* (citation omitted).

26   ────────────────

27   [29]  Plaintiffs' counsel has not pursued any objection to Kamakahi's deposition testimony.
     [30]  "I don't know [when].  There is a civil war going on right now.  I don't know.  Not next
28   year, I will say.  In the future."  *Lujan*, 504 U.S. at 564 (quoting deposition testimony) (alteration
     in original).

United States District Court
Northern District of California

1    Kamakahi's statement that "it's possible" she would donate again represents, at most, a

2    "some day intention."  *See id.*  If the individuals in *Lujan* could not establish standing by stating

3    their unequivocal intent to visit the countries at issue at an unspecified time in the future,

4    Kamakahi's deposition testimony—which leaves open not only *when*, but also *if* she will ever

5    donate eggs again—is also insufficient.  Accordingly, because neither named plaintiff has standing

6    to pursue injunctive relief, the Court cannot certify a subclass of future donors seeking such relief.

7    *See Bates*, 511 F.3d at 985; *Hodgers-Durgin*, 199 F.3d at 1045.

8    Even setting aside Article III standing, Kamakahi and Levy cannot represent the proposed

9    subclass of future donors due to the fundamental rule that "a class representative must be part of

10   the class."  *Wal-Mart*, 131 S. Ct. at 2550 (citation omitted).  The proposed subclass is defined as

11   women "who intend to sell Donor Services in the future," Cert. Mot. at 1, and by any reasonable

12   definition, neither Kamakahi nor Levy "intends" to do so.  Plaintiffs' non-membership in the

13   proposed subclass implicates several of the Rule 23(a) requirements: it could potentially be

14   construed as an issue of commonality, typicality, or adequacy.  In any case, it is a bar to

15   certification.  Plaintiffs' motion to certify a subclass for injunctive relief pursuant to Rule 23(b)(2)

16   is therefore DENIED.

## VI.    CONCLUSION

17

18   For the reasons stated above, Plaintiffs' *Daubert* motion is DENIED, Defendants' *Daubert*

19   motion is GRANTED, and Plaintiffs' motion for class certification is GRANTED IN PART.  The

20   class defined as follows is certified to determine whether the Guidelines' restriction of

21   "appropriate" compensation to $5,000, or $10,000 with justification, violates the Sherman Act,

22   with the method of adjudicating damages and injury-in-fact to be determined if Plaintiffs prevail in

23   showing a Sherman Act violation:

24
>        All women who sold human egg donor services for the purpose of
>        supplying human eggs to be used for assisted fertility and
25      reproductive purposes ("AR Eggs") within the United States and its
>        territories at any time during the time period from April 12, 2007 to
26      the present (the "Class Period") to or through:
>             a. any clinic that was, at the time of the donation, a member
27      of Society for Assisted Reproductive Technology ("SART") and
>        thereby agreed to follow the Maximum Price Rules (as that term is
28      defined in Plaintiffs' Consolidated Amended Complaint) set forth by

United States District Court
Northern District of California

SART and the American Society for Reproductive Medicine ("ASRM"); and/or

     b. any AR Egg Agency that was, at the time of the donation, agreeing to follow the Maximum Price Rules.

The Court appoints Plaintiffs Lindsay Kamakahi and Justine Levy as class representatives, and appoints interim co-lead counsel Finkelstein Thompson LLP and Cafferty Clobes Meriwether & Sprengel LLP as class counsel.  Plaintiffs' request to certify a subclass for injunctive relief is DENIED for lack of a class representative with standing.

The parties are instructed to meet and confer regarding class notice and a schedule for any further discovery, dispositive motions, and trial on the class phase of the case.  The parties shall submit a joint case management statement no later than February 20, 2015, and a case management conference will occur on February 27, 2015 at 2:00 pm in Courtroom G, located on the 15th floor of the San Francisco courthouse at 450 Golden Gate Avenue.

**IT IS SO ORDERED.**

Dated: February 3, 2015

JOSEPH C. SPERO
Chief Magistrate Judge

United States District Court
Northern District of California

47